# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

July 22, 2019

**BY ECF & Hand**

The Honorable Jed S. Rakoff
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

> **Re:**   **United States v. Cesar Altieri Sayoc**
> **18 Cr. 820 (JSR)**

Dear Judge Rakoff:

A series of traumatic events pushed Cesar Sayoc further and further into the margins of society. Kind-hearted and eager to please, Mr. Sayoc was born with cognitive limitations and severe learning disabilities that made it difficult for him to maintain relationships and succeed in school. As a boy, he was abandoned by his father and sexually abused by a teacher at his Catholic school. As a man, he became increasingly estranged from his family and dependent on drugs, particularly steroids. He lost everything in the Great Recession. By 2018, he was living alone in a decrepit and cramped van that had been his home for more than a decade. A typical day saw Mr. Sayoc waking up in his van, showering at the gym, and cooking crockpot meals while inside the DJ booth of a strip club before heading off to his second job delivering pizza. As he grew older and more isolated, excessive steroid use increased his feelings of anxiety and paranoia.

In this darkness, Mr. Sayoc found light in Donald J. Trump. His infatuation with the President began as something personal, not political. When he was most down, Mr. Sayoc relied on self-help books on tape to keep going. Donald Trump's books on success and business were his favorites. Mr. Sayoc was an ardent Trump fan and, when Trump announced he was running for President, Mr. Sayoc enthusiastically supported him. He began watching Fox News religiously at the gym, planning his morning workout to coincide with *Fox and Friends* and his evenings to dovetail with *Hannity*. Mr. Sayoc's family had historically been Democrats and this was Mr. Sayoc's first foray into politics. He firmly believed in Donald Trump the

person and wanted him to be President. To that end, Mr. Sayoc passionately championed the President on social media and at rallies and covered his van with stickers supporting President Trump and criticizing his political opponents. Through these actions, Mr. Sayoc found the sense of community that he had been missing for so many years.

Mr. Sayoc was enthusiastic and credulous. Because of his cognitive limitations and mental illness, he believed outlandish reports in the news and on social media, which increasingly made him unhinged. He became obsessed with "attacks" from those he perceived as Trump's enemies. He believed stories shared on Facebook that Trump supporters were being beaten in the streets. He came to believe that he was being personally targeted for supporting Trump: Mr. Sayoc thought that anti-Trump forces were trying to hurt him and they were to blame when his van was vandalized.

In the lead up to the 2018 mid-term elections, Mr. Sayoc became increasingly obsessive, paranoid, and angry. He conflated his personal situation with the perceived struggles of Trump supporters across the country, and even the President himself. His paranoia bled into delusion and Mr. Sayoc came to believe that prominent Democrats were actively working to hurt him, other Trump supporters, and the country as a whole. Mr. Sayoc became obsessed with this idea and found himself unable to think of anything else. He repeatedly lashed out at Democrats on social media in vitriolic terms. He then decided to act out—to send a message, to try to intimidate and scare Trump's perceived enemies. After months suffering from these delusional beliefs and while using large doses of steroids, his heightened paranoia and anger pushed him to commit these offenses. Mr. Sayoc constructed devices designed to look like pipe bombs and mailed them to prominent Democrats. In Mr. Sayoc's mind, he was sending a hoax device, and he had no true grasp of the severity of his crimes or the potential ramifications of his actions. Now, nearly a year later, he understands how deeply wrong his actions were, and he is truly sorry for sending these packages.

Mr. Sayoc is 57 years old. He has no prior history of actual violence against others. In real life, he is almost uniformly described as friendly and affable, in sharp contrast to the tone of his online posts. He has a steady work history. He was a devoted son and grandson before his recent personal disintegration created distance between himself and his family. Nonetheless, his family remains supportive of him and willing to assist in his rehabilitation. Both Dr. Harrison G. Pope, Jr., M.D., a leading psychiatrist and expert in the field of steroid use, and Dr. Michael First, M.D., an expert in clinical psychiatry, believe Mr. Sayoc's actions here were the product of

The Honorable Jed S. Rakoff                                    Page 3
United States v. Cesar Altieri Sayoc, 18 Cr 820 (JSR)

his long-untreated mental illness, compounded by excessive steroid use. See Exs. A & C.[1] The packages that Mr. Sayoc mailed were not functional as bombs and it was unlikely that they would have exploded. In fact, no one was physically injured by these offenses. All of these factors militate in favor of a below-Guidelines sentence: Mr. Sayoc does not deserve or need to die in prison.

For all of the reasons described below, we ask the Court to impose a total sentence of 121 months' imprisonment, to be followed by a substantial period of community supervision.

## Mr. Sayoc's Difficult Childhood

Cesar Sayoc was born in 1962 in Brooklyn, New York, and he is 57 years old. See Presentence Investigation Report ("PSR") ¶ 236. His father was one of nine brothers born and raised in the Philippines by a prominent military figure and plastic surgeon, Burgos Topacio Sayoc and his wife Severina, see Ex. E at 1 (Letter from Kimberly Sayoc). His mother Madeline is from an Italian-American family that settled in Brooklyn. PSR ¶ 238. Mr. Sayoc remembers his earliest years as his happiest because he was living with his maternal grandparents, whom he looked up to as his heroes and doted on him as the first-born child. Id. His sisters, Sabrina and Christina were born one year and five years after him. Id. ¶ 237. Life changed, however, when his father, also named Cesar Sayoc, moved his young family to Florida in the mid-1960s to start a wholesale import business. See Ex. F at 1 (Letter from Madeline Giardiello). Once in Florida, Mr. Sayoc's father was gone every six months, telling Madeline that he was setting up a warehouse in the Philippines. Mr. Sayoc felt "alone" without his grandparents, and he had difficulty adapting to his new surroundings. Id.; PSR ¶ 238.

Madeline did her best to care for the three children, working two full-time jobs to make ends meet while her husband was away. Ex. F. Then, her world was upended. One of Mr. Sayoc's uncles revealed to Madeline that her husband was not telling her

---

[1] Dr. Harrison G. Pope, Jr. is a Professor of Psychiatry at Harvard Medical School and the Director of the Biological Psychiatry Laboratory at McLean Hospital, Harvard's principal psychiatric teaching hospital. His curriculum vitae is attached as Exhibit B. Dr. Michael B. First is a Professor of Clinical Psychiatry at Columbia University and a Research Psychiatrist at the Biometrics Department at the New York State Psychiatric Institute. His curriculum vitae is attached as Exhibit D. Dr. Pope and Dr. First are available if the Court would like them to be present on the date of Mr. Sayoc's sentencing.

The Honorable Jed S. Rakoff                                                    Page 4
<u>United States v. Cesar Altieri Sayoc</u>, 18 Cr 820 (JSR)

the truth. <u>Id.</u> Instead of using the money she was sending him from her jobs on their business, he was squandering it to womanize and use drugs. <u>Id.</u> When Cesar Sayoc, Sr. returned from one long trip, Madeline divorced him. <u>Id.</u> Mr. Sayoc's father had severely damaged the family financially and emotionally. The family became destitute, Madeline fell into a depression, and Mr. Sayoc was utterly devastated that his father left his life. PSR ¶ 239. Before he left the home, Mr. Sayoc's father had told him that he would one day "come back to get him." Ex. F at 1; PSR ¶ 239. He never did. Cesar Sayoc, Sr. did not send birthday cards, pay alimony, or return to Mr. Sayoc's life. Ex. F at 1. It was a crushing blow for the young boy.



*A Young Mr. Sayoc at His Grandparent's Home*

With her husband gone, Madeline noticed several changes in Mr. Sayoc's personality. He isolated himself, "started acting out at home and wasn't himself." <u>Id.</u>; PSR ¶ 240. For years, Mr. Sayoc believed his father would return. He believed this so fervently that he refused to connect with Madeline's new husband, whom she married when Mr. Sayoc was a teenager. <u>Id.</u> ¶ 241. Mr. Sayoc could not bring himself to grow "attached again and be abandoned [again]." Ex. E; <u>see also</u> Letter from his sister Christina Villasana (attached as Exhibit G) ("He always was waiting for . . . his biological father to come back for him."); Letter from his old friend Dr. Eric Ciliberti (attached as Exhibit H) ("[H]is father's disappearance had . . . a dramatic effect on Mr. Sayoc's personality and behavior."). Even years later, his friend Dr. Eric Ciliberti felt that Mr. Sayoc "never recovered." <u>Id.</u>

The Honorable Jed S. Rakoff                                                 Page 5
<u>United States v. Cesar Altieri Sayoc</u>, 18 Cr 820 (JSR)

Mr. Sayoc's struggle with the loss of his father was exacerbated by his cognitive limitations. While in elementary school, Mr. Sayoc was diagnosed with "severe learning disabilities" and required a "highly individualized program" of education. PSR ¶ 263. Madeline recalls that he was also diagnosed with dyslexia and suffered from hyperactivity and stuttering. <u>Id.</u> ¶ 242. Mr. Sayoc bounced between various elementary schools without achieving academic success or making real social connections. <u>Id.</u> ¶ 242. Then, in 1973, his mother sent him to boarding school at St. Stanislaus School in Bay St. Louis, Mississippi, in the hopes of helping him get on track. Ex. F at 1–2; PSR ¶ 264.



*Mr. Sayoc's Sixth Grade Yearbook Photo from St. Stanislaus*

Almost immediately after arriving at the school, Mr. Sayoc called his mother daily "begging to come home." Ex. F at 1–2. One of the supervising priests in his dorm, Brother Raymond, was sexually abusing him. PSR ¶ 243; Ex. I (Nov. 27, 2013 settlement letter). At first, Brother Raymond would approach Mr. Sayoc's bunk while the other boys were sleeping and fondle his genitals. Later the abuse ramped up, with Brother Raymond raping Mr. Sayoc. PSR ¶ 243. Mr. Sayoc attempted to report the abuse, but he was not believed, and thereafter Brother Raymond attempted to isolate Mr. Sayoc to ensure he did not make further reports. <u>Id.</u> Finally, Mr. Sayoc escaped the school when he called his mother and threatened to kill himself—without telling her why—if she did not come to get him. <u>Id.</u> He returned home to South Florida even more distraught and broken than before.

Madeline writes that "Cesar was never the same after his time at the boarding school." Ex. F at 2. He stayed in his room and stopped participating in family events. <u>Id.</u>; PSR ¶ 244. He began suffering from extreme anxiety, paranoia, and nightmares. <u>Id.</u> ¶ 256. He felt worthless because of what happened to him. In 1976, he entered North Miami Beach High School with poor reading comprehension and math skills (scoring in the bottom 11% in the State of Florida in reading and bottom 26% in math), and he continued to struggle academically throughout the next four years. <u>See</u>

Ex. J at 2 (North Miami Beach Transcript). His youngest sister Christina writes in her letter to the Court that Mr. Sayoc's "intelligen[ce] level was quite low" and that he was a "fantasy land talker" with no friends. Ex. G at 1. She "felt sorry for him because of his IQ level" and the difficulties he had in school and then later at work. <u>Id.</u>

Academics were always difficult for Mr. Sayoc, and he believes he only graduated because his grandmother, who had moved to Florida, tutored him and helped him pass some of his classes. PSR ¶ 266. Although distant from the rest of his family, he was close to his grandparents. They reminded him of the happier times of his early childhood (before the abuse and his father leaving), and they were available to him in a way his mother could not be because of her busy work schedule.



*Mr. Sayoc with his Grandparents at his High School Graduation*

Beyond the comfort of his grandparents' home, where Mr. Sayoc began living in high school, soccer was the only area of his life that brought him joy. <u>Id.</u> ¶ 245. He played it all four years of school, and his coach Victor Cappillo remembers Mr. Sayoc as a "highly skilled and competitive High School soccer player" who demonstrated good sportsmanship. Ex. K (Letter from Victor Cappillo). His sister Christina writes that Mr. Sayoc loved the sport and he was "great at it." Ex. G at 1. Although Mr. Sayoc found an escape on the soccer field, he was still suffering and failing to cope with the abuse he experienced. Small for his age and with a stutter, Mr. Sayoc was bullied at school. Ex. A at 3. As a result, he turned to steroids to get stronger—as Dr. Pope notes, Mr. Sayoc hoped that he would not be victimized again if he were strong

enough to fight back. <u>Id.</u> Mr. Sayoc was unusually young to be using steroids, and he began a lifelong dependency on them. <u>Id.</u>; PSR ¶ 258.

Mr. Sayoc left home in 1980 to attend Brevard Junior College in Brevard, North Carolina. <u>Id.</u> ¶ 267. He chose that school because it invited him to join the soccer team with some of his high school teammates. There, he performed poorly in his classes but played well enough to draw the attention of the University of Central Florida ("UCF") soccer team. <u>Id.</u> ¶ 268; <u>see also</u> Ex. L (Transcript from Brevard Junior College). In 1982, UCF offered Mr. Sayoc an athletic scholarship and invited him to join the team. UCF was a much larger campus than Brevard, and the size and pressure of the school affected Mr. Sayoc greatly. After arriving on campus for summer workouts, Mr. Sayoc had a panic attack and returned to his grandparents' apartment in South Florida. He could not bring himself to return to the school and lost his chance at the scholarship. He never played for UCF.

Depressed and anxious about his missed opportunity, Mr. Sayoc made the best of living with his grandparents, whom he helped to care for. He worked for his stepfather's construction business and in the catering industry. <u>Id.</u> ¶ 277. He also took courses at the local community college. A year later, a friend from Brevard got in touch and gave him another chance to play soccer, this time at the University of North Carolina in Charlotte ("UNC"). <u>Id.</u> ¶ 269. He played on the 1983 team, but the rigors of university academics and the social pressures of college proved too much for him. He left UNC without a degree.



*Profile of Mr. Sayoc for the UNC 1983 Soccer Team*

The Honorable Jed S. Rakoff                                                      Page 8
United States v. Cesar Altieri Sayoc, 18 Cr 820 (JSR)

## Mr. Sayoc's Life on the Margins in Adulthood

Although college was difficult for Mr. Sayoc, it provided structure and purpose, and he loved being part of a soccer team. Unfortunately, his mental health and cognitive limitations made it impossible for him to continue in school, and in the mid-1980s he returned to South Florida and his grandparents. Over the next several years, his financial challenges, growing dependence on steroids, and family difficulties precipitated his descent into isolation. Mr. Sayoc worked for a construction company, a concession stand at sporting events, a newspaper delivery service, and various caterers at Jewish temples near his grandparents' condo. Id. ¶ 277. He also took his role as his grandparents' caretaker seriously. Madeline writes that Mr. Sayoc did "everything for them. He fed them, gave them things to drink, and wash[ed] them." Ex. F at 2. Other family members agree that Mr. Sayoc was always generous and caring with his loved ones, deferential and respectful of his elders, and that he went out of his way to help those he loved. See Ex. E at 1; Ex. G at 2; Letter from Patricia Bonire (attached as Exhibit M); Letter from Theresa Sharp (attached as Exhibit N); Letter from Yvette Ciliberti (attached as Exhibit O); Letter from Joanne Marrazzo (attached as Exhibit P).

In spite of his unending love for them, Mr. Sayoc's relationship with his grandparents became strained in the early 1990s when he began working at strip clubs. As a naturally shy person, Mr. Sayoc was drawn to these clubs because they brought him in contact with women and helped to get him out of his shell. His foray into the exotic dance profession also brought an increase in his steroid use. In order to work as a bouncer, and later as an entertainer, Mr. Sayoc believed he needed to bulk up. Dr. Pope writes that this profession is common among younger steroid users. Ex. A at 3. By taking more drugs, Mr. Sayoc became more volatile, and his family members noticed that something was amiss. See Ex. F at 2. In 1994, this came to a breaking point. Mr. Sayoc became "verbally abusive" and got into an argument with his grandfather and pushed him. Id. His grandparents then asked Mr. Sayoc to leave their home, which broke his heart. He was "lost without them, completely devastated." Id.

After this rift, Mr. Sayoc left South Florida to travel with an exotic dance revue. His group traveled to various strip clubs across the country to perform their routine, and Mr. Sayoc eventually helped with bookings and management. He also used steroids regularly and suffered from mood swings. See Ex. A at 3–4. Mr. Sayoc worked hard to maintain his physique, taking up to 170 vitamins a day and working out regularly. PSR ¶ 254. He and his troupe would crisscross the nation hoping to book several shows in each city before moving to the next one. He visited Minnesota,

Alabama, Oklahoma, and South Carolina, where he married another exotic dancer in 1998. Id. ¶ 246. This relationship lasted for three months and then he never saw his ex-wife again. He did not remarry or have children. In 2000, after nearly six years on the road, Mr. Sayoc saved up money to open a dry-cleaning business with a friend back home. He returned to his grandparents in South Florida, who were older and needed assistance more than ever before.

Mr. Sayoc reconnected with his grandparents and apologized for his past behavior. He reconciled with his grandfather before he passed away later that year and continued to help care for his grandmother until her death six years later. Unable to manage a complicated enterprise, Mr. Sayoc had trouble running his dry-cleaning business. In 2002, he was arrested after getting into a dispute with the Florida Power and Light Company, the utility that supplied his business's electricity. Id. ¶ 222. In a heated argument with a customer service representative, Mr. Sayoc threatened to blow up the company if they shut off the dry-cleaner's power. Id. He had no such plan, but the stress of running the business and the rising financial costs, coupled with his erratic emotional state, triggered this outburst. Id.; see also Ex. A at 3. In the wake of 9/11, the police took this threat seriously and arrested him, resulting in a period of probation which he successfully completed. Id. Unfortunately, this probationary period did not include the meaningful, long-term mental health treatment that Mr. Sayoc needed. It also did not deter his later return to heavy steroid use.

At the time of this incident, Mr. Sayoc's dry-cleaning business had already been struggling for some time, and it closed soon thereafter, taking much of the money Mr. Sayoc had saved in the preceding years with it. Mr. Sayoc believes that his partner stole his share of what remained, and they had a falling out over the business's failure. He returned to strip clubs and attempted to revive his male revue, with limited success. Starting in 2005, he worked at Tootsie's Cabaret, a large club in Miami. Id. ¶ 277. He stayed there until 2007, when he moved to Solid Gold Entertainment, a strip club in Pompano Beach. Id. ¶ 276. During this period, Mr. Sayoc purchased his first home with the help of his aunt, who is a real estate broker. See Ex. N. Unfortunately, he made this purchase at the height of the real estate bubble. He was foreclosed on during the Great Recession. He moved out of his new house less than two years later, and filed for bankruptcy in 2012, with a debt of $21,109. Id. ¶ 280. He has been homeless ever since. Id. ¶¶ 248–49. He packed up his possessions and moved them to his van and trailer, where he lived for the ten years preceding his arrest for this case in October 2018.

The Honorable Jed S. Rakoff                                    Page 10
<u>United States v. Cesar Altieri Sayoc</u>, 18 Cr 820 (JSR)



*Exterior of Mr. Sayoc's Van*



*Mr. Sayoc's Bed in His Van*

The Honorable Jed S. Rakoff                                          Page 11
United States v. Cesar Altieri Sayoc, 18 Cr 820 (JSR)



*Mr. Sayoc's Clothes in His Van*



*Exterior of Mr. Sayoc's Trailer*

The Honorable Jed S. Rakoff                                    Page 12
United States v. Cesar Altieri Sayoc, 18 Cr 820 (JSR)



*Interior of Mr. Sayoc's Trailer*

See also Ex. Q (collected photos of Mr. Sayoc's van).

       The Great Recession left no part of this country unscathed, but South Florida
faced particularly severe economic problems. As noted by the Brookings Institution,
South Florida suffered more during the Great Recession than nearly every other
major metropolitan area in the United States. See Douglas Hanks, Report: South
Florida Area among Hardest Hit by Recession, SUN SENTINEL (Jun. 10, 2010).[2]
During these trying times, Mr. Sayoc struggled to find work. After getting back into
strip clubs in 2011, he worked as a bouncer, DJ, and host while also delivering pizza
for Papa John's, Pizza Hut, Domino's, and other restaurants. See id. ¶¶ 274–76. He
occasionally launched and managed revues for a younger generation of dancers. See
Ex. R (Letter from Justin Humberger). Throughout these years, Mr. Sayoc showered
at his local gym and, aside from his van, never had a steady place to live. He would
often cook and eat his meals at work in a portable crockpot, causing his co-workers to
complain. Ex. S (FBI interview of Philip Costa). At times, he was desperate for money,
and he was arrested on several occasions for petty theft, which resulted in
probationary sentences. See PSR ¶¶ 225–28. Mr. Sayoc regrets these crimes, and he
recognizes that his stealing was wrong and unacceptable.

---

[2] Available at https://www.sun-sentinel.com/business/fl-xpm-2010-06-16-fl-south-
florida-economy-mh-20100616-story.htm (last visited Jul. 18, 2019).

The Honorable Jed S. Rakoff                                    Page 13
<u>United States v. Cesar Altieri Sayoc</u>, 18 Cr 820 (JSR)

<u>**Mr. Sayoc's Political Radicalization**</u>

Mr. Sayoc's lack of a stable place to live, growing estrangement from his family, and increasing social isolation fueled his mental health problems. His mother and sisters did not hear from him for long stretches, and at times he was actively suicidal. <u>See</u> Ex. F at 2; Ex. G at 2. His behavior and mood fluctuated radically. During this time, he told an attorney Don Jones about the sexual abuse he experienced as a child, and Mr. Jones helped Mr. Sayoc sue St. Stanislaus. PSR ¶ 243; Ex. I; Ex. T (Letter from Don Jones, Esq.). Mr. Sayoc received only a small amount of money from the civil settlement of his lawsuit, which compounded his frustration and sadness over what had happened to him. He had suffered abuse, relived agonizing memories by finally revealing them to others, and for what? He felt victimized again. The legal process also catalyzed his mounting sense of paranoia, grief, and anger.

When he was feeling most depressed, Mr. Sayoc sought spiritual advice and guidance outside the church. He found a spiritual advisor, Lisa Massa, who was working out of a strip mall in South Florida. He visited her regularly for advice, blessings, and prediction ceremonies. Mr. Sayoc spent money for her to light candles on his behalf and to read cigar smoke to tell his fortune. <u>See</u> Alexia Campbell, <u>Perfecting a Potion for Work, Wealth</u>, Sun Sentinel (Apr. 4, 2009).[3]

He also began listening to motivational books on tape. It was from these books that he discovered Donald Trump, whose audiobooks Mr. Sayoc credits with saving his life. As the attorney representing Mr. Sayoc in his civil suit wrote in November 2013, "Not unlike many victims of childhood sexual abuse, Cesar has had great difficulty talking about or confronting the abuse. . . . Cesar's coping approach has been to rely upon self-help tapes from Anthony Robbins and Donald Trump, which he listens to obsessively." Ex. I. Mr. Jones elaborates in his letter to this Court, "Mr. Sayoc found in Donald Trump a sort of surrogate father." Ex. T. Ron Lowy, another attorney who previously represented Mr. Sayoc, agreed with Mr. Jones. Mr. Lowy said, "He was looking for some type of parental figure and being a loner, being an outcast, being the kind of person Trump speaks to, I think he was attracted to Trump as a father figure." Jack Healy, <u>et al.</u>, <u>Cesar Sayoc, Mail Bombing Suspect, Found an Identity in Political Rage and Resentment</u>, N.Y. Times (Oct. 27, 2018).[4]

---

[3] Available at https://www.sun-sentinel.com/news/fl-xpm-2009-04-04-0904030190-story.html (last visited Jul. 18, 2019).

[4] Available at https://www.nytimes.com/2018/10/27/us/cesar-altieri-sayoc-bomber.html (last visited Jul. 18, 2019).

Mr. Sayoc viewed Donald Trump as everything he wanted to be: self-made, successful, and a "playboy." He listened to titles such as Think like a Billionaire: Everything You Need to Know about Success, Real Estate, and Life and Trump: How to Get Rich. The tapes helped Mr. Sayoc dream of a better life and motivated him to keep going. He pushed himself to work multiple jobs at once to get back on his feet. See PSR ¶¶ 271–75. He followed Donald Trump's career, watched his television shows, purchased Trump-branded products, and attended a Trump-sponsored career coaching event in South Florida. He was a Donald Trump super-fan.

Then, Donald Trump decided to run for President. This decision had a profound effect on Mr. Sayoc—he found a calling for the first time in years. Before 2015, Mr. Sayoc was not especially political. He did not vote, volunteer for candidates, go to political rallies, or follow most political issues. Old friends, acquaintances, and family members do not remember him ever speaking to them about political issues or politicians. See, e.g., Ex F at 2; Ex. G at 2. But when Donald Trump announced his candidacy, Mr. Sayoc came to view Trump as a personal champion—someone who had helped him through the most difficult periods of his life and who could do the same for other people across the country. He threw himself into the campaign by attending rallies, passing out flyers, and covering his van in pro-Trump stickers, including some that he had custom printed.

Mr. Sayoc's experiences campaigning for the President further fueled his Trump obsession. As Don Jones explains, "During [Cesar's] involvement with the campaign events, he became more and more attached to the belief that the cause of 'making America great again' through Trump's election would somehow also include making the unfair world he had previously been exposed to by weak men in his life better." Ex. T.

The Honorable Jed S. Rakoff                                                    Page 15
<u>United States v. Cesar Altieri Sayoc</u>, 18 Cr 820 (JSR)



*Photos on Mr. Sayoc's Van*

<u>See</u> <u>also</u> Ex. U (collected photos of Mr. Sayoc's political stickers).



*Mr. Sayoc at a Trump Rally*

Mr. Sayoc began watching Fox News religiously and following Trump supporters on social media. He became a vocal political participant on Facebook, something he had not done previously. He was not discerning of the pro-Trump information he received, and by the time of his arrest, he was "connected" to hundreds of right-wing Facebook groups. Many of these groups promoted various conspiracy theories and, more generally, the idea that Trump's critics were dangerous, unpatriotic, and evil. <u>See</u> Ex. V (excerpting social media posts that Mr. Sayoc received

The Honorable Jed S. Rakoff                                         Page 16
United States v. Cesar Altieri Sayoc, 18 Cr 820 (JSR)

from some of these groups). They deployed provocative language to depict Democrats as murderous, terroristic, and violent. See id. Fox News furthered these arguments. For example, just days before Mr. Sayoc mailed his packages, Sean Hannity said on his program that a large "number of Democratic leaders [were] encouraging mob violence against their political opponents." Hannity Transcript, FOX NEWS (Oct. 11, 2018).[5]

Mr. Sayoc was also an avid follower of @RealDonaldTrump, Donald Trump's Twitter page, where Trump posted prolifically about his political enemies, including all of the recipients of Mr. Sayoc's mailings. See Ex. W (selection of President Trump's tweets). In his tweets, Trump portrayed these individuals as dangerous, corrupt, and un-American. See id. For example, he suggested that anti-Trump protestors were paid agents of billionaire George Soros and that Hillary Clinton should be prosecuted for corruption and put in jail. Id.

Mr. Sayoc was particularly susceptible to believing these dubious stories of Democratic malfeasance. The combination of his cognitive deficiencies, steroid-induced delusional thinking, political naiveté, and his isolation resulted in Mr. Sayoc being unable to critically evaluate these claims. He lived alone in a claustrophobic van, did not have close relationships with his remaining family members, and did not have friends or loved ones to help puncture his alternative reality. He truly believed wild conspiracy theories he read on the internet, many of which vilified Democrats and spread rumors that Trump supporters were in danger because of them. He heard it from the President of the United States, a man with whom he felt he had a deep personal connection. He read it on almost every website he visited. He saw it on Fox News, which he watched at the start and end of his day. And it was reinforced to him on social media.

In this bubble, Mr. Sayoc personalized the misinformation to which he was exposed. He began to consider Democrats as not just dangerous in theory, but imminently and seriously dangerous to his personal safety. President Trump did nothing to dissuade this message. In the lead up to the 2018 mid-term elections, President Trump warned his supporters that they were in danger from Democrats, and at times condoned violence against his critics and "enemies." See Meghan Keneally, A Look Back at Trump Comments Perceived by some as Encouraging

---

[5] Available at https://www.foxnews.com/transcript/candace-owens-john-james-on-kanyes-oval-office-meeting (last visited Jul. 18, 2019).

<u>Violence</u>, ABC NEWS (Oct. 19, 2018).[6] At a rally in October 2018, around the time Mr. Sayoc sent the packages, President Trump announced that Democrats "destroy people. They want to destroy people. These are really evil people." <u>See</u> Maggie Haberman & Peter Baker, <u>Trump Taunts Christine Blasey Ford at Rally</u>, N.Y. TIMES (Oct. 2, 2018).[7] In his statements, Trump specifically blamed many of the individuals whom Mr. Sayoc ultimately targeted with his packages. For example, on June 25, 2018, President Trump tweeted:



<u>See</u> <u>also</u> Ex. W.

A rational observer may have brushed off Trump's tweets as hyperbole, but Mr. Sayoc took them to heart. He was credulous, paranoid, and using large doses of steroids and supplements. Mr. Sayoc first began using steroids in high school and used them chronically throughout his adult life. In addition to his own self-reports, numerous people who know him attest to Mr. Sayoc's steroid use. <u>See</u> Ex. F at 2; <u>see also</u> Lia Eustachewich, <u>Suspected Mail Bomber was a Stripper with a 'Steroid</u>

---

[6]   Available   at   https://abcnews.go.com/Politics/back-trump-comments-perceived-encouraging-violence/story?id=48415766 (last visited Jul. 22, 2019).

[7]   Available   at   https://www.nytimes.com/2018/10/02/us/politics/trump-me-too.html (last visited Jul. 19, 2019).

The Honorable Jed S. Rakoff                                    Page 18
<u>United States v. Cesar Altieri Sayoc</u>, 18 Cr 820 (JSR)


<u>Problem'</u>, N.Y. Post (Oct. 26, 2018).[8] This use is also clear in pictures of him over the years. <u>See id.</u>

   Mr. Sayoc's steroid usage ramped up considerably in 2018. He began working at Ultra, a strip club in West Palm Beach, and he wanted to bulk up for that job. PSR ¶ 272. The FBI's investigation of Mr. Sayoc verified his steroid use: agents spoke to one of his recent steroid dealers, who turned over text exchanges he had with Mr. Sayoc about the drugs. Mr. Sayoc's van and trailer were filled with needles, old steroids, supplements, and receipts for some of the other substances Mr. Sayoc had purchased for himself. <u>See</u> Ex. X (documenting Mr. Sayoc's steroid usage). As Mr. Sayoc admitted to Dr. Pope, he was using far more steroids than usual in 2018 because at his new job "size and image [was] everything." Ex. A at 4.



*Needles Found in Mr. Sayoc's Van at the Time of His Arrest*


---

[8] Available at nypost.com/2018/10/26/suspected-mail-bomber-was-a-stripper-with-a-steroid-problem/ (last visited Jul. 22, 2019)).

The Honorable Jed S. Rakoff                                    Page 19
<u>United States v. Cesar Altieri Sayoc</u>, 18 Cr 820 (JSR)



*Supplements Found in Mr. Sayoc's Van at the Time of his Arrest*

The world of conspiracy and danger blurred with Mr. Sayoc's real life, and he believed liberals, under the direction of Democratic leaders, sought to harm and kill him because of his support for Donald Trump. Mr. Sayoc's political obsessions became increasingly debilitating, to the point that he could think of little else. <u>Id.</u> at 5. For example, he became convinced, that because of the stickers he had supporting President Trump, liberals had broken the window of his van, slashed its tires, and tried to kill him by cutting its fuel wires. <u>Id.</u> at 4. Mr. Sayoc reported the damage to the police, the repairs were costly, and Mr. Sayoc no longer felt safe sleeping in his van at night. <u>See</u> Ex. Y (police report and receipts documenting van repair).

*Excerpt from Mr. Sayoc's Letter to the Court, ECF No. 26 at 17*

The Honorable Jed S. Rakoff                                          Page 20
<u>United States v. Cesar Altieri Sayoc</u>, 18 Cr 820 (JSR)

In the same vein, after reading that a Papa John's deliveryman was shot and killed in New York, Mr. Sayoc became convinced that Papa John's deliverymen like him were being executed all across the country as retribution for certain racist remarks made by the founder of Papa John's. <u>See</u> Georgett Roberts & Gabrielle Fonrouge, <u>Pizza Deliveryman Shot Dead Outside Papa John's</u>, N.Y. POST (Aug. 30, 2018);[9] Tiffany Hsu, <u>Racial Slur Leads to Papa John's Founder Quitting Chairman Post</u>, N.Y. TIMES (Jul. 11, 2018).[10]   Then, after hearing about Antifa, a left-wing militant group that had clashed with Trump supporters, Mr. Sayoc worried that they were personally targeting him.

Mr. Sayoc's obsession and fear deepened as the mid-term elections drew closer. As part of the candle-burning ceremonies with his spiritual advisor, Mr. Sayoc came to believe that he could influence the election through his writing and Ms. Massa's rituals. He drafted rambling lists of Democrats that he wanted the candles to affect negatively, and designed more stickers for his van alleging that Democrats murdered Trump supporters and supported ISIS. <u>See</u> Ex. Z (collected photos of Mr. Sayoc's writing found in his van).



*Example of Mr. Sayoc's Drawing of a Custom Window Decal*

---

[9]  Available at https://nypost.com/2018/08/30/pizza-deliveryman-shot-dead-outside-papa-johns (last visited Jul. 17, 2019).

[10]  Available at https://www.nytimes.com/2018/07/11/business/papa-johns-racial-slur.html (last visited Jul. 22, 2019).

The Honorable Jed S. Rakoff                                      Page 21
United States v. Cesar Altieri Sayoc, 18 Cr 820 (JSR)

A few weeks before the November 2018 mid-term elections, Mr. Sayoc's obsession with the Democratic leadership boiled over and he made the biggest mistake of his life. As the President ramped up his rhetoric predicting anarchy if the Democrats won the election, and Mr. Sayoc persevered on the belief that an organized Democratic effort was to blame for the abuse he suffered and the damage to his van, he committed these offenses.

### Mr. Sayoc Mailed Devices Designed to Look Like Bombs

In the fall of 2018, the "slow boil" of Mr. Sayoc's political obsessions and delusional beliefs manifested in his construction and sending of 16 packages to prominent Democratic figures. These packages included devices designed to look like pipe bombs. As Mr. Sayoc explained to Dr. Pope, his obsessions became "increasingly severe, to the point that he could think of little else" and he "resolved that he needed to do something to scare or deter the prominent figures in the media and on the left." Ex. A at 5. Using the internet, Mr. Sayoc researched what mail bombs looked like and how they were made. He constructed crude devices that were roughly 6 inches long, slightly larger than a pen.



*One of the Devices Next to a Pen for Scale*

In connection with this case, the defense retained an expert in explosives and forensic chemistry, Dale Mann of Engineering Systems Inc. ("ESi"). A copy of Mr. Mann's report and curriculum vitae are attached as Exhibits AA ("ESi Report") and BB. These documents have also been previously provided to the Court. ESi explains

that Mr. Sayoc's devices were made from PVC pipe, with powder inside, and a small digital clock taped to the front of the pipe. Ex. AA at 3. Mr. Sayoc took wires from the clock and ran them into the pipe. But this was for show: the wires were not actually connected to anything that could ignite and the digital clock was not set—it still had the factory sticker over its face simulating a time display. <u>Id.</u> at 5. In a manila mailing envelope with each device, Mr. Sayoc included a small envelope of powder (simulating anthrax or some similar toxin) and a photograph of the recipient with a red "X" over the picture. <u>Id.</u> at 3; PSR ¶ 73, 75. He deposited these packages in the mail.

Mr. Sayoc was delusional at this time, suffering from muddled and disjointed thought processes. His goal was to scare, intimidate, and emotionally injure the targets of these packages. But he did not actually want to kill or physically injure anyone, and he did not think that the devices were capable of exploding, although he has acknowledged the risk that the powder inside the devices could somehow have exploded or caught fire and thereby caused injury or property damage. <u>See</u> Plea Tr. at 8–10, Apr. 15, 2019, ECF No. 24; Plea Tr. 20–21, Mar. 21, 2019, ECF No. 20. Mr. Sayoc targeted people he believed to be the enemies of President Trump and who he perceived as presenting a danger to the country. Ironically, he somehow thought that he was helping the country or defending it (and himself) from people who were working to do harm. Mr. Sayoc loves the United States, its institutions, and its people—he would never want to harm this country. As Dr. Pope summarizes, because of distorted and delusional thinking, Mr. Sayoc did not appear to comprehend the seriousness of his conduct, the consequences he would face, or the objective, external appearance of his actions. Ex. A at 5. It was not until he began seeing news reports related to this case that, in shock, he realized for the first time the severity of what he had done. <u>Id.</u>

Mr. Sayoc sent the packages through the mail in October 2018, and he was arrested soon after on October 26, 2018. He was charged by complaint on the same day and indicted on November 9, 2018. On March 21, 2019, Mr. Sayoc pled guilty to a superseding information pursuant to a plea agreement, and he will be sentenced on August 5, 2019.

## Mr. Sayoc's Post-Arrest Conduct

In the nine months since Mr. Sayoc's arrest, he has tried to adapt to life at the Metropolitan Correctional Center ("MCC") while grappling with the serious nature of his crime and the ramifications of his actions. Mr. Sayoc is truly sorry for what he did. Madeline writes, "He has shown me such remorse over the phone. . . . He cries

and tells me how sorry he is." Ex. F at 2. He is sorry for the fear he caused across the country and has drafted personalized letters of apology to each of the victims in this case. He knows what he did was wrong, and he wishes more than anything he could go back in time and act differently.

Mr. Sayoc has sought psychological treatment for the first time in his adult life. The first several months in the MCC were very challenging and after a suicide attempt, he was kept on suicide watch. <u>See</u> Ex. CC (MCC medical records). He is now taking anti-anxiety medication, which is helping him to stabilize after a lifetime of anxiety, paranoia, and trauma. <u>Id.</u> Mr. Sayoc has not given up on life. More than anything, he wishes for the chance to one day leave federal prison and show that he has changed and can live within the bounds of the law.

Instead of watching political television, Mr. Sayoc has taken every course available to him at the MCC, and he has excelled in his 15-hour Reflections course and other programs designed to help him take responsibility for his actions. <u>See</u> Ex. DD (Mr. Sayoc's MCC transcript); Ex. EE (collected certificates earned by Mr. Sayoc). Mr. Sayoc has also signed up to be an inmate companion to help others avoid the temptation of suicide. The inmate companion program requires training and rigorous dedication, staying up through the night with inmates on suicide watch to ensure they are safe. When he is designated to his next BOP facility, Mr. Sayoc hopes to continue his education and to enroll in additional vocational training. If he is released, he plans to continue working in South Florida while volunteering to help others with mental illness.

## <u>The Court Should Sentence Mr. Sayoc to 121 Months in Prison</u>

Mr. Sayoc pled guilty to 65 counts: (i) 16 counts of using a weapon of mass destruction, in violation of 18 U.S.C. § 2332(a); (ii) 16 counts of interstate transportation of an explosive, in violation of 18 U.S.C. § 844(d); (iii) 16 counts of threatening interstate communications, in violation of 18 U.S.C. § 875(c); (iv) 16 counts of the illegal mailing of explosives, in violation of 18 U.S.C. § 1716(j)(2); and (v) one count of using an explosive to commit a felony, in violation of 18 U.S.C. § 844(h).

Section 844(h) carries a mandatory-minimum sentence of 10 years in prison, which may not run concurrently to any other prison term. The remaining counts have no mandatory minimum sentence and the Court may sentence Mr. Sayoc to any additional consecutive time it deems necessary to impose an overall prison term that

The Honorable Jed S. Rakoff                                       Page 24
United States v. Cesar Altieri Sayoc, 18 Cr 820 (JSR)

meets the ends of sentencing. See Dean v. United States, 137 S. Ct. 1170, 1176–77 (2017); United States v. Ballard, 599 F. Supp. 2d 539, 542 (S.D.N.Y. 2009).

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." United States v. Cavera, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). The Court must consider each of the factors set forth in 18 U.S.C. § 3553(a) to make an individualized sentencing determination. See, e.g., Gall v. United States, 552 U.S. 38, 59 (2007). A sentencing court begins by calculating the advisory Sentencing Guidelines. However, "[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable." Nelson v. United States, 555 U.S. 350, 352 (2009).

Rather than simply deferring to the Guidelines, a sentencing court must make an individualized decision based on all of the factors set forth in § 3553(a). This includes considering the history and characteristics of the offender; the nature and circumstances of the offense; sentences for similarly-situated defendants; and the need to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deterrence, protection of the public, and rehabilitation of the offender. 18 U.S.C. § 3553(a). The Court must impose a sentence that is "sufficient, but not greater than necessary." Id. Overall, as this Court has recognized, sentencing "requires a court to consider, with great care and sensitivity, a large complex of facts and factors. . . . [T]his complicated analysis, and moral responsibility" cannot be "reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables." United States v. Gupta, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012).

The United States Probation Office calculates an advisory Guidelines range of life plus 120 months, based on an offense level of 43 and a criminal history category of VI. PSR at 50. This comports with the parties' plea agreement. The defense has no legal objections to this calculation but urges the Court to impose a below-Guidelines sentence of 121 months' imprisonment total based on all of the statutory factors.

A total sentence of 121 months in prison, followed by a substantial period of community supervision (with mental health counseling and drug treatment), is the most just and appropriate sentence considering: (i) Mr. Sayoc's personal characteristics and history, including his record of trauma, his mental health problems, his age, and his capacity for change, as demonstrated by his conduct since his arrest and (ii) the nature and circumstances of his offenses, and comparing him to similarly-situated defendants.

I.     **Mr. Sayoc's history and characteristics call for a variance to 121 months' imprisonment.**

A. **Mr. Sayoc's traumatic childhood coupled with his cognitive difficulties are reasons to impose a substantially below-Guidelines sentence.**

The dual traumas of losing his father and being sexually abused at a boarding school scarred Mr. Sayoc's childhood and shaped his adulthood. These traumas were further exacerbated by Mr. Sayoc's cognitive limitations and severe learning disabilities, which made it difficult for him to express his emotions and succeed in school and the work force. These challenges were apparent to his school, PSR ¶ 263, his family, see, e.g., Ex. F, and his peers, see Ex. H. As he grew older, Mr. Sayoc used steroids in the hope of better protecting himself from further victimization, but they also caused him to suffer psychologically. See Ex. A at 3; Ex. C at 10. He isolated himself further and further into the margins of society, especially after his grandparents passed away, making him more susceptible to powerfully negative influences. Without the breakdown of his family support and the sexual abuse he experienced, he may not have descended into the depths of anxiety, paranoia, and anger that in part led him to commit these crimes. These factors should be considered in crafting a just sentence.

B. **Mr. Sayoc's mental health at the time of the offense is a reason to impose a substantially below-Guidelines sentence.**

Given Mr. Sayoc's limitations, his use of steroids had far-reaching negative effects on his mental health. Dr. Harrison G. Pope, Jr. is a leading expert on the psychiatric effects of steroids, with more than 3,500 scientific citations in the field. Ex. A. at 2; see also Ex. B. In his report, Dr. Pope summarizes research, including his own studies, which have "abundantly documented that steroids can cause some men to develop severe psychological effects" including "irritability, aggressiveness, violence, and criminal behavior." Ex. A at 5. Steroids cause users to "develop profound personality and mood changes, and to display aggressiveness, violence, or criminal behavior that is entirely different from their normal personalities." Id. at 7.

Moreover, rather than have a moment of "roid rage" as is the lay understanding, "it is more common that steroid users will develop chronic obsessional preoccupations that they cannot get out of their heads—a 'slow boil' rather than a sudden loss of control." Id.; see also id. at 8–9 (noting that steroids cause some men

to "develop prolonged, premeditated acts of aggression"). Further, many "users who get these reactions are unable to tell that they are behaving abnormally until it is too late," a phenomenon called "anosognosia"—they cannot perceive that their "actions are grossly abnormal" and, afterwards, "it is common that [the user] will look back and be perplexed at how he could possibly have displayed such behavior." Id. at 9.

Mr. Sayoc experienced this "slow boil" leading up to the 2018 mid-term elections because he was using an extremely large dose of steroids—five different steroids simultaneously—to bulk up for his new job at the Ultra strip club. Id. at 4. On this dose, Mr. Sayoc felt "invincible," became "pathologically obsessed" with perceived actions by certain Democratic leaders, and was "unable to get the obsessive thoughts out of his head, leading ultimately to his actions of constructing and mailing" these devices. Id. at 9. Like many steroid users who suffer these effects, Mr. Sayoc was also unable to "recognize what his behavior looked like when viewed objectively from the outside." Id. at 5. In short, Dr. Pope believes that the steroids Mr. Sayoc was taking caused severe psychological effects that led him to commit these offenses. Id. at 9–10. Furthermore, Dr. Pope opines that "if Mr. Sayoc had not been using steroids in 2018, the alleged crimes would not have occurred." Id. at 10.

Dr. Michael B. First of Columbia University came to similar conclusions. Dr. First found that Mr. Sayoc was suffering from a personality disorder and the effects of a "steroid-induced mental disorder with manic-like features" at the time he committed these offenses, and that the "psychiatric changes caused by his steroid use, working in concert with his maladaptive personality traits like emotional lability and suspiciousness caused him to act out is self-destructive way." Ex. C at 9, 10. Dr. First agrees that Mr. Sayoc's long devotion to steroids is inextricably linked to the abuse he suffered as a child, as Mr. Sayoc believed that the abuse occurred in part because he was weak and vulnerable. Id. Moreover, the abuse and the loss of his father led Mr. Sayoc to suffer from chronic low self-esteem and feeling victimized and betrayed throughout his life. Id. at 11. Dr. First opines that Mr. Sayoc's psychological issues caused "significant impairment in occupational, social, or other important areas of functioning," including feeling intense and volatile emotions, submissiveness to others, withdrawing from his family and social activity, suspiciousness, and unusual beliefs and experiences. Id. at 9–10. Dr. First finds that these feelings led to Mr. Sayoc having many beliefs and ideas that bordered on delusion, in that while Mr. Sayoc now acknowledges that certain delusional beliefs may not be true (for example, that his spiritual advisor could control outcomes by lighting candles), Mr. Sayoc believed them at the time of the offense.

The accounts of Mr. Sayoc's family, acquaintances, and co-workers further support Dr. Pope's and Dr. First's expert opinions. The people in Mr. Sayoc's life expressed shock that Mr. Sayoc committed these offenses, given his usual caring and sweet disposition. For example, Mr. Sayoc's sister Christina describes him as "sweet, gentle and kind, a lost teddy bear." Ex. G at 2. His cousin Kimberly Sayoc relates that he was always "very kind and respectful," "upbeat and positive," and acted in a caring and devoted manner towards his extended family members, including his aunt, uncle, and grandparents. Ex. E at 1. Justin Humberger, Mr. Sayoc's friend and former business partner in a male revue, describes him as someone who was "selfless" and always professional at work. Ex. R. A former co-worker named Joseph Diekmann said that he "would have never thought [My. Sayoc] would be capable of what he did" and that in 20 years of knowing Mr. Sayoc, he "never [saw] any violent outbursts or threats." Ex. FF (FBI interview of Joseph Diekmann). Joe Saccal recounts that Mr. Sayoc was "always very professional, polite, calm and courteous" at work. Ex. GG (FBI interview of Joe Saccal). Stacey Saccal said "He was an asset to the club" and she could not believe he committed these crimes, while Scott Migs, who also worked with Mr. Sayoc, characterized him as "an extremely nice guy" who had helped him in the past by working his shift when Mr. Migs needed to take care of his children. <u>See Cesar Sayoc: Alleged Pipe Bomb Mailer Worked as DJ at West Palm Strip Club Ultra Thursday</u>, ABC NEWS (Oct. 26, 2018).[11] Carey Jannelli, a fellow floor man at Ultra, also described Mr. Sayoc as "friendly and jovial." Ex. HH (FBI interview of Carey Jannelli).

This dichotomy is entirely consistent with Dr. Pope's findings that taking a large dose of steroids may cause a person to display behavior that is "entirely different from their normal personalities." Ex. A at 7. In his letters to the Court, Mr. Sayoc has expressed remorse for his actions and a recognition that he "was not in the right state of mind" when he committed the offense. ECF No. 26 at 1, 5.

Since his arrest, Mr. Sayoc has worked to improve himself and to demonstrate his capacity for rehabilitation. He has reconnected with his family, learned about the negative mental and physical effects of steroid use, and actively sought psychological counseling. He recognizes that steroids had a profoundly negative effect on his mind. He has also begun to recognize the problems and deficiencies in his thinking and is anxious to learn how to better cope with his paranoia and anxiety, such that he can

---

[11] Available at https://www.abcactionnews.com/news/national/cesar-sayoc-alleged-pipe-bomb-mailer-worked-as-dj-at-west-palm-strip-club-ultra-thursday (last visited Jul. 19, 2019).

problem solve and have more meaningful social relationships. This demonstrates that while Mr. Sayoc is still mentally ill and struggling, he is redeemable and able to change. It also shows that he is individually deterred and, to the extent it is possible, the public will be generally deterred by any sentence the Court chooses. See 18 U.S.C. § 3553(a)(2)(B).[12] Given these factors, a variance is appropriate to account for his mental health problems, as well as the influence steroids had on his decision to commit this crime.

### C. The Court should consider Mr. Sayoc's age as a reason to impose a substantially below-Guidelines sentence.

Mr. Sayoc is 57 years old. The current life expectancy for men is around 76.5 years. See Kenneth D. Kochanek et al., Ctr. for Disease Control, U.S. Life Tables, 2014, Nat'l Vital Statistics Rep., Jun. 30, 2016, at 8.[13] Thus, even if the Court does not explicitly sentence Mr. Sayoc to life, a sentence of 20 years or more will likely mean that he will never again step outside of prison. Also, while no one can know with any certainty how long Mr. Sayoc will live, "we do know that, as a statistical matter, the life expectancy of an incarcerated person drops significantly for each year of incarceration," and that is before accounting for Mr. Sayoc's socioeconomic status, mental health, and steroid use. United States v. Jenkins, 854 F.3d 181, 186 n.2 (2d Cir. 2017) (citing Evelyn J. Patterson, The Dose–Response of Time Served in Prison on Mortality: New York State, 1989–2003, 103 Am. J. of Pub. Health 523, 526 (2013)); see also Office of the Inspector General, U.S. Dep't of Justice, The Impact of an Aging Inmate Population on the Federal Bureau of Prisons, 1–2 (May 2015) ("OIG Aging Inmate Report") ("Several studies . . . state that an inmate's physiological age

---

[12] As to general deterrence, evidence-based studies strongly support the conclusion that it is the certainty of being prosecuted rather than the severity of punishment that deters crime. See Nat'l Inst. of Justice, Five Things about Deterrence, Jun. 6, 2016 (available at nij.gov/five-things/pages/deterrence.aspx (last visited Jul. 22, 2019)). The fact that Mr. Sayoc was caught so quickly by the FBI and then swiftly prosecuted, jailed, and punished will provide sufficient general deterrence. In addition, a sentence of at least a decade in prison is a significant and meaningful prison term that should have sufficient deterrent effect.

[13] Available at http://www.cdc.gov/nchs/data/nvsr/nvsr65/nvsr65_04.pdf (last visited Jul. 18, 2019).

The Honorable Jed S. Rakoff                                                    Page 29
United States v. Cesar Altieri Sayoc, 18 Cr 820 (JSR)

averages 10–15 years older than his or her chronological age.").[14] Mr. Sayoc's crimes are serious. But they are not so serious that he should be condemned to die in prison.

As we are increasingly recognizing as a society, it is unnecessary and inhumane to keep the elderly in prison. The elderly pose less of a danger to society than other individuals. Even if people have previously committed crimes, and even if they have committed crimes into middle age, their likelihood of committing another crime continues to decrease as they get older. See, e.g., U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, 12 & Exhibit 9 (May 2004) ("Recidivism rates decline relatively consistently as age increases. . . . [O]ffenders over age 50 have a recidivism rate of 9.5 percent."); OIG Aging Inmate Report at iii, 38–40 (noting "the rate of recidivism of aging inmates is significantly lower" and discussing OIG analysis finding that recidivism rate continued to decline such that while 19% of sampled 50–54 year olds were re-arrested for a new crime, none over 70 were re-arrested); William Rhodes, et al., Recidivism of Offenders on Federal Community Supervision, U.S. Dep't of Justice, Bureau of Justice Statistics, at 13 (Dec. 21, 2012) (finding that older offenders are less likely to be arrested for a new offense).

Elderly inmates also suffer more in prison. The elderly are prone to abuse and predation in prison; they need more frequent medical care; they often require special physical accommodations that may not be available, as their mobility, vision, hearing, and other vital functions diminish; and they often experience greater emotional distress behind bars. See, e.g., OIG Aging Inmate Report at ii ("[a]ging inmates often require assistance with activities of daily living, . . . [h]owever, institution staff is not responsible for ensuring inmates can accomplish these activities"; "aging inmates experience delays receiving medical care"; "BOP programs . . . do not address the needs of aging inmates"). It is also costly to incarcerate the elderly due to increased medical needs. OIG Aging Inmate Report at i.

Courts have long recognized age as a reason for imposing a reduced prison sentence in individual cases. See, e.g., United States v. Sanchez, No. 99 Cr. 338, 2007 WL 60517, at *4 (S.D.N.Y. Jan. 8, 2007) (Sweet, J.) (collecting cases imposing reduced sentences based on age, both because of declining recidivism rates and due to the need to further rehabilitation by giving defendants hope of life beyond prison); United States v. Alberto William Vilar, No. 05 Cr. 621 (S.D.N.Y. Feb. 5, 2010) (Sullivan, J.)

---

[14] Available at https://oig.justice.gov/reports/2015/e1505.pdf (last visited Jul 18, 2019).

(imposing substantially below-Guidelines sentence, largely based on defendant's advanced age of 69); United States v. Barbato, No. 00 Cr. 1028, 2002 WL 31556376, at *4 (S.D.N.Y. Nov. 15, 2002) (Kram, J.) (departing from Guidelines based on defendant's physical condition and advanced age).

By now, even the Sentencing Commission and Congress have come to recognize that there are compelling reasons not to keep the elderly in prison. After many years, the Sentencing Commission reversed course in 2010 and recognized that age could be a basis for a Guidelines departure. See U.S.S.G. § 5H1.1, Amendment 739 (effective November 1, 2010) (stating that age may be a reason to depart downward where a defendant is "elderly and infirm" and home confinement might be "equally efficient as and less costly than incarceration"). More recently, in the First Step Act, Congress moved to permit the release of previously sentenced elderly prisoners on a case-by-case basis. Pursuant to modifications made by this Act, 18 U.S.C. § 3582(c) now permits compassionate release for a broadened group of offenders aged 65 and older.

These decisions of courts, the Sentencing Commission, and Congress reflect a consensus that there is often less need to hold elderly people in prison. With a ten-year sentence, Mr. Sayoc will be well into his 60s before he is released to community supervision. Considering his history, his prior successes on probation, some of the unique causes of this offense, and his supportive family, there is every reason to think that he can be safely returned to society. He is not one of the few people whose crimes are so heinous, or who has proved so unmanageable and dangerous in the community, that he needs to spend the rest of his life in prison.

## II.   The nature and circumstances of the offenses support a below-Guidelines sentence.

### A. The devices Mr. Sayoc sent were not functional as bombs and his offenses did not cause any actual physical injury.

None of the packages that Mr. Sayoc sent exploded or physically injured anyone. And because of the way that these items were designed and put together, they were not functional bombs and there is no real likelihood that they would have exploded. As the ESi report explains, the items that Mr. Sayoc sent could not actually function as explosive devices and were, "at best, each a crude counterfeit of an explosive device." Ex. AA at 9–10; id. at 7. Moreover, although the packages contained powder that meets the legal definition of "explosives," the chance that the powder inside would somehow have ignited appears remote.

An improvised explosive device such as a pipe bomb needs several components to work: (i) an intact, gas-tight container; (ii) a reactant chemical mixture; and (iii) some initiating mechanism. See id. at 7. While they looked like pipe bombs, Mr. Sayoc's devices did not actually have any of these three functional components.

First, there was no gas-tight container. Mr. Sayoc used PVC pipe with end caps pushed on, but not glued or otherwise sealed. This was not a gas-tight container, and if the substance inside the pipe had somehow ignited, it would not have built up pressure sufficient to cause the pipe to explode; rather, it would have pushed the end caps off. See id. at 7, 9.

Second, there was no initiating mechanism. Id. The clock taped to the front of the pipe was not set or attached to anything in a way that it could ignite the powder. In addition, although there was a solder wire inside the pipe (something that looked like a metal coil), this was also non-functional. That wire was not capable of heating up to the point that it could ignite the powder inside the pipe. Id. The FBI also acknowledges this deficiency with the devices, as discussed below.

Third, the pipe does not appear to have been filled with a reactant mixture sufficient to cause an explosion. As ESi explains, the "powder contained in each device was variable"—a mixture of fuel and "inert" materials—and was "not confirmed to be thermally energetic." Id. at 6, 7. "An inhomogeneous mixture of large grain size with the presence of inert materials, such as that documented in the powders from the recovered devices, all decrease or eliminate the efficacy of the mixture." Id. at 8. In other words, the powder mixture in the devices was in all likelihood insufficiently reactive and flammable to cause an explosion.

ESi's expert conclusions regarding the inability of these devices to function as actual bombs are supported by the facts of this case, the FBI's field testing of the devices, and even the government's own expert report. In its analysis of these devices, the FBI expert report acknowledges that, "As submitted, the devices would not have functioned as a result of their design." ECF No. 37 at 24. In particular, the FBI recognizes that the "fuzing system for each IED lacked the proper components and assembly to enable it to function as a method of initiation for these devices." Id. In plain English, the clock, wires, and solder coil could not set off the devices. Moreover, in field testing by government agents using a laser and "burn test," the mix of powder in the pipe did not ignite, see Ex. AA at 4—in other words, it is not clear that the powder inside would have ignited even if there had been a functional fuzing system.

This conclusion is supported by the fact that none of the devices did explode or ignite, even after they were subjected to render safe procedures in the field.

We expect the government will argue that, even though the packages Mr. Sayoc sent could not function as bombs, he nonetheless intended for them to work as such and therefore he should be sentenced more severely. But these packages were not actual bombs and there are several reasons the Court should recognize that Mr. Sayoc did not intend to make or send real bombs. First, the functional deficiencies of the devices are overwhelming and plainly intentional. Perhaps the best example of this is the fact that the clock was not set and instead retained the factory sticker simulating a display. Second, the devices were clearly intended to be viewed intact—that is why Mr. Sayoc included the small envelope and the pictures with red "X"s. If he thought these packages would explode, why would he include a threatening picture that would be destroyed in the explosion? Third, the packages were deposited in mailboxes and Mr. Sayoc did not deliver them directly to anyone. As a result, Mr. Sayoc could have no way of knowing exactly when the packages would be delivered; it could be days or even weeks after he put them in the mail. Why would anyone try to send an actual bomb on a timer through the mail? Mr. Sayoc's actions are consistent with someone sending a threatening message, not someone who intended these packages to function as actual bombs or to physically harm a specific person.

## B. A sentence of 121 months would be in line with sentences imposed on similarly-situated defendants and would not create unwarranted sentencing disparities.

The Court must consider similarly situated defendants to avoid unwarranted sentencing disparities. 18 U.S.C. § 3553(a)(6). A review of recent and similar cases demonstrates that Mr. Sayoc's conduct does not warrant more than 121 months in prison.

There are no perfect analogies to Mr. Sayoc's case. The nature and seriousness of Mr. Sayoc's conduct warrants a substantial sentence of imprisonment. But there are also important mitigating circumstances here: (i) these threatening packages were not intended to function as actual bombs and none of them did; (ii) no one was physically injured by Mr. Sayoc's conduct; (iii) Mr. Sayoc does not have a history of actual violence against others and has not served prior extended prison terms; (iv) Mr. Sayoc's conduct was at least partially attributable to mental health problems; and (v) he has pled guilty and expressed remorse for his actions.

The Honorable Jed S. Rakoff                                          Page 33
United States v. Cesar Altieri Sayoc, 18 Cr 820 (JSR)

When mitigating factors such as these considerations are present, courts have imposed prison sentences around ten years or less, even where a defendant's conduct is seriously threatening; even where the offense involves the use or threatened use of explosive materials or toxins; and even where the offenses are connected to some political motivation, involve threats against public officials, or have otherwise engendered widespread public concern. Below is a compendium of recent cases that share key characteristics with Mr. Sayoc's case and information about the total prison sentence that each defendant received.

### i. Defendants sentenced for threatening mailings involving explosive devices or toxins

- In United States v. Ronald Haddad, Jr., No. 09 Cr. 115 (VMK) (N.D. Ill. 2015), the defendant went to trial on 30 felony counts, based on allegations that he sent numerous threatening communications to prominent individuals, including former Chicago Mayor Richard Daley. Compl. 3–4, ECF No. 1. The defendant sent packages containing powder, an oily substance, and shotgun shells that appeared rigged to explode (none did explode). Def. Sent'g Mem. 5–6, ECF No. 406. After his conviction at trial, he was sentenced to 150 months. ECF No. 462.

- In United States v. Hong Minh Truong, No. 14 Cr. 314 (SAF) (N.D. Tex. 2015), the 67-year old defendant perpetrated an anthrax hoax, over a five-year period, by mailing hundreds of threatening letters with white powder to targets across the United States, including schools, news organizations, and others. Man Sentenced to Serve 60 Months in Federal Prison for Mailing More Than 400 Hoax White Powder Letters, FBI (Dec. 18, 2015).[15] The government estimated that the scare caused millions of dollars in damages. Id. He was sentenced to 60 months. Id.

- In United States v. Kao Xiong, 18 Cr. 235 (TLN) (E.D. Ca. 2019), the defendant sent over 150 threatening letters, some of which threatened the use of pipe bombs or contained a white powdery substance simulating anthrax. Compl. 4–5, ECF No. 1. The threatening letters were directed to former President Bush, President Trump, the Dallas-Fort Worth airport, and the Mall of America, among others. Id. 6–8. The defendant was found to be seriously mentally ill and psychotic when he sent the letters. Def. Sent'g Mem. 1–2, ECF No. 51. He was sentenced to time served of approximately five months. Id.

---

[15]   Available at https://www.fbi.gov/contact-us/field-offices/dallas/news/press-releases/rowlett-man-sentenced-to-serve-60-months-in-federal-prison-for-mailing-more-than-400-hoax-white-powder-letters (last visited Jul. 10, 2019).

- In <u>United States v. Jay Stuart DeVaughn</u>, No. 10 Cr. 132 (JLK) (D. Colo. 2011), the defendant sent threatening letters to President Obama and other federal and state politicians, in mailings that included a white powder simulating anthrax. Def. Mem. Op. at 1–2, ECF No. 41. The judge characterized the defendant's actions as a coordinated campaign of harassment which spanned many years, but also recognized that he suffered from mental illness and abused prescription medication. <u>Id.</u> at 3, 11–14. On a total of three cases (each charging multiple counts), he was sentenced to 72 months. <u>Id.</u> at 16–17.

- In <u>United States v. Roland Prejean</u>, No. 10 Cr. 206 (WWE) (D. Conn. 2013), the defendant sent numerous threatening letters to public officials, including specific threats to kill them, shoot them from a distance, use toxins against them, or to detonate a bomb that he had planted. Def Sent'g Mem. 1, ECF No. 81. Some of his mailings contained a white powder purporting to be anthrax. <u>Id.</u> at 8. He maintained a "kill list" and continued to send threatening letters after his arrest. <u>Id.</u> at 14. The defendant had severe, untreated mental health problems. <u>Id.</u> at 29. He was sentenced to 70 months. ECF No. 83.

- In <u>United States v. Linda Louise Culkin</u>, No. 12 Cr. 10080 (GAO) (D. Mass. 2014), the defendant transmitted bomb threats, anthrax threats, and other death threats to people in the United States and abroad, over the course of two years. Gov't Sent'g Mem. 1–2, ECF No. 115. One of the defendant's hoax bomb threats caused police in a foreign city to evacuate a building and close off a neighborhood for hours while one of her hoax anthrax threats included a letter that, when opened, expelled white powder, causing nearby people to be quarantined. <u>Id.</u> at 3–4. She was sentenced to 51 months. ECF No. 139.

- In <u>United States v. Rodney Cydrus</u>, No. 17 Cr. 27 (MRB) (S.D. Ohio 2018), the defendant sent letters with violent threats directed against the FBI, federal defenders, judges, and other federal employees. Def Sent'g Mem. 1, ECF No. 29. Some letters contained a white powder, which led to a quarantine of the people who opened them. <u>Id.</u> at 4. He was sentenced to 36 months. ECF No. 37.

- In <u>United States v. Kyle Dore</u>, No. 16 Cr. 24 (DEW) (W.D. La. 2017), ECF No. 25, the defendant sent a series of threatening letters to government officials. Superseding Indictment 1–3, ECF No. 25. In four letters, he included a white powder designed to simulate a toxin. <u>Id.</u> at 4–6. He was sentenced to 33 months. ECF No. 75.

The Honorable Jed S. Rakoff                                    Page 35
United States v. Cesar Altieri Sayoc, 18 Cr 820 (JSR)

- In United States v. Clifton Lamar Dodd, No. 10 Cr. 156 (AKK) (N.D. Ala. 2011), the defendant sent letters laced with white powder to government officials. Compl. 2–4, ECF No. 1. According to the government, the defendant caused emotional injury to the victims and disrupted government functions as those who opened the letters spent hours fearing that they had been exposed to a deadly toxin. Gov't Sent'g Mem. 6–8, ECF No. 45. He was sentenced to 51 months. ECF No. 48.

- In United States v. Daniel Frisiello, No. 18 Cr. 10314 (NMG) (D. Mass. 2019), the defendant sent 13 threatening letters, over a three-year period, to various public figures. Gov't Sent'g Mem. 1–2, ECF No. 45. In two letters, he sent white powder to relatives of Donald Trump to push Trump to drop out of the presidential race. Id. The defendant was autistic and cognitively impaired, and he did not seem to understand the seriousness of his actions. Def. Sent'g Mem. 1, ECF No. 46. He was sentenced to probation. ECF No. 50.

### ii.  Defendants sentenced for possession or use of explosive devices and toxins

- In United States v. Paul M. Rosenfeld, No. 19 Cr. 69 (S.D.N.Y. 2019) (Roman, J.), the defendant constructed and possessed a 200-pound bomb in his home and planned to detonate it on the National Mall on Election Day, in order to bring attention to the political philosophy of "sortition." Gov't Sent'g Mem. 2–5, ECF No. 26. Mental illness contributed to his commission of the offense and no one was injured by his conduct. Id. at 6. He was sentenced to 16 months. ECF No. 29.

- In United States v. Richard Laugel, No. 18 Cr. 443 (S.D.N.Y. 2018) (Engelmayer, J.), the defendant constructed, planted, and remotely detonated a pipe bomb on his neighbor's car in the Bronx. Gov't Sent'g Mem. 3, ECF No. 22. The neighbor was not injured. Id. A search of the defendant's home uncovered ammunition, home-made pistols, other guns, a bump stock, and silencers. Id. at 3–4. The defendant, a former Marine, had severe psychological issues. Def. Sent'g Mem. 3–5, ECF No. 21. He was sentenced to 121 months. ECF No. 25.

- In United States v. Theodore Shulman, No. 11 Cr. 264 (S.D.N.Y. 2012) (Crotty, J.), the defendant, a pro-choice activist, made violent threats against pro-life advocates. Manhattan Man Pleads Guilty in Manhattan Federal Court to Illegally

The Honorable Jed S. Rakoff                                          Page 36
United States v. Cesar Altieri Sayoc, 18 Cr 820 (JSR)

Threatening Pro-Life Advocates, FBI (May 10, 2012).[16] When he was arrested, he had cyanide and castor beans. Id. He was sentenced to 41 months. ECF No. 22.

- In United States v. John Roos, No. 16 Cr. 203 (MC) (D. Or. 2017), the defendant made violent threats against President Obama and FBI agents. Gov't Sent'g Mem. 1–3, ECF No. 38. When the government searched his home and car, they found an assault rifle, other guns, and four pipe bombs. Id. at 5. He was sentenced to 63 months. ECF No. 45.

- In United States v. Christopher Bandy, No. 09 Cr. 20298 (VAR) (E.D. Mich. 2010), the defendant detonated several pipe bombs in homes, destroying property and causing significant fear in the community, but not physical injury. Gov't Sent'g Mem. 1–3, ECF No. 21. He was sentenced to 105 months. ECF No. 24.

- In United States v. Francis Grady, No. 12 Cr. 77 (WCG) (E.D. Wis. 2012), the defendant used a homemade incendiary device to start a fire at a Planned Parenthood clinic. Am. Compl. 1–3, ECF No. 2. No one was injured, but there was some property damage. Sent'g Mem. 7–8, ECF No. 78. Following conviction at trial, he was sentenced to 132 months. ECF No. 81.

- In United States v. Michael Turney, No. 08 Cr. 1493 (SRB) (D. Ariz. 2010), the defendant possessed 26 illegal pipe bombs in his home, along with handguns, silencers, and ammunition. Gov't Sent'g Mem. 1–2, ECF No. 381. Police found notes indicating that he was planning an attack on a local union hall. Id. 2–3. He was sentenced to 120 months. ECF No. 406.

- In United States v. Stephen Powers, No. 18 Cr. 37 (AWA) (E.D. Va. 2019), ECF No. 37, the defendant detonated a homemade explosive device on a commercial strip in Colonial Williamsburg and had additional bomb materials in his home. Gov't Sent'g Mem. 1–3, ECF No. 37. No one was injured, though there was extensive property damage. Id. He was sentenced to 120 months. ECF No. 40.

- In United States v. Robert J. Shubert, Jr., No. 13 Cr. 50 (MTT) (M.D. Ga. 2013), the defendant built and possessed more than 80 pipe bombs that he reportedly intended to sell to foreign nationals. He was sentenced to 78 months. ECF No. 36.

---

[16]   Available    at    https://archives.fbi.gov/archives/newyork/press-releases/2012/manhattan-man-pleads-guilty-in-manhattan-federal-court-to-illegally-threatening-pro-life-advocates (last visited Jul. 20, 2019).

The Honorable Jed S. Rakoff                                          Page 37
United States v. Cesar Altieri Sayoc, 18 Cr 820 (JSR)

- In <u>United States v. Collin McKenzie-Gude</u>, No. 08 Cr. 518 (PJM) (D. Md. 2012), the defendant was involved in a plot to assassinate Barack Obama and amassed weapons and materials to build pipe bombs. Compl. 1–3, ECF No. 1. A search of his home revealed numerous firearms, bomb components (including pipes, timers, and reactive chemicals), and a diagram of an explosive device. <u>Id.</u> He was sentenced to 61 months. ECF No. 85.

- In <u>United States v. Michael Christopher Estes</u>, No. 17 Cr. 142 (MOC) (W.D. N.C. 2018), the defendant planted an improvised explosive device near the baggage claim area of the Ashville Regional Airport. Compl. 3, ECF No. 1. It did not explode and the defendant reportedly did not intend to hurt anyone, but rather to help teach law enforcement. <u>Id.</u> at 7–8. He was sentenced to 46 months. ECF No. 32.

- In <u>United States v. Michael Sibley</u>, No. 15 Cr. 339 (AT) (N.D. Ga. 2016), the defendant placed two pipe bombs in a park. Compl. 3, ECF No. 1. They did not function because they lacked a power source, but they were loaded with shrapnel and explosives. Gov't Sent'g Mem. 2, ECF No. 32. No one was injured. <u>Id.</u> The defendant said his goal was to make people aware of the threat of terrorism. <u>Id.</u> at 3. He was sentenced to 24 months. ECF No. 35.

- In <u>United States v. Jeffery Harbin</u>, No. 11 Cr. 163 (NVW) (D. Ariz. 2011), the defendant, a one-time member of a white supremacist group, created grenade-style explosive devices that he reportedly intended to use to "protect" the border from immigrants. Gov't Sent'g Mem. 5–6, ECF No. 44. No one was physically injured by his conduct <u>Id.</u> at 6. He was sentenced to 24 months. ECF No. 49.

- In <u>United States v. Donny Eugene Mower</u>, No. 11 Cr. 308 (LJO) (E.D. Cal. 2011), the defendant vandalized a mosque and later started a fire at a Planned Parenthood by using a Molotov cocktail. Compl. 1–2, ECF No. 1. No one was hurt, though there was extensive property damage. <u>Id.</u> at 2. He was sentenced to 60 months. ECF No. 26.

### iii.   Defendants sentenced for threats against public officials and for politically motivated threats

- In <u>United States v. Lawrence Mulqueen</u>, No. 13 Cr. 157 (S.D.N.Y. 2013) (Karas, J.), the defendant made threats against several New York politicians and supporters of President Obama. Gov't Sent'g Mem. 3–4, ECF No. 6. He also used Facebook to urge his social media followers to commit violence. <u>Id.</u> At his home,

The Honorable Jed S. Rakoff                                                      Page 38
<u>United States v. Cesar Altieri Sayoc</u>, 18 Cr 820 (JSR)

law enforcement found two rifles, ammunition, and bayonets. <u>Id.</u> at 4. He was
sentenced to 15 months. ECF No. 7.

- In <u>United States v. Harold Turner</u>, No. 09 Cr. 650 (DEW) (E.D.N.Y. 2010), the
defendant, a right-wing radio host, threatened violence against two federal judges
based on one of their rulings regarding the Second Amendment and posted
personal information about the judges and the court's security for his followers.
Sent'g Mem. 1–2, ECF No. 119. After conviction at trial, he was sentenced to 33
months. ECF No. 122.

- In <u>United States v. Vincent McCrudden</u>, No. 11 Cr. 61 (DRH) (E.D.N.Y. 2011), the
defendant threatened to kill and harassed dozens of financial regulators over a
period of several years. Gov. Sent'g Mem. 108, ECF No. 94. He was sentenced to
28 months. ECF No. 96.

- In <u>United States v. Edgar Maddison Welch</u>, No. 16 Cr. 232 (KBJ) (D.D.C. 2017),
the so-called "Pizzagate" case, the defendant carried an assault rifle, pistol, and
shotgun, and fired while inside a crowded D.C.-area restaurant, because he had
come to believe stories from right-wing internet sources that Hillary Clinton was
using the restaurant to run a child sex-trafficking ring. Gov't Sent'g Mem. 2–3,
ECF No. 37. He was sentenced to 48 months. ECF No. 38.

   In each case, sentencing is necessarily highly individualized. But these prior
cases demonstrate that a sentence of around ten years in prison for Mr. Sayoc would
not be out of line with prison sentences imposed in cases that share certain important
characteristics.

## <u>Conclusion</u>

   Mr. Sayoc is deeply sorry for his crimes and has taken responsibility for them
by pleading guilty. He did so with the understanding that he will be spending at least
the next ten years in prison and that he will not be released until he is at least 65
years old. No significant additional prison time beyond those ten years is necessary
to meet the goals of sentencing. Mr. Sayoc is a broken man who committed these
offenses in the throes of a steroid-induced psychosis. He has no history of similarly
violent conduct. He recognizes that his actions were irrational and wrong. Dr. Pope
opines that with proper supervision, the odds "would be very remote that [Mr. Sayoc]
would ever commit a crime of comparable magnitude." Ex. A at 10. And although Mr.
Sayoc's crimes here were serious and scared many, none were physically injured.

The Honorable Jed S. Rakoff                                    Page 39
United States v. Cesar Altieri Sayoc, 18 Cr 820 (JSR)


According to both the FBI and ESi reports, it is unlikely that anyone would have been
physically injured due to the design of the devices. Finally, even after any prison
term, the Court can continue to monitor Mr. Sayoc on supervised release, with
rigorous conditions including drug testing and mental health treatment. Given all of
the factors in 18 U.S.C. § 3553(a), we respectfully urge the Court to sentence Mr.
Sayoc to a total of 121 months in prison, followed by a substantial period of
community supervision.


Respectfully submitted,

/s/

Sarah Baumgartel
Amy Gallicchio
Ian Marcus Amelkin
Assistant Federal Defenders
52 Duane Street, 10th Floor
New York, NY 10007
(212) 417-8772

cc:    Emil Bove, Jane Kim, Samuel Adelsberg, and Jason Richman, Esqs.
       United States Attorney's Office, SDNY