present in the file, and may check for typographical or grammatical errors.

**4.6.1.1 Limitations of Administrative Reviews.** An administrative reviewer may not necessarily possess all of the knowledge, skills, and abilities of the investigator or of a technical reviewer. As such, the administrative reviewer may not be able to provide a substantive critique of the investigator's work product.

**4.6.2 Technical Review.** A technical review can have multiple facets. If a technical reviewer has been asked to critique all aspects of the investigator's work product, then the technical reviewer should be qualified and familiar with all aspects of proper fire investigation and should, at a minimum, have access to all of the documentation available to the investigator whose work is being reviewed. If a technical reviewer has been asked to critique only specific aspects of the investigator's work product, then the technical reviewer should be qualified and familiar with those specific aspects and, at a minimum, have access to all documentation relevant to those aspects. A technical review can serve as an additional test of the various aspects of the investigator's work product.

**4.6.2.1 Limitations of Technical Reviews.** While a technical review may add significant value to an investigation, technical reviewers may be perceived as having an interest in the outcome of the review. Confirmation bias (attempting to confirm a hypothesis rather than attempting to disprove it) is a subset of expectation bias (*see 4.3.9*). This kind of bias can be introduced in the context of working relationships or friendships. Investigators who are asked to review a colleague's findings should strive to maintain a level of professional detachment.

**4.6.3 Peer Review.** Peer review is a formal procedure generally employed in prepublication review of scientific or technical documents and screening of grant applications by research-sponsoring agencies. Peer review carries with it connotations of both independence and objectivity. Peer reviewers should not have any interest in the outcome of the review. The author does not select the reviewers, and reviews are often conducted anonymously. As such, the term "peer review" should not be applied to reviews of an investigator's work by coworkers, supervisors, or investigators from agencies conducting investigations of the same incident. Such reviews are more appropriately characterized as "technical reviews," as described above.

**4.6.3.1** The methodologies used and the fire science relied on by an investigator are subject to peer review. For example, NFPA 921 is a peer-reviewed document describing the methodologies and science associated with proper fire and explosion investigations.

**4.6.3.2 Limitations of Peer Reviews.** Peer reviewers should have the expertise to detect logic flaws and inappropriate applications of methodology or scientific principles, but because they generally have no basis to question an investigator's data, they are unlikely to be able to detect factual errors or incorrectly reported data. Conclusions based on incorrect data are likely to be incorrect themselves. Because of these limitations, a proper technical review will provide the best means to adequately assess the validity of the investigation's results.

**4.7 Reporting Procedure.** The reporting procedure may take many written or oral forms, depending on the specific responsibility of the investigator. Pertinent information should be reported in a proper form and forum to help prevent recurrence.

## Chapter 5   Basic Fire Science

**5.1 Introduction.** The fire investigator should have an understanding of ignition and combustion principles and should be able to use them to help in the identification and interpretation of evidence at the fire scene and in the development and testing of hypotheses regarding the origin and cause of the fire. The body of knowledge associated with combustion and fire could easily fill several textbooks. The discussion presented in this chapter should be considered introductory. (*See Annex A and Annex C for additional information.*)

*N* **5.1.1\* Fire and Energy.** Fire is a rapid oxidation process, which is an exothermic chemical reaction, resulting in the release of heat and light energy in varying intensities. It is important that the fire investigator understands the basic concepts of energy, power, and heat flux and how the units of measurement for each are used to describe the behavior of fire.

*N* **5.1.2 Energy.** Energy is a property of matter that manifests as an ability to perform work, either by moving over a distance against a force or by transferring heat. Energy can be changed in form (e.g., from chemical to mechanical energy), or transferred to other matter, but it can neither be created nor destroyed. Energy is measured in joules (J), calories (cal), or British thermal units (Btu). A joule is the heat produced where one ampere is passed through a resistance of one ohm for one second, or it is the work required to move over a distance of one meter against a force of one newton. A calorie is the amount of energy required to raise the temperature of 1 g of water by 1°C (e.g., from 14°C to 15°C); a calorie is equal to 4.184 J. A Btu is the quantity of heat required to raise the temperature of 1 lb of water 1°F at a pressure of 1 atmosphere and temperature of 60°F; a British thermal unit is equal to 1055 J, and 252.15 cal.

*N* **5.1.3 Power.** Power is a property that describes energy released per unit time. The same amount of energy is required to carry a load up a flight of stairs whether the person carrying it walks or runs, but more power is needed for running because the work is done in a shorter amount of time. Raising the temperature of a volume of water requires the same amount of energy whether the temperature increase takes place in 10 sec or in 10 min. Raising the temperature more quickly requires that the energy be transferred more quickly. Power is measured in joules per second (J/s) or watts (W).

*N* **5.1.4 Heat Flux.** Heat flux is a term that describes the amount of power per unit area. A kilowatt spread over 1 m² is approximately equal to the radiant heat flux outdoors on a sunny day. If that same kilowatt is concentrated using a magnifying glass and only spread over .05 m² (500 cm²), there may be sufficient energy transferred to that area to cause ignition of combustibles. Heat flux is measured in kW/m² or W/m².

**5.1.5 Fire Tetrahedron.** The combustion reaction can be characterized by four components: the fuel, the oxidizing agent, the heat, and the uninhibited chemical chain reaction. These four components have been classically symbolized by a four-sided solid geometric form called a tetrahedron (*see*

# EXHIBIT BB



700 South Industrial Way
Seattle, WA  98108

*June 2017*

# DALE C. MANN
## SENIOR MANAGING CONSULTANT
dcmann@engsys.com

Mr. Dale Mann is a forensic chemist with over 36 years of experience in analytical chemistry, general forensic evaluations, and forensic chemistry. He has performed chemical and physical analyses in thousands of investigations involving criminalistics, subrogation, industrial trouble shooting, and liability claims in criminal and civil investigations.

For over 17 years, Mr. Mann was a forensic scientist at the Washington State Patrol Crime Laboratory. While there, he was responsible for performing chemical, analytical, physical, microscopic, and general forensic analyses to assist in thousands of law enforcement investigations, and testified in over 300 court appearances. He was also responsible for the training, quality control, and productivity of the Chemistry and Microanalysis Sections in the Tacoma Crime Laboratory. He provided extensive training to law enforcement personnel and forensic scientists throughout the country in a variety of forensic topics.

For over 18 years, Mr. Mann was a principal and vice-president with MDE Inc. He started the Forensic Laboratory division of MDE and provided state-of-the-art analytical services to clients throughout the country. In addition to the types of work he performed while with Crime Laboratory, he assisted in many field investigations and laboratory testing involving the failure analysis of complex polymeric materials in a wide variety of applications, including fire and bombing investigations, building envelope defects, chemical failure analysis, chemical manufacturing/process control troubleshooting and much more.

Mr. Mann is a certified fire and explosions origin and cause investigator. His areas of expertise include scene documentation, laboratory analyses, and scenario testing. He has reviewed many case files to assist counsel to understand the nuances of the investigation and in trial preparation. He has organized and administered several large loss fire investigations and artifact inspections involving dozens of parties. He is also a principal researcher, author, and lecturer in several topic areas involving forensic chemistry.

## Areas of Specialization

Building envelope/component failures
Chemical and microscopic analysis and research
Chemical failure analysis
Chemical manufacturing/tampering/incompatibility
Drugs/hazardous material issues environmental contamination
Fire and bombing investigations
General criminal and civil investigations
Polymer characterization
Chemical process troubleshooting
Fire investigation case review
Criminal defense reanalysis and case review



## Education

B.S., Chemistry, University of Washington, 1978
B.S., Oceanography, University of Washington, 1978

## Training

International Association of Arson Investigators – Certified Fire Investigator, 2008
Washington State Department of Ecology – Accredited for analysis of methamphetamine, 2003
National Association of Fire Investigators – Certified Fire and Explosion Investigator, 1998
American Board of Criminalistics – Certified with Specialty Areas in Fire Debris and Drug Analysis, 1990

## Professional Affiliations/Honors

**American Academy of Forensic Sciences (AAFS)**
> Fellow, 1984 – Present
> Regional Scientist Award, 1986

**American Board of Criminalistics (ABC)**
> Fellow, 1991 – Present
> Board of Directors, 1991 – 1994

**International Association of Arson Investigators (IAAI)**
> Member, 1998 – Present
> Forensic Science Committee, 1996 – Present

**National Association of Fire Investigators (NAFI)**
> Member, 1998 – Present

**Northwest Association of Forensic Scientists (NWAFS)**
> Member, 1982 – Present
> Board of Directors, 1987 – 1990
> President, 1989

**Technical Working Group on Fire and Explosives (TWGFEX)**
> Member, 2000 – 2015

## Positions Held

**ESI (Engineering Systems Inc.), Seattle, WA**
> Senior Managing Consultant, 2016 – Present

**MDE, Inc., Seattle, WA**
> Vice President & Principal, Senior Forensic Chemist, 1998 – 2016
> Washington State Patrol Crime Laboratory, Seattle, WA Forensic Scientist, 1981 – 1998



**Battelle, Pacific Northwest Laboratories, Richland, WA**
Research Scientist, 1978 – 1981

**University of Washington-Department of Oceanography, Seattle, WA**
Research Assistant, 1977 – 1978

## Publications/Presentations

"Epoxy Grout and Enzymatic Cleaners: A Question of Compatibility" By D.C. Mann, Tile Magazine, July 2009.

Confirmation of the Presence of Styrene Butadiene Resin (SBR) Polymer in Drywall Primer Applications" by D.C. Mann, Perkin Elmer Application Note, 2009

"The Use of Rated Wall Board Primers as Vapor Barriers" by D.C. Mann, WDTL Defense News, Spring 2007

"Studies of the Dehydration/Calcination of Gypsum Wall Board" by D.C. Mann, Fire and Materials, 2009

"Alternative Sampling Methods to Collect Ignitable Liquid Residues from Non-Porous Areas Such as Concrete" by D.C. Mann and N.D. Putaansuu, Fire and Arson Investigator, 57:1, 43-46, 2006

"In Search of the Perfect Container for Fire Debris Evidence" by D.C. Mann, Fire and Arson Investigator, 30:3, 21-25, 2000

"Washing Machine Effluent May Provide Clues in Dryer Fire Investigations by D.C. Mann and M.M. Fitz, Fire Findings, 7:4, 4, 1999

"Considerations in the Analytical Interpretation of Gas Chromatographic Test Results of Fire Debris" by D.C. Mann, Proceedings of the International Symposium on the Forensic Aspects of Arson Investigations, U.S. Department of Justice, Federal Bureau of Investigation, 163-164, 1995

"Bacterial Degradation of Gasoline in Soil" by D.C. Mann and W.R. Gresham, Journal of Forensic Sciences, 35:4, 913-923, 1989



"The Comparison of Automotive Gasolines Using Capillary Gas Chromatography II: Limitations of Automotive Gasoline Comparisons in Casework" by D.C. Mann, Journal of Forensic Sciences, 32:2, 616-628, 1987

"The Comparison of Automotive Gasolines Using Capillary Gas Chromatography I: Comparison Methodology" by D.C. Mann, Journal of Forensic Sciences, 32:2, 606-615, 1987

Over 60 presentations to local associations of investigators, attorneys and insurance adjusters regarding fire debris analysis, clandestine drug manufacturing, general forensic science, and laboratory services, including the recognition and preservation of evidence and the theoretical and practical considerations regarding laboratory analysis of evidence.

Numerous presentations at regional and national meetings of forensic scientists and investigators regarding original research on a variety of topics related to fire debris analysis and general forensic science. Topics include comparison of automotive gasolines to determine common source, bacterial degradation of petroleum products and its effect in fire debris analysis, contamination of commercially available packaging materials for fire debris evidence, theoretical considerations of methodology used for fire debris analysis, and distinguishing burned versus evaporated petroleum products.

Guest lecturer and instructor at the Federal Bureau of Investigation (FBI), Bureau of Alcohol, Tobacco and Firearms (BATF), the National Forensic Science Training Center (NFSTC), and the International Association of Arson Investigators (IAAI) for basic and advanced schools dealing with fire debris analysis.

# EXHIBIT CC

# Bureau of Prisons
## Health Services
## Clinical Encounter - Administrative Note

| | | | | | | |
|---|---|---|---|---|---|---|
| Inmate Name: | SAYOC, CESAR ALTIERI | | | | Reg #: | 17781-104 |
| Date of Birth: | | Sex: | M | Race: WHITE | Facility: | NYM |
| Note Date: | 05/30/2019 08:30 | Provider: | Joaquin, Y. MLP | | Unit: | K01 |

Admin Note - General Administrative Note encounter performed at Housing Unit.

**Administrative Notes:**

    **ADMINISTRATIVE NOTE   1**    **Provider:**  Joaquin, Y. MLP

        Today during medication rounds in 11 north inmate Sayoc came in to get his pill line AM dose of Buspar three tablets of 5 mg each. Before taking theses pills he asked this provider.
        How many tablets a person needs to take of this medication to get overdose?
        I asked him why he is asking this question. He then, smile and swallowed his schedule morning those, and walked back to his cell.

**Other:**

    Incident discussed with Chief Psychologist.

**Copay Required:** No        **Cosign Required:**  Yes

**Telephone/Verbal Order:**  No

Completed by Joaquin, Y. MLP on 05/30/2019 10:55

Requested to be cosigned by  Beaudouin, Robert MD.

Cosign documentation will be displayed on the following page.

Requested to be reviewed by  Okafor, Chidubem DO.

Review documentation will be displayed on the following page.

**Bureau of Prisons**
**Health Services**
**Clinical Encounter**

| | | | | |
|---|---|---|---|---|
| Inmate Name: | SAYOC, CESAR ALTIERI | | Reg #: | 17781-104 |
| Date of Birth: | ███████ | Sex: M   Race: WHITE | Facility: | NYM |
| Encounter Date: | 05/02/2019 09:21 | Provider: Okafor, Chidubem DO | Unit: | H01 |

Chronic Care - Chronic Care Clinic encounter performed at Health Services.

**SUBJECTIVE:**

**COMPLAINT  1**       **Provider:** Okafor, Chidubem DO

**Chief Complaint:** MENTAL HEALTH

**Subjective:** Pt is seen in suicide watch. Per a note to staff from pt's roommate,  it was stated that he has been recently making vague SI statements and even may have tried to hang himself recently with a string. Pt throughout current encounter repeatedly denies the claim adding that the visible markings around his neck were caused by him shaving too deeply with his razor. Pt states his only current symptom is much anxiety in direct relation to his current case to which he pleaded guilty and is currently awaiting sentencing. During encounter, pt is much more focused on appeasing the judge in his case stating that he does not want to do anything that would cause the judge to give him more than the 10 years minimum that he is facing. Pt claims a previous history of being on Ritalin as a teenager to his 30's secondary to ADHD, but denies being on any psychotropic medication for over 15 years. Pt denies ever being inpatient at a psychiatric hospital/unit although his mother did try to take him a few times in Florida, however the hospitals would let him go as they found no reason to keep him involuntarily. Pt states during those incidents he had become angry and irritable at his grandfather, but denies any homicidal or suicidal threats were made. In fact, pt denies any history of suicidality. Pt does admit to being sexual abused as a youth. Pt denies repeatedly/currently any Suicidal/Homicidal ideations, intent or plan. Pt denies any current Auditory/Visual Hallucination's and any form of delusions.  Pt states that they are currently future oriented to improve themselves both emotionally and behavior wise while housed at MCC-NY. Pt is instructed to follow up with the psychology department if any further negative emotional changes occur, with appropriate referral by the department to me if needed. Pt verbalizes understanding.

**Pain:** Not Applicable

**Seen for clinic(s):** Mental Health

**Added to clinic(s):** Mental Health

**OBJECTIVE:**

**Exam:**

**Mental Health**

**Posture**
Yes: Within Normal Limits

**Grooming/Hygiene**
Yes: Appropriate Grooming

**Facial Expressions**
Yes: Appropriate Expression

**Affect**
Yes: Appropriate

**Speech/Language**
Yes: Appropriate

**Mood**
Yes: Appropriate

**Thought Process**

| Inmate Name: | SAYOC, CESAR ALTIERI | | | Reg #: | 17781-104 |
| Date of Birth: | 03/17/1962 | Sex: M | Race: WHITE | Facility: | NYM |
| Encounter Date: | 05/02/2019 09:21 | Provider: | Okafor, Chidubem DO | Unit: | H01 |

**Exam:**

      Yes: Appropriate

    **Thought Content**

      Yes: Appropriate

    **Perceptions**

      Yes: Appropriate

    **Orientation**

      Yes: Alert and Oriented x 3

**ASSESSMENT:**

Adjustment Disorders: With Anxiety, F43.22 - Current

**PLAN:**

**New Medication Orders:**

| Rx# | Medication | Order Date | Prescriber Order |
|---|---|---|---|
| | busPIRone Tablet | 05/02/2019 09:21 | 15 mg  Orally  -  Two Times a Day x 180 day(s) Pill Line Only -- crush |

      **Indication:** Adjustment Disorders:  With Anxiety

**Schedule:**

| Activity | Date Scheduled | Scheduled Provider |
|---|---|---|
| Chronic Care Visit | 06/03/2019 00:00 | Psychiatrist |

**Other:**

1. Due to pt's current and/or history of reported symptoms, I will (with agreement by patient) start the patient on Buspar 15 mg bid

2. As patient is in a suicide watch cell (or under "PSYCHOLOGY OBSERVATION" DESIGNATION), he is required to be followed daily by the psychology department.

**Patient Education Topics:**

| Date Initiated | Format | Handout/Topic | Provider | Outcome |
|---|---|---|---|---|
| 05/02/2019 | Counseling | Access to Care | Okafor, Chidubem | Verbalizes Understanding |

**Copay Required:** No    **Cosign Required:** No

**Telephone/Verbal Order:** No

Completed by Okafor, Chidubem DO on 05/02/2019 09:45

# Bureau of Prisons
# Health Services
# Clinical Encounter - Administrative Note

| | | | | |
|---|---|---|---|---|
| Inmate Name: | SAYOC, CESAR ALTIERI | | Reg #: | 17781-104 |
| Date of Birth: | ▂▂▂▂ | Sex:   M     Race: WHITE | Facility: | NYM |
| Note Date: | 05/01/2019 14:46 | Provider:    DiMisa, Samantha Ph.D. | Unit: | H01 |

Psychology - Clinical Orders encounter performed at Health Services.

**Administrative Notes:**

**ADMINISTRATIVE NOTE   1**          **Provider:**  DiMisa, Samantha Ph.D.

Mr. SAYOC was placed on Suicide Watch today (5/1/19).  He presents with decompensation in mood, such as lack of sleep and appetite loss, as well as not showering for the past three days.  Mr. SAYOC presents with a depressed mood, flattened affect, and slowed speech.  Additionally, there appears to be a ligature mark around his neck, indicating possible recent suicidal behavior.  He also expressed an interest in being treated with psychotropic medication.  Please evaluate for a medication consultation.

**New Consultation Requests:**

| **Consultation/Procedure** | **Target Date** | **Scheduled Target Date** | **Priority** | **Translator** | **Language** |
|---|---|---|---|---|---|
| Psychiatry | 05/08/2019 | 05/08/2019 | Routine | No | |
| **Subtype:** | | | | | |
| Tele-psychiatry | | | | | |
| **Reason for Request:** | | | | | |
| Medication consultation | | | | | |

**Copay Required:** No          **Cosign Required:**  No

**Telephone/Verbal Order:**   No

Completed by DiMisa, Samantha Ph.D. on 05/01/2019 14:48

# EXHIBIT DD

```
  NYMAF        *        INMATE EDUCATION DATA        *      06-25-2019
PAGE 001 OF 001 *             TRANSCRIPT             *      14:56:28


REGISTER NO: 17781-104    NAME..: SAYOC             FUNC: PRT
FORMAT.....: TRANSCRIPT    RSP OF: NYM-NEW YORK MCC

------------------------ EDUCATION INFORMATION --------------------------
FACL ASSIGNMENT DESCRIPTION             START DATE/TIME STOP DATE/TIME
NYM  GED UNK    GED STATUS UNKNOWN         10-26-2018 1621 CURRENT


---------------------------- EDUCATION COURSES ----------------------------
SUB-FACL   DESCRIPTION             START DATE  STOP DATE EVNT AC LV  HRS
NYM M      INTO THE GREAT PYRAMID       06-25-2019 06-25-2019  P  C  P    1
NYM M      MYSTERIES OF MANKIND         06-25-2019 06-25-2019  P  C  P    1
NYM M      NAMIB DESERT, HOSTILE DUNES  06-25-2019 06-25-2019  P  C  P    1
NYM M      KILLER WHALES                06-18-2019 06-18-2019  P  C  P    1
NYM M      FOREST OF THE DEEP           06-10-2019 06-10-2019  P  C  P    1
NYM M      LOST CIVILIZATION OF ATLANTIS 06-10-2019 06-10-2019  P  C  P    1
NYM M      LOST KINGDOM OF THE MAYA     06-18-2019 06-18-2019  P  C  P    1
NYM M      HISTORY OF DAVY CROCKET      06-12-2019 06-12-2019  P  C  P    1
NYM M      ASTRONOMY CLASS              03-07-2019 06-11-2019  P  C  P   12
NYM M      AFRICAN AND AFRICAN AM DRAMA 01-07-2019 03-25-2019  P  C  P   12
NYM M      REFLECTIONS RELAXATION       01-31-2019 05-28-2019  P  C  P   15
NYM M      THE ADVENTURES OF DANIEL BOONE 05-02-2019 05-02-2019  P  C  P    1
NYM M      OCEAN DRIFTERS               04-26-2019 04-26-2019  P  C  P    1
NYM M      SHARK ENCOUNTERS             04-29-2019 04-29-2019  P  C  P    1
NYM M      FOREST OF THE DEEP           04-25-2019 04-25-2019  P  C  P    1
NYM M      INTERVIEWING SKILLS          01-22-2019 02-27-2019  P  C  P    3
NYM M      RESUME WRITING               01-28-2019 02-27-2019  P  C  P    6
NYM M      CONFLICT RESOLUTION CORP TRAIN 01-17-2019 02-07-2019  P  C  P   12




G0000      TRANSACTION SUCCESSFULLY COMPLETED
```

# EXHIBIT EE



# CERTIFICATE of ACHIEVEMENT

THIS ACKNOWLEDGES THAT

## Cesar Sayoc

HAS SUCCESSFULLY COMPLETED THE ADULT CONTINUING EDUCATION CLASS

### Reflections

SIGNED, *T. Volpini, Supervisor of Education*

MAY 2019

ADULT CONTI  NG EDUCATION

# CERTIFICATE OF APPRECIATION

*This certificate is awarded to*

## CESAR SAYOC

*for completing the Adult Continuing Education program*

## Conflict Resolution

*February 7, 2019*

L. R. Johnson
*Education Specialist*
*MCC New York Education Department*

# CERTIFICATE OF COMPLETION

*This certificate is awarded to*

## CESAR SAYOC

*for completion of an extensive course of study in the Adult Continuing Education program*

*Interview Skills*

**February 27, 2019**

T. Volpini, Supervisor of Education
MCC New York Education Department



# CERTIFICATE OF COMPLETION

*This certificate is awarded to*

## CESAR SAYOC

*for completion of an extensive course of study in the Adult Continuing Education program*

## *Resume Writing*

**February 27, 2019**

T. Volpini, Supervisor of Education
MCC New York Education Department





# CERTIFICATE of ACHIEVEMENT

THIS ACKNOWLEDGES THAT

## Cesar Sayoc

HAS SUCCESSFULLY COMPLETED THE ADULT CONTINUING EDUCATION CLASS

**Drama**

SIGNED, T. Volpini, Supervisor of Education

JANUARY 2019

# EXHIBIT FF

FD-302 (Rev. 5-8-10)



## FEDERAL BUREAU OF INVESTIGATION

Date of entry     10/29/2018

    JOSEPH MICHEAL DIEKMANN (DIEKMANN), date of birth (DOB) ████████,
was interviewed at his residence located at ██████████████████,
Port Saint Lucie, Florida. Present for the interview was Federal Bureau of
Investigation (FBI) Special Agents (SA) Richard Miller, and FBI SA
Nicholas Schnelle.  Also present during the interview was DIEKMANN'S
fiance, AMBER KOLBASUK, telephone number ████████.  After being
advised of the identity of the interviewing Agents and the nature of the
interview, DIEKMANN provided the following information:

DIEKMANN knew SAYOC for twenty (20) years.  DIEKMANN met SAYOC while
working valet services at night clubs.  SAYOC was always strange.  SAYOC
seemed to be a person who would decorate his vehicle in whatever theme
SAYOC was interested in at the time.  DIEKMANN remembered SAYOC decorating
his vehicle with professional wrestling material.  After professional
wrestling, SAYOC was interested and decorated his vehicle in
Chippendales.  SAYOC'S recent interests were politics and pro-Trump
rallies.

DIEKMANN believed that SAYOC had always lived in his vehicle.

SAYOC would send DIEKMANN a "barrage" of texts consisting of pictures or
videos during road trips, lifting weights at the gym and of political
rallies.  DIEKMANN never paid much attention to the texts and would always
respond with a one word answer such as "cool" or "awesome."

SAYOC called DIEKMANN on Thursday, October 25, 2018.  This was weird
because SAYOC never called DIEKMANN, only texted.  DIEKMANN answered and
SAYOC asked if the night club "Solid Gold" in Pompano, Florida was
busy.  SAYOC was told the club was not busy and DIEKMANN told SAYOC he had
customers arriving and had to go.  The entire phone call couldn't have
lasted more than thirty (30) seconds.

DIEKMANN is not friends with SAYOC on Facebook.  DIEKMANN tries to
separate work and personal lives.

---

Investigation on   10/29/2018   at   Port Saint Lucie, Florida, United States (In Person)

File #   266O-NY-3005093, 266O-NY-3005093-MM                              Date drafted   10/29/2018

by   ████████████████████████████████████

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not
to be distributed outside your agency.

266O-NY-3005093

Continuation of FD-302 of　(U) Interview of JOSEPH MICHAEL DIEKMANN　, On　10/29/2018　, Page　2 of 2

SAYOC was always super nice but strange. DIEKMANN never heard SAYOC say
anything violent or exhibit violent behavior. DIEKMANN never heard SAYOC
reference anyone named "Bobby."

DIEKMANN had never seen SAYOC'S van with political stickers on it prior to
news broadcasts covering the arrest.  The valet services employees had
never mentioned the van previously.

SAYOC was a gym rat and probably frequented the LA Fitness in Fort
Lauderdale.  If he lived in his car he probably used LA Fitness for
showers.

SAYOC didn't have any close friends.  People would stay away from SAYOC
because he was known to be weird and smell bad.  SAYOC had a lot of
acquaintances due to frequenting night clubs.  SAYOC was always at night
clubs such as Ultra, Dean's Gold, Tootsie's and Solid Gold.

DIEKMANN provided his cellular telephone to SA Richard Miller to show that
he had deleted texts from SAYOC and had no saved videos or pictures from
SAYOC.

# EXHIBIT GG

FD-302 (Rev. 5-8-10)



### FEDERAL BUREAU OF INVESTIGATION

Date of entry    10/27/2018

JOE SACCAL (SACCAL), ███████████████████████ Caucasian male, cellular telephone number ███████████ was interviewed at approximately 8:30 PM at his place of employment, Ultra Gentlemen's Club (ULTRA), located at ██████████████████████████████████████████. After being advised of the identity of the interviewing Special Agents and the nature of the interview, SACCAL provided the following information:

SACCAL is the night shift manager at ULTRA. He typically works Tuesday - Saturday, 9:00 PM to close. SACCAL was shown a Florida driver's license photo of CESAR SAYOC (SAYOC) and confirmed his identity.

SAYOC worked at ULTRA for about nine (9) weeks, since August 2018. SAYOC was hired first as a door man on Fridays and Saturdays, then became a day shift DJ on Saturday - Monday afternoons until 9:00 PM. As a DJ, SAYOC used the equipment present in the DJ booth, and SACCAL did not believe SAYOC used his own personal laptop or equipment.

SACCAL confirmed that SAYOC drove the white van with political stickers. SACCAL had personally observed the stickers included supportive PRESIDENT DONALD TRUMP stickers, but SACCAL didn't fully observe or realize the scope of the stickers, such as the "CNN Sucks" sticker. SACCAL did not believe SAYOC was homeless or living in the van. SACCAL had the impression that SAYOC had a home in Pompano Beach, and used to live in Miami and New York. SACCAL also noted SAYOC worked out a lot at various LA Fitness gyms south of West Palm Beach. SAYOC had previous work experience at TOOTSIES club in Miami, and SOLID GOLD (now closed) in Fort Lauderdale. He did not think SAYOC had a family, significant other, or children.

SAYOC was always very professional, polite, calm and courteous as a doorman and on the job. SAYOC never talked about politics. SACCAL had never seen SAYOC angry or arguing or debating with anyone. SACCAL did not talk about anything threatening, such as weapons, bombs, or terrorism. Therefore, SACCAL was surprised to learn SAYOC was arrested on 10/26/2018 for mailing package bombs. It was SACCAL's opinion that SAYOC must have had help making and mailing the bombs, due solely to the sheer

---

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 05-08-10)

266O-NY-3005093

(U) Interview of Joe Saccal, Manager,
Continuation of FD-302 of  Ultra Gentlemen's Club                                          , On  10/26/2018 , Page  2 of 2

number of bombs that were made and mailed.  SACCAL did not think SAYOC could make so many so fast by himself.  However, SACCAL could not provide any names or leads of people he thought may have assisted SAYOC.  He never saw SAYOC associate with anyone at the club he would describe as suspicious or criminal.  In fact, SAYOC refused to drink alcohol on or off duty at the club, and refused free drink offers from patrons.  SAYOC hated illegal drugs.  SAYOC told SACCAL he liked working at ULTRA because he saw very little illegal drug use there compared to other gentleman's clubs.

However, SACCAL was disappointed to learn that SAYOC had lied about his age.  SAYOC told SACCAL he was 46, however the media reported SAYOC was 56 when he was arrested on 10/26/2018.

SACCAL noted that SAYOC often cooked food at the club.  SAYOC brought a steamer into the club and cooked salmon and broccoli in it and made wraps.  He ate every two - three hours due to his fitness regimen.

The only suspicious thing SACCAL saw SAYOC do was on 10/25/2018, after he finished his shift at 9:00 PM, he departed and then returned near closing time to collect his tips.  While waiting for closing, he sat at a table and had papers, a binder, and newspaper clippings. [Note: Interviewing agents requested a copy of the surveillance video of SAYOC with the papers and newspaper clippings.  SACCAL advised he would request a copy from ULTRA's owner, ALAN LUCKMAN, ███████████████████

# EXHIBIT HH


OFFICIAL RECORD
Document participants have digitally signed.
All signatures have been verified by a
certified FBI information system.

FD-302 (Rev. 5-8-10)

## FEDERAL BUREAU OF INVESTIGATION

Date of entry        10/27/2018

CAREY JANNELLI (JANNELLI), ▮▮▮▮▮▮▮▮▮▮, Caucasian male, cellular telephone number ▮▮▮▮▮▮▮▮, was interviewed at approximately 8:15 PM at his place of employment, Ultra Gentlemen's Club (ULTRA), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮  After being advised of the identity of the interviewing Special Agents and the nature of the interview, JANNELLI provided the following information:

JANNELLI has been a floor man, aka dance counter, at ULTRA for two years.  He typically worked the Friday - Tuesday day shift from about 12:00 PM to 9:00 PM.  JANNELLI was shown a Florida driver's license photo of CESAR SAYOC (SAYOC) and confirmed his identity.

SAYOC worked at ULTRA for about two months, since August 2018.  He was friendly and jovial.  SAYOC never talked about politics, or the famous people or politicians who were the recipients of the package bombs.  JANNELLI did see that SAYOC drove the white van with the political stickers, and he kept it parked in the back of the club parking lot.

SAYOC worked as a DJ at ULTRA. The DJ booth had its own equipment, and SAYOC did not appear to bring a laptop with him. However, SAYOC did frequently bring bags into work, including grocery store plastic bags and duffel bags.  SAYOC also cooked food in the DJ booth. It smelled bad, like fish or collard greens.  SAYOC also had a blender he used to make shakes.

JANNELLI once saw SAYOC bring in notebooks into the DJ booth. They were old, and had hard covers.  JANNELLI did not see what was in them.

SAYOC told JANNELLI his ethnicity was Samoan.  SAYOC also said his family used to work on bridges.  JANNELLI was uncertain if SAYOC had a significant other.  JANNELLI did not know any dancers or employees by the name of "Bobby".

Investigation on  10/26/2018  at  West Palm Beach, Florida, United States (In Person)

File #  2660-NY-3005093, 2660-NY-3005093-MM                    Date drafted  10/27/2018

by  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

This document contains neither recommendations nor conclusions of the FBI. It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.