UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>        - v. -<br><br>CESAR ALTIERI SAYOC,<br>     a/k/a "Cesar Randazzo,"<br>     a/k/a "Cesar Altieri,"<br>     a/k/a "Cesar Altieri Randazzo,"<br><br>                              Defendant. | S1 18 Cr. 820 (JSR) |

## THE GOVERNMENT'S SENTENCING MEMORANDUM

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York
for the United States of America

Sam Adelsberg
Emil J. Bove III
Jane Kim
Jason A. Richman
Assistant United States Attorneys
     *Of Counsel*

**Table of Contents**

BACKGROUND ............................................................................................................ 4

I.   The Defendant's Terrorist Attack ......................................................................... 4

   A.   The Defendant Threatened Violence Against the Victims for Years Since
At Least 2016 ................................................................................................. 4

      1.   The Defendant Used Social Media to Incite Violence Against the Victims
and Convey Direct Threats Beginning in April 2016 ...................................... 5

      2.   The Defendant's Cellphone Reflects Violent Notes and Messages Dating
Back to September 2016 ................................................................................. 6

      3.   The Defendant's Email Accounts Reflect Research Regarding Explosives
Beginning in October 2017 ............................................................................. 6

      4.   The Defendant's Laptop Reflects Attack Planning Beginning in At Least
December 2017 ................................................................................................. 8

   B.   The Defendant Mailed 16 IEDs to 13 Victims Across the Country ........................ 10

   C.   The Arrest of the Defendant and Seizure of His Van ............................................. 19

   D.   The Forensic Analysis of the Defendant's IEDs .................................................... 20

II.   The Charges and the Defendant's Plea Agreement .............................................. 22

III.   The Defendant's Guilty Plea Allocution and Statements to the Court ............................ 23

   A.   The Defendant's March 21, 2019 Guilty Plea Allocution ..................................... 23

   B.   The Defendant's Post-Plea Letters to the Court and Subsequent Proceedings ........ 23

   C.   The Defendant's April 15, 2019 Statements to the Court Affirming His Guilty Plea
and Plea Allocution ...................................................................................... 24

IV.   The Probation Office Calculates a Guidelines Sentence of Life Imprisonment .............. 25

V.   The Probation Office Recommends a Sentence of Life Imprisonment ........................... 26

DISCUSSION ............................................................................................................. 26

I.   A Life Sentence Is Warranted Based on the Nature and Seriousness of the
Defendant's Terrorist Attack ............................................................................. 27

   A.   The Defendant Planned and Executed a Terrorist Attack with the Intent to
Harm Others ................................................................................................. 27

   B.   The Defendant's Attack Crippled Parts of Several Cities and Required a
Massive Response ......................................................................................... 32

II.   A Sentence of Life Imprisonment Is Sufficient but Not Greater than Necessary to Protect
the Public from Further Terrorism Crimes of the Defendant Given the Defendant's
Absence of Remorse, Lack of Candor with the Court, and Failure to Fully Accept
Responsibility for His Crimes .......................................................................... 34

i

A.   The Defendant's Lengthy Criminal History Gives Rise to a Significant Risk of Recidivism .................................................................................... 34

B.   The Defendant Has Not Fully Accepted Responsibility or Demonstrated Remorse for His Crimes ................................................................................ 35

C.   The Defendant's Expert Report Does Not Mitigate His Conduct .......................... 37

III.   A Life Sentence Will Avoid Creating Unwarranted Sentencing Disparities ................... 39

A.   *United States v. Tomkins*, No. 07 Cr. 227 (N.D. Ill) ................................. 39

B.   The Anthrax Cases ................................................................ 41

IV.   A Life Sentence Is Necessary to Afford Adequate Deterrence and to Promote Respect for the Law ................................................................................. 42

CONCLUSION ................................................................................. 43

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>CESAR ALTIERI SAYOC,<br>    a/k/a "Cesar Randazzo,"<br>    a/k/a "Cesar Altieri,"<br>    a/k/a "Cesar Altieri Randazzo,"<br><br>                              Defendant. | S1 18 Cr. 820 (JSR) |

    The Government respectfully submits this memorandum in connection with the sentencing

of Cesar Altieri Sayoc ("Sayoc" or the "defendant"), scheduled for August 5, 2019.  For the reasons

set forth below, a Guidelines sentence of life imprisonment is necessary and appropriate.

    Over the course of approximately two weeks in late-October 2018, the defendant mailed

16 improvised explosive devices ("IEDs") to 13 victims around the country (the "Victims").  The

defendant's terrorist attack was the culmination of years of violent and hate-filled threats, months

of planning, and days of carefully assembling the explosive mailings while proudly monitoring

media coverage of the widespread panic he induced.  It is clear that the defendant perpetrated this

attack intending to injure and silence public servants and private citizens based on their civic

activities, and to intimidate like-minded people from entering the public arena and participating in

discourse that is critical to the proper functioning of this country.

    The defendant manifested his violent intentions through the preparation of the mailings

and the construction of the IEDs.  In addition to addresses, he found photographs of each of the

Victims and placed them carefully on each IED with a red "X" over their faces.  He also added

black flags similar in appearance to banners used by ISIS and other foreign terrorist organizations.

In each of the 16 PVC pipes, he packed not only explosive powder from fireworks, but also "pool

shock" and shards of glass.  He used the pool chemicals, which typically contain chlorine, to increase the chances of burning the skin of the Victims.  He added the glass shards hoping to pierce the Victims' flesh and seeking to maximize potential injuries and other damage in connection with an explosion.  Sixteen separate times, the defendant mailed a package containing an explosive with these components while intending to injure people, to scare and intimidate others, and to damage property.  He mailed these IED-laden packages to government facilities, private offices, and—in a telling sign of his depravity—an assisted living facility that former Vice President Joseph Biden had happened to visit just once.

While there is no dispute that the defendant's IEDs would not have functioned as designed, that fact has little legal significance or practical import here.  As a legal matter, the definition of "destructive device," as relevant to 16 of the defendant's offenses of conviction, requires only that the bomb be capable of exploding and intended to be used as a weapon.  Those elements are met here.  As a factual matter, the defendant's IEDs were dangerous, capable of causing extensive harm, and responsible for shutting down parts of several major metropolitan areas, including train stations, schools, and postal facilities.  Notwithstanding his design flaws, the defendant has admitted that he understood that each IED was capable of exploding, which would have resulted in the discharge of glass shards and toxic chemicals towards the holder of the package and those in the vicinity, and therefore presented a risk of harm to both people and property.  Conduct of this massive scale and scope, animated by these deadly intentions, warrants severe punishment.

The defendant's failure, at least thus far, to fully accept responsibility and express remorse further supports the imposition of a life sentence.  The defendant appears to regret facing potential punishment, but not what he did and the harm that his attack caused.  His factual allocution in

2

connection with his guilty plea was legally sufficient but strained at best.  Following the plea, he sought to recant sworn statements to the Court regarding his intent, clinging desperately in two separate letters to the implausible claim that he intended to damage property but not injure people with his explosives—because he evidently fears that harsh consequences are likely to follow from such baldly violent intent.

In a similarly desperate effort to avoid accountability, the defendant claimed that his IEDs were a "hoax." That is simply false.  Deficient as the defendant may be as a bomb maker, hoaxes do not involve real explosives, real shards of glass, and real toxic chemicals, as the defendant's IEDs did.  The defendant also outright lied in his post-plea letters by asserting that he had not reviewed his allocution prior to reading it and was tricked by his lawyers when answering questions from the Court.  That was also false, and the defendant's lies further indicate that he is willing to say anything he believes may help him avoid appropriate punishment.  At an April 15, 2019 conference, the defendant wisely appeared to abandon at least some of these untenable positions.  After the conference, however, the Court docketed a third letter from the defendant in which he used terminology of military conflict and war in a poorly conceived effort to justify his actions, once again demonstrating that he executed his terrorist attack with violent intent to harm.

Thus, in addition to the seriousness of the offense conduct, a life sentence is necessary to protect the public from the defendant due to his lack of remorse and lengthy criminal history, including a 2002 conviction for making bomb threats while invoking the September 11, 2001 terrorist attacks.  Such a sentence is also appropriate in order to promote respect for the law and to achieve general deterrence of others who may contemplate similar acts of domestic terrorism.

# BACKGROUND

## I.     The Defendant's Terrorist Attack

The defendant spent more than a year contemplating acts of violence against the Victims, and other politicians and celebrities, in order to silence them.  He put his plan into action beginning on or about October 17, 2018, when he commenced a widespread terror campaign that lasted approximately two weeks.  During that period, the defendant conducted his nationwide campaign of terror by constructing and mailing 16 IEDs from South Florida to 13 Victim addressees in New York, New Jersey, Washington, D.C., Delaware, Georgia, and California.   (July 8, 2019 Presentence Investigation Report ("PSR") ¶¶ 73-74).  Each package included a pipe bomb consisting of explosives packed inside a PVC pipe along with glass shards that would function as shrapnel, at least one photograph of the Victim-addressee (sometimes with relatives) covered with a red "X," and a black flag similar in appearance to flags used by ISIS and other foreign terrorist organizations.  While the 13 Victims were the defendant's most readily apparent targets, his attack placed thousands of innocent people in harm's way, including the Victims' families and employees, employees of the U.S. Postal Service ("USPS") throughout the country, and law enforcement personnel responsible for responding to and rendering safe the defendant's IEDs.

### A.     The Defendant Threatened Violence Against the Victims for Years Since At Least 2016

The defendant's electronic devices, including his cellphone and his laptop, his social media and email accounts, and his van were seized and searched following his arrest on October 26, 2018. (*See* PSR ¶¶ 76-77).  The defendant's electronic devices and accounts were filled with violent and hateful messages regarding the Victims and other public officials, as well as online research

4

regarding explosives and the Victims.  These materials establish the defendant's deep-seated and longstanding hatred and proclivity toward violence, his intent to harm and injure the Victims, and his long-term planning of the attack.  (*See id.*).

### 1. The Defendant Used Social Media to Incite Violence Against the Victims and Convey Direct Threats Beginning in April 2016

The defendant used social media to post innumerable violent and hateful messages about the Victims and other potential targets dating back to 2016.  (*See* Ex. B at 3-4).  In April 2016, he wrote that former President Barack Obama's "head need[ed] to be chopped off" and wished "death" to George Soros and former Attorney General Eric Holder.  (*Id.* at 3).  On successive days in June 2016, he wrote that former Secretary of State Hillary Clinton "has to die" and "must be killed."  (*Id.*).  Later that summer, the defendant wrote that it was "time to seek to destroy CNN." (*Id.*).  In April 2017, the defendant wished "Death" to "all Clintons."  (*Id.*).  In November 2017, he posted, "Your days are number[ed] Steyer[]."  (*Id.*).

The defendant also used social media to convey threats directly and personally.  In April 2018, the defendant sent a threatening message from a Facebook account in his name to the Facebook account of then-Congressman Beto O'Rourke, which warned that O'Rourke should "hug your loved ones everytime [sic] you leave your home" and threatened that Sayoc would "see you soon."  Sayoc also sent O'Rourke's Facebook account several pictures of O'Rourke, some of which included his wife and children, and headlines from press coverage about missing persons in South Florida, such as "Body Found in Everglades is Missing 8-Year-Old."  Similarly, in July 2018, the defendant sent numerous Facebook messages from a Facebook account in his name to an employee of CNN, also advising the employee to "Hug your loved ones real close everytime

you leave your home."  The defendant's threatening messages included a photograph of the CNN building on fire.

### 2.     The Defendant's Cellphone Reflects Violent Notes and Messages Dating Back to September 2016

The defendant's cellphone contained numerous messages, dating back to 2016, contemplating violence against the Victims and others.  (*See* PSR ¶ 77; Ex. B at 2).  The defendant sent many of these messages as notes to himself to "kill" people.  (Ex. B at 2).  In September 2016, he wrote to an associate that "[h]opefully" Hillary Clinton would "die."  (*Id.*).  In April 2018, he wrote to himself, "Death to all liberals."  (*Id.*).  The defendant's cellphone also contained photographs of some of the Victims and images of what purport to be their homes.

### 3.     The Defendant's Email Accounts Reflect Research Regarding Explosives Beginning in October 2017

The defendant created dozens of email accounts as he contemplated violence against the Victims and others, such as "killallliberalleftdemocrats@aol.com," which he created on January 13, 2018, and "maximwatersdeathsoon@aol.com," which he created on January 28, 2018.  The contents of the defendant's email accounts reveal his research regarding explosive devices, additional death threats to the Victims and others, and efforts to compile the Victims' addresses for use in his attack.

On October 30, 2017, nearly a year before the attack, the defendant used the email account cesaraltieri2@gmail.com to send himself a video of a man holding an object in one hand and a

flame in another, which the man referred to as a "nice cocktail"[1]—in an apparent reference to an explosive Molotov cocktail:



On March 18, 2018, over seven months before the attack, the defendant searched for the phrases, "How do they make letter bomb" and "What a letter bomb," while logged into the email account cesarnorthcarolina@gmail.com. (*See* PSR ¶ 77; Ex. B at 5-6). The search results included

---

[1] While the speaker's identity is unclear, the white paint on the vehicle's door resembles that of the defendant's van.

a series of YouTube videos the defendant accessed, including one that is self-described as a "demonstration of a letter bomb" and depicts the simulated receipt and explosion of such a bomb:



###    4.    The Defendant's Laptop Reflects Attack Planning Beginning in
         At Least December 2017

Consistent with his social media accounts and cellphone, the defendant used his laptop to conduct numerous Internet searches related to murdering the Victims.  On March 9, 2018, he searched for the phrase "kill george soros."  (Ex. B at 4).  In March and April 2018, he searched for the terms, "How to kill all democrats" and "Kill all socialist."  (*Id.*).  On May 1, 2018, he searched for a "list of house democrats."  (*Id.*).  In June 2018, he searched for the phrase, "Kill Maxine waters."  (*Id.*).

The defendant began researching the Victims and other public officials beginning in at least December 2017.  (*See* PSR ¶ 77; Ex. B at 4).  He conducted online searches for the Victims'

addresses and the addresses of other public officials.  For example, on December 23, 2017, he searched for the addresses of Speaker of the House Nancy Pelosi, Senator Chuck Schumer, and Congresswoman Maxine Waters.  (*See* PSR  ¶ 77; Ex. B at 4-5).  Over the ensuing months, the defendant repeatedly searched for the "home address" or "address" of several of his Victims, including Waters, Clinton, former Director of the Central Intelligence Agency John Brennan, Senator Cory Booker, and Robert De Niro.  (*See* Ex. B at 4-5).  His address searches increased beginning in late September 2018, as his attack planning increased.  On September 18, 2018, he searched for, among other things, "cnn building" and strings of search terms that included relatives of the Victims.  (*Id.*).  Beginning on September 26, and continuing during the attack, the defendant searched for the addresses of Schumer, Barack Obama, Michelle Obama, former Senator Jeff Flake, O'Rourke, Alec Baldwin, and Tom Steyer.  (*See id.*).

The defendant also used his laptop to compile information that he used to execute his attack and to prepare the IED mailings.  In July 2018, the defendant created files that listed the addresses to which he mailed the IEDs in a format that he used for mailing labels when he printed the documents.  The defendant accessed these files as late as October 2018.  In September 2018, the defendant created separate files that included his return-address label format.



**B.     The Defendant Mailed 16 IEDs to 13 Victims Across the Country**

In October 2018, the defendant constructed and mailed 16 IEDs from South Florida to 13 Victims at various personal and professional addresses in New York, New Jersey, Washington, D.C., Delaware, Georgia, and California.   (PSR  ¶¶ 73-74).   The defendant listed U.S. Representative Debbie Wasserman Schultz as his mailings' return address, entangling yet another victim in his offense conduct.   The defendant mailed his first IED to Soros through the USPS on or about October 17, 2018, and continued mailing the remaining 15 IEDs to 12 more victims over the next nine days, through on or about October 26, the day of his arrest.   (*See* PSR ¶¶ 73-74). Reveling in widespread media coverage of the fear and panic his bombs were causing, after the Soros IED was discovered, the defendant mailed six additional bombs.   Law enforcement

recovered and rendered safe the defendant's IEDs between October 22 and November 1, 2018, in connection with the following chronology:

The Soros IED.  On or about October 17, 2018, Sayoc mailed an IED to Soros's personal residence in Katonah, New York (the "Soros IED").  USPS personnel in South Florida scanned the Soros IED at approximately 10:42 p.m. on October 17, and delivered it to Soros's residence on October 22, 2018.

 

(*See* PSR ¶ 73; *see also* Dkt. No. 37 at 34-40).

The Clinton IED.  On or about October 18, 2018, Sayoc mailed an IED to Hillary Clinton at the Clintons' personal residence in Chappaqua, New York (the "Clinton IED").  USPS personnel scanned the Clinton IED in South Florida at approximately 5:21 p.m. on October 18, and delivered it to the Clintons' residence on October 23, 2018.

 

11

(*See* PSR ¶ 74(a); *see also* Dkt. No. 37 at 60-65).

The Brennan IED.  On or about October 20, 2018, Sayoc mailed an IED to Brennan at the Time Warner Center in Manhattan (the "Brennan IED").  USPS personnel scanned the Brennan IED in South Florida at approximately 9:23 p.m. on October 20, and delivered it to the Time Warner Center on October 24, 2018.

 

(*See* PSR ¶ 74(c); *see also* Dkt. No. 37 at 50-55)).

The Obama IED.  On or about October 18, 2018, Sayoc mailed an IED to Obama at a P.O. Box for the Obamas in Washington, D.C. (the "Obama IED").  USPS personnel scanned the Obama IED in South Florida at approximately 5:29 p.m. on October 18, and delivered it to the P.O. Box on October 24, 2018.

 

(*See* PSR ¶ 74(b); *see also* Dkt. No. 37 at 30-34).

The Waters IEDs.   On or about October 18, 2018, Sayoc mailed two IEDs to Waters ("Waters IED-1" and "Waters IED-2").   Sayoc mailed Waters IED-1 to Waters's congressional office in Washington, D.C.   He mailed Waters IED-2 to her congressional office in Los Angeles, California.   USPS personnel scanned Waters IED-1 in South Florida at approximately 1:46 a.m. on October 19, and Waters IED-2 at approximately 3:37 a.m. on the same morning.   The IEDs were delivered to Waters's addresses in Washington, D.C., and Los Angeles on October 24, 2018.

 

 

(*See* PSR ¶ 74(e); *see also* Dkt. No. 37 at 24-29, 74-78).

The Holder IED.   On or about October 19, 2018, Sayoc mailed an IED to Holder's business address (the "Holder IED").   USPS personnel scanned the Holder IED in South Florida at approximately 1:53 a.m. on October 20.   Law enforcement recovered the Holder IED from the USPS mail stream on October 24, 2018.



(*See* PSR ¶ 74(d); *see also* Dkt. No. 37 at 65-69).

    <u>The Biden IEDs</u>.  On or about October 19, 2018, Sayoc mailed an IED to an assisted living facility in Wilmington, Delaware, which Biden had once visited ("Biden IED-1").  USPS personnel scanned Biden IED-1 in South Florida at approximately 2:31 a.m. on October 20, and law enforcement recovered it from the USPS mail stream on October 25.  On or about October 22, 2018, Sayoc mailed an IED to Biden's personal address in Wilmington, Delaware ("Biden IED-2").  USPS personnel scanned Biden IED-2 in South Florida at approximately 2:14 a.m. on October 23, and law enforcement also recovered it from the USPS mail stream on October 25, 2018.





14

 

(*See* PSR ¶ 74(f); *see also* Dkt. No. 37 at 40-45, 45-50).

The De Niro IED.   On or about October 18, 2018, Sayoc mailed an IED to De Niro's business address in Manhattan (the "De Niro IED").   USPS personnel scanned the De Niro IED in South Florida at approximately 1:46 a.m. on October 19, and law enforcement recovered it from De Niro's address on October 25, 2018.

 

(*See* PSR ¶ 74(g); *see also* Dkt. No. 37 at 55-60).

The Booker IED.   On or about October 24, 2018, Sayoc mailed an IED to Booker's congressional office in Camden, New Jersey (the "Booker IED").   USPS personnel scanned the Booker IED in South Florida at approximately 7:36 a.m. on October 25, and law enforcement recovered it from the USPS mail stream on October 26, 2018.

15




(*See* PSR ¶ 74(h); *see also* Dkt. No. 37 at 69-73).

The Clapper IED.  On or about October 23, 2018, Sayoc mailed an IED to former Director of National Intelligence James Clapper at the Time Warner Center in Manhattan (the "Clapper IED").  USPS personnel scanned the Clapper IED in South Florida at approximately 5:22 p.m. on October 23, and law enforcement recovered it from the USPS mail stream on October 26, 2018.




(*See* PSR ¶ 74(i); *see also* Dkt. No. 37 at 79-84).

The Harris IED.  On or about October 24, 2018, Sayoc mailed an IED to the congressional office of Senator Kamala Harris in Sacramento, California (the "Harris IED").  USPS personnel scanned the Harris IED in South Florida at approximately 2:39 p.m. on October 25, and law enforcement recovered it from the USPS mail stream on October 26, 2018.




(*See* PSR ¶ 74(j); *see also* Dkt. No. 37 at 84-88).

The Steyer IEDs.  On or before October 26, 2018—the day Sayoc was arrested—he mailed IEDs to two of Steyer's business addresses in San Francisco, California ("Steyer IED-1" and "Steyer IED-2").  USPS personnel scanned Steyer IED-1 in South Florida at approximately 10:21 p.m. on October 26, and law enforcement recovered it from the USPS mail stream that night. USPS has not been able to identify the point at which Steyer IED-2 entered the mail stream, but it was recovered from the mail stream on November 1, 2018.







(*See* PSR ¶ 74(k); *see also* Dkt. No. 37 at 90-95, 101-106).

The CNN IED.   On or before October 26, 2018, Sayoc mailed an IED to CNN at its headquarters in Atlanta, Georgia (the "CNN IED").  The CNN IED was delivered on October 29 and recovered by law enforcement after it was discovered.

 

(*See* PSR ¶ 74(l); *see also* Dkt. No. 37 at 95-100).

Video surveillance outside of certain USPS facilities and post office boxes captured the defendant and his white Dodge Ram van driving past a USPS post office box located in Fort Lauderdale, Florida on October 17, 2018, and mailing some of the IEDs from that location early in the morning on October 18 and 24, 2018.

18





## C.    The Arrest of the Defendant and Seizure of His Van

On October 26, 2018, law enforcement arrested the defendant in Florida and seized his van, cellphone, and laptop.  The windows of the defendant's van were covered with stickers depicting written text and images, including some that further reflect his intent to target the Victims.  (PSR ¶ 76).  Other stickers contained messages such as "KILL YOUR ENEMY" and

19

"No Mercy Not An Option."  Similar to his IEDs, the van bore stickers reflecting pictures of some of the Victims, including Obama and Clinton, targeted with cross hairs or red "Xs."

 

Inside the defendant's van, the Federal Bureau of Investigation ("FBI") seized commercially produced fireworks that contained low explosive mixtures consistent with some of the chemicals in the IEDs, as well as solder consistent with solder the defendant used to build the IEDs.  (*See* PSR ¶ 76; Dkt. No. 37 at 88-90).

**D.    The Forensic Analysis of the Defendant's IEDs**

Each of the defendant's 16 IEDs was recovered, rendered safe, and transported to the FBI's Explosives Unit in Quantico, Virginia.  Forensic analyses of the IEDs and associated material left no doubt that the defendant was the perpetrator of the attack.  Specifically, the FBI identified Sayoc's DNA on 12 of the IEDs, and his fingerprints on two of the IED packages.

The FBI Explosives Unit examined the IEDs and produced a 107-page report regarding its analysis (the "FBI Explosives Report").  (*See* Dkt. No. 37).  The FBI Explosives Report includes the following findings and conclusions, among others:

20

- Each IED included the components of a destructive device, including (i) a "concealment container" in the form of a mailing envelope, (ii) a "confinement container" in the form of a PVC pipe with two end caps, (iii) a "low explosive main charge" packed inside the PCV pipe, and (iv) an "electric fuzing system." (*See id.* at 24).

- Chemical analysis of the explosives material in the IEDs revealed mixtures of oxidizers and fuels typically used in "pyrotechnic formulations," *e.g.*, commercially produced fireworks as seized from the defendant's van, that "reacted energetically," *i.e.*, burned, when exposed to flame. (*See* Dkt. No. 34 at 6-7).

- Each of the defendant's 16 IEDs contained glass fragments. "Hardened objects, such as glass, are referred to as fragmentation. Fragmentation is a form of IED enhancement that is added to an IED to impart further physical damage to the surrounding area, and/or to injure or kill personnel in the vicinity of the explosion." (Dkt. No. 37 at 24).

- "Properly assembled and initiated, the resulting explosion from one of the IEDs could cause property damage and/or personal injury." (*Id.*).

The FBI Explosives Report acknowledged that the defendant's IEDs "would not have functioned as a result of their design," but concluded that the IEDs were nevertheless capable of exploding and injuring people because of the volatile qualities of the chemicals that the defendant packed into each pipe bomb. (*See id.*). Given the instability of the defendant's IEDs' mixture, the FBI explosives expert could not quantify the likelihood of explosion or the extent of any detonation. The defendant's placement of a combination of different chemicals and glass shards within each IED, however, could have created enough friction to ignite the explosive material within one or more of the IEDs. Additional heat and friction capable of igniting the explosives could have resulted from the transportation, handling, and disassembly of the IEDs. In such an event, the ignition of the explosives would have resulted in a rapid release of gasses and an explosion of the closed-container that would propel pieces of the PVC pipes outward. The glass

shards would also "impart further physical damage to the surrounding area, and/or injure/kill personnel in the vicinity." (*See id.*).

## II.     The Charges and the Defendant's Plea Agreement

On March 21, 2019, the defendant waived indictment and pled guilty, pursuant to a plea agreement (the "Plea Agreement"), to Superseding Information S1 18 Cr. 820 (JSR) (the "Information"). The Information charged the defendant in 65 counts related to the 16 IEDs he constructed and mailed to victims across the country. (Dkt. No. 15). The defendant was charged with (i) 16 counts of Use of a Weapon of Mass Destruction, in violation of 18 U.S.C. §§ 2332a(a)(2) and 2 (Counts 1 to 16); (ii) 16 counts of Interstate Transportation and Receipt of Explosives, in violation of 18 U.S.C. §§ 844(d) and 2 (Counts 17 to 32); (iii) 16 counts of Threatening Interstate Communications, in violation of 18 U.S.C. §§ 875(c) and 2 (Counts 33 to 48); (iv) 16 counts of Illegal Mailing of Explosives, in violation of 18 U.S.C. §§ 1716(j)(2) and 2 (Counts 49 to 64); and (v) one count of Using Explosives to Commit a Felony, "to wit, the explosive powder packed inside the improvised explosive devices described in" Counts 1 through 64, in violation of 18 U.S.C. §§ 844(h) and 2 (Count 65). (*Id.*).

Pursuant to the Plea Agreement, the defendant stipulated to a Guidelines calculation under the U.S. Sentencing Guidelines ("U.S.S.G." or the "Guidelines") recommending a term of life imprisonment, and acknowledged that Count 65 required a mandatory minimum term of 10 years' imprisonment. (03/21/2019 Plea Tr. at 15).

22

**III.    The Defendant's Guilty Plea Allocution and Statements to the Court**

**A.    The Defendant's March 21, 2019 Guilty Plea Allocution**

On March 21, 2019, the defendant pleaded guilty to all of the charges in the Information,

pursuant to the Plea Agreement, based on the following sworn factual allocution:

> In October 2018, I made devices that were designed to look like pipe bombs
> and sent them through the U.S. mail.  I sent a total of 16 devices to people
> around the country.  I mailed them from South Florida to George Soros,
> Hillary Clinton, John Brennan, Robert De Niro, James Clapper, Barack
> Obama, Maxine Waters, Eric Holder, Joe Biden, Cory Booker, Kamala
> Harris, Thomas Steyer, and CNN.
>
> I sent all of the 16 devices with the intent to threaten and intimidate people
> and with the intent to injure property.
>
> The devices consisted of a plastic pipe with a digital alarm clock and wires
> attached to it.  Inside the plastic pipe was powder from fireworks, fertilizer,
> pool shock and some glass fragments.  I also put pictures of the recipients
> with a red "X" over their faces inside the package.
>
> . . .
>
> I was aware of the risk that [the devices] would explode.

(03/21/2019 Plea Tr. at 17, 20).  The defendant stated that he intended the IEDs to be "viewed" as

"explosive devices" and that he was "aware of the risk" that they "would explode."  (*Id.* at 20).

The defendant also responded, "Yes," when the Court asked if he knew "there was a risk that there

would be an injury to persons."  (*Id.* at 21-22).

**B.    The Defendant's Post-Plea Letters to the Court and Subsequent Proceedings**

On or about March 23, 2019, the defendant sent a letter to the Court in which he claimed

that he misspoke during his guilty plea two days prior.  (Dkt. No. 18).  He asserted in the letter that

"under no circumstances [was] my intent to hurt or harm anyone," and that "the intention was only

23

to intimidate [and] scare." (*Id.* at 2-3). The defendant also described his bombs as "decoy devices" and his terror attack as a "hoax." (*Id.*)

On or about April 1, 2019, the defendant sent another letter to the Court in which he made further efforts to retract his sworn statements during his plea allocution. (Dkt. No. 19). He asserted, contrary to the FBI's expert analysis, and his own sworn allocution, that the IEDs "would never explode" and that he was not aware of a risk of harm to others. (*Id.* at 3-4). The defendant also wrote that the statement that he read to the Court on March 21, 2019, was given to him the day of the plea and that he had "no time to read or review the paper." (*Id.* at 5).

### C.    The Defendant's April 15, 2019 Statements to the Court Affirming His Guilty Plea and Plea Allocution

On April 15, 2019, the Court conducted a conference to address the defendant's post-plea letters. The defendant reaffirmed his guilt on all counts of the Information. (04/15/2019 Tr. at 9-10). He stated that he stood by his plea allocution to the Court on March 21, 2019, and he confirmed—contrary to the April 1, 2019 letter—that he had carefully reviewed his written plea allocution with his attorneys prior to reading it during the guilty plea. (*Id*).

The Court observed that the defendant's post-plea letters asserted, "in effect, that he did not intend or even perceive a likelihood that he would injure anyone, and that would seem to be at variance with the elements of at least some of the counts to which he pled." (*Id.* at 4). When the Court focused on the element of Counts 49 through 64 that requires specific intent to "kill or injure another, or injure the mails or property," defense counsel sought to avoid the human injury prong and to focus on potential damage to property. (*Id.* at 5). The Court inquired of defense counsel:

24

> [P]lease explain to me how he could have an intent to injure property, but
> not an intent to injure people?  So the thing would explode, but by the grace
> of God, it would not injure any person who received it? . . . I am just asking
> how you can possibly, under the facts of this case, say that your client had
> an intent to injure property under that statute, but did not have, as he has
> now repeatedly denied in his letters, any intent to injure a person?

(*Id.* at 5-6).  Counsel replied that "there is an argument" that the element is satisfied by "intent to cause emotional injury or intimidation towards others."  (*Id.* at 6-7).

The Court also asked the defendant about his intent in mailing the 16 IEDs.  The defendant initially indicated—implausibly—that he intended to injure "[j]ust the property."  (*Id.* at 8).  The defendant, however, then answered, "Yes," when the Court noted that the IEDs included "some explosive materials" and asked the defendant if he knew that the IEDs "could injure either property or person" if they detonated.  (*Id.*).  The defendant also reiterated that he intended to "scare and intimidate."  (*Id.* at 9).

## IV.    The Probation Office Calculates a Guidelines Sentence of Life Imprisonment

The Probation Office concluded, and the defendant agreed in the Plea Agreement, that the Guidelines call for a sentence of life imprisonment with a mandatory minimum term of 10 years' imprisonment.  (PSR ¶ 68, at 50).  For each of the 16 IEDs, the undisputed Guidelines calculation includes enhancements based on intent to injure the United States, U.S.S.G. § 2M6.1(a)(1), targeting current and former officials based on their status, *id.* § 3A1.2(a), and intent to promote federal crimes of terrorism, *id.* § 3A1.4(a).   His Guidelines calculation is literally, and appropriately, off the chart with an offense level of 59 capped at 43.   Although the defendant's criminal history category is VI based on the terrorism enhancement, he also has four criminal history points as the result of nine prior convictions.  (PSR ¶¶ 220-29).  One of these convictions

25

stemmed from the defendant's threats to throw or discharge a bomb at Florida Power & Light ("FPL") in August 2002.  (*Id.* ¶ 222).  There, the defendant contacted FPL and threatened to "blow up FPL" in a manner that would be "worse than September 11th."  (*Id.*).  Sayoc told an FPL employee that if FPL cut his utility services, "something would happen."  (*Id.*).

## V.     The Probation Office Recommends a Sentence of Life Imprisonment

The Probation Office recommends a sentence of life imprisonment.  (PSR at 50).  This recommendation is based on the seriousness of the offense; the defendant's long-term planning of the attack, which included online research regarding bomb-making and the Victims; the defendant's targeting of public officials; the fear the defendant caused to the Victims and to the public; the need for general and specific deterrence; and the defendant's criminal history, which dates back to 1991 and includes the above-described conviction for threatening to bomb FPL in 2002.  (*Id.* at 52-53).

## **DISCUSSION**

The statutory sentencing factors counsel in favor of a Guidelines sentence of life imprisonment.  The defendant's offenses are exceedingly serious.  He poses significant risk of recidivism based on his prior convictions and his lengthy history of threats against public officials. And a Guidelines sentence is critical and necessary to achieve general deterrence of acts of terrorism targeting public servants and participants in civic discourse.  Put simply, the defendant intended to silence, through harm and fear, those with whom he disagreed, and now he must be incapacitated to protect the public and promote respect for the law.

I.     **A Life Sentence Is Warranted Based on the Nature and Seriousness of the Defendant's Terrorist Attack**

The indisputably serious nature of the defendant's crimes warrant a life sentence.  *See* 18 U.S.C § 3553(a)(1), (a)(2)(A).

The defendant engaged in a premeditated and prolonged course of conduct that culminated in a two-week terrorist attack involving 16 pipe bombs that he constructed and mailed to multiple victims, including a former U.S. President, current U.S. Senators, a current U.S. Congresswoman, and other former government officials.  His large-scale attack triggered massive law enforcement response and crippled parts of several major metropolitan areas as well as several government facilities.  The defendant acted—16 separate times—with violent intent, including the intent to harm, threaten, and silence innocent civilians.  In doing so, the defendant terrorized the public and placed thousands of individuals in harm's way.

A.     **The Defendant Planned and Executed a Terrorist Attack with the Intent to Harm Others**

The defendant contemplated violence for years, planned his attack over the course of several months, and mailed 16 IEDs to 13 Victims around the country—while enjoying media coverage of the mass panic and fear he created.

In April 2016, the defendant called for the then-U.S. President to be decapitated.  (*See* Ex. B at 3).  Continuing until his arrest, in private messages and public social media posts alike, the defendant incited and planned violence against numerous people, including the Victims and other public officials.  Of his targets he wrote the following:  Their "days are numbered," their "head need be chopped off," "death to him," "dead man walking," "You will die soon contract written," "Death to Hilary," "Death Death Death to all Clintons," "He must die," "kill him," "kill him," "kill

27

him."   (*See id.*).   By December 2017, the defendant was researching the Victims and their addresses.   (*See id.* at 4-5).   In 2018, he sent threatening messages to O'Rourke and CNN.   By March 2018, he was conducting searches and watched a YouTube video relating to the construction of "letter bomb[s]."   (*Id.* at 4).   Beginning in July 2018, the defendant started to compile the Victims' addresses into mailing labels on his laptop.

The defendant's construction of each of the 16 IEDs required careful planning, assembly, and the intent to harm others.   He has admitted as much.   The defendant purchased PVC pipe, clocks, fireworks, wire, mailing labels, envelopes, and stamps.   He found the addresses and downloaded photographs of each of the Victims and their family members.   Sixteen different times, the defendant drew "Xs" over a Victim's face, printed mailing labels, placed an IED in an envelope, drove to a USPS mailbox, and mailed a pipe bomb that he intended to cause injury, property damage, and fear.   (*See* 03/21/2019 Plea Tr. at 17; PSR ¶ 76).   Surveillance video captured the defendant's mailings at least twice:





The videos help illustrate the defendant's careful execution of the attack, as he sought to mail the IEDs early in the morning when witnesses were less likely to observe him.

For each of the 16 IEDs, the defendant used tape and/or putty to seal the PVC pipes, which increased the chances that the expansion of gas resulting from the ignition of his explosives would cause parts of the pipe to be launched outward towards members of the public:



If it were true, as the defendant suggested in one of his letters, that he intended these IEDs as a "hoax," there was no reason for him to fill the pipes with an explosive and seal them in this fashion.

The defendant admitted at his guilty plea that he also put "pool shock," *i.e.*, chlorine, in the IEDs.  His purpose in that decision is clear:  The defendant intended that, even absent a detonation, his IEDs would harm people—not property—by exposing the Victims, USPS workers, law enforcement, and anyone else who came into contact with his devices to burns from toxic chemicals.  But it is also clear that the defendant very much hoped his IEDs would explode and harm people in the process.  His decision to pack glass shards in with the explosives demonstrates his violent intent:



The significance of the shards cannot be understated as an indicator of the defendant's intent.  There is no reason to pack fragmentation into an explosive device other than to maximize the likelihood that the bomb will cause injury.  Each of the 16 times the defendant did so, he hoped that an explosion would cause the glass to lodge into the flesh of a human being.

The addressees on the defendant's IED mailings were not his only victims.  The defendant endangered the 13 Victims' families, friends, and colleagues, and thousands of others.  The defendant tried to mail an explosive to a nursing home simply because Biden had once visited it.  The U.S. Postal Inspection Service ("USPIS") estimates that the defendant placed numerous postal facilities, which employ hundreds of employees, six commercial properties, three private

30

residences, five congressional offices—and each of the individuals within these residences, facilities, or properties—at risk of harm should even one of the defendant's 16 IEDs have detonated.

The culpability of the defendant's actions, and his intent, increased exponentially as he saw firsthand the terror and panic that his IEDs caused during his extended attack.  On October 23, 2018, he sent a text message to 18 people with a link to *The New York Times* coverage of the Soros IED.  (Ex. B at 2).  On October 24, 2018, the defendant proudly watched television coverage of his ongoing attack, with a visible smile that speaks volumes about his pre-arrest mindset:





(*See* Ex. A at 1-4).  He then proceeded to mail approximately three additional bombs.  On October 25, 2018, in the midst of widespread coverage of his IEDs, he sought to prolong the attack with a thirteenth victim by searching for "tom steyers mailing address" and then mailing Steyer IED-1 and Steyer IED-2.  (*See* Ex. B at 5).

In sum, the defendant's 16 IEDs, considered individually, warrant substantial punishment because of the intent to injure associated with each mailing and the risk of harm to countless people that each device posed.  When the defendant's 16 IEDs are evaluated together, as part of a two-week terrorist attack preceded by a prior bomb-threats conviction in which the defendant invoked the September 11, 2001 attacks, years of premeditation, and months of planning, his course of conduct reflects escalating criminal intent that warrants a life sentence.

**B.      The Defendant's Attack Crippled Parts of Several Cities and Required a Massive Response**

The magnitude of the law enforcement response to the defendant's IEDs—an effort that was truly national in reach and necessary to protect the public from additional acts of terrorism by the defendant—demonstrates the exceptionally serious nature of the defendant's conduct, the harm that it caused, and the need for general deterrence.

Law enforcement recovered and rendered safe the defendant's IEDs on an almost daily basis over a 10-day period from October 22 to November 1, 2018, including three devices recovered as many as four days after he was arrested on October 26.  Beginning on October 22, law enforcement around the country worked tirelessly to protect the public by responding to frequently emerging bomb scenes, finding and recovering additional IEDs within the USPS mail stream, working to identify and apprehend the defendant, investigating over a thousand reports

and leads from the community, and notifying Victims and potential victims targeted by the defendant.

In Manhattan, from October 24 forward, for approximately eight days, the New York Joint Terrorism Task Force ("JTTF-NY"), including agents, officers, analysts, attorneys, from the FBI, the New York City Police Department ("NYPD"), USPIS, the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), the Department of Homeland Security's Homeland Security Investigations, and approximately 50 JTTF-NY partner agencies, assembled in a command center that operated around the clock to coordinate the nationwide investigation. At certain points, up to approximately 90 law enforcement personnel staffed the JTTF-NY's command center. The FBI also operated a supplemental command center in Miami, Florida, for several days.

Beginning on October 22, the USPS alerted each of its approximately 35,000 facilities and 500,000 employees to the defendant's ongoing attack, and urged vigilance in efforts to identify suspect mailings. In the early stages of the investigation, the number of IEDs and the number of perpetrators was unknown. As a result, USPS locations across the country heightened their screening to locate possible devices, affecting USPS operations around the country. The USPIS devoted more than 20% of its personnel to locating, tracking, and recovering the IEDs, and to ensuring that no other IEDs were in the mail stream, including approximately 531 Postal Inspectors, Postal Police Officers, analysts, support staff, and contractors.

Individual responses to some of the defendant's IEDs demonstrate the fear that the defendant caused and the magnitude of the response each of the 16 bombs triggered. When the Soros IED was discovered on October 22, 2018, dozens of law enforcement officers responded from numerous law enforcement agencies, including JTTF-NY, the FBI's Evidence Response

33

Team, the FBI's Weapons of Mass Destruction squad, the USPIS, the ATF, the Westchester County Police Department, the Westchester County Bomb Squad, the Bedford Police Department, the Katonah Fire Department, and the NYPD. Employees were evacuated from the Soros residence, safety sweeps were conducted across the property, and the IED was secured. When the Brennan IED was discovered, the Time Warner Center was evacuated, the Columbus Circle subway station was temporarily closed, and public facilities—including at least two schools in the Columbus Circle area—were ordered to shelter in place. The USPS evacuated entire facilities upon the discovery of Waters IED-2, the Booker IED, and Steyer IED-1.

The defendant's attack caused significant disruptions in several major metropolitan areas, in addition to widespread fear and panic, which illustrate the seriousness of his conduct and the importance of deterring such behavior in the future through the imposition of a term of life imprisonment.

## II. A Sentence of Life Imprisonment Is Sufficient but Not Greater than Necessary to Protect the Public from Further Terrorism Crimes of the Defendant Given the Defendant's Absence of Remorse, Lack of Candor with the Court, and Failure to Fully Accept Responsibility for His Crimes

The defendant's criminal history, his lack of remorse, and his failure to fully accept responsibility demonstrate that the defendant poses an ongoing risk of danger to the community. A life sentence is thus necessary here in order to protect the public from further crimes of the defendant. *See* 18 U.S.C. § 3553(a)(2)(C).

### A. The Defendant's Lengthy Criminal History Gives Rise to a Significant Risk of Recidivism

The defendant's criminal history dates back to 1991 and includes nine prior convictions. His prior convictions include crimes of dishonesty and fraud, such as theft and possession of false

and altered identity documents.  (PSR ¶¶ 220-28).  He has received several lenient, probationary

sentences, but violated terms of probation imposed in 2015.  (*Id.* at 51).

The defendant's most pertinent prior conviction arose from bomb threats that he conveyed

in August 2002.  Just over a month before the one-year anniversary of the September 11 terrorist

attacks, the defendant threatened to "blow up" a Florida utility company in an attack that "would

be worse than September 11th."  (*Id.* ¶ 222).  He received a sentence of probation for that offense,

which was plainly insufficient to deter him from making violent threats and engaging in acts of

violence and terrorism.

**B.    The Defendant Has Not Fully Accepted Responsibility or Demonstrated
        Remorse for His Crimes**

The defendant elected to enter a guilty plea based on an extremely narrow factual allocution

and illogical positions regarding his culpability.  Indeed, after hearing the defendant's allocution

and reading his post-plea letters to the Court, the Government offered its consent to permit the

defendant to withdraw his guilty plea and proceed to trial.  He declined.  Nevertheless, while the

defendant's plea allocution and post-plea statements are legally sufficient, they are also factually

dubious—to say the least—and reflect the defendant's failure to fully accept responsibility and

demonstrate meaningful remorse.

The defendant's intention to plead guilty based on a strained factual allocution was

immediately apparent during the change-of-plea proceeding.  The Plea Agreement required pleas

to 16 counts involving "weapons of mass destruction."  *See* 18 U.S.C. § 2332a.  The statutory term

"weapon of mass destruction" includes "any destructive device as defined in" 18 U.S.C. § 921.  *Id.*

§ 2332a(c)(2)(A).  A "destructive device," in turn, must be capable of exploding and intended to

be used as a weapon.  *See United States v. Sheehan*, 838 F.3d 109, 119-20 (2d Cir. 2016).  The Court addressed this definition specifically at the defendant's guilty plea, and defense counsel argued that "[w]hether or not that item was actually a destructive device, is not an element" of Counts One through Sixteen.  (03/21/2019 Plea Tr. at 19-20).

Neither the Court nor the Government was comfortable, based on the facts of this case, that the defendant could "threaten" to use a destructive device without having actually used one.  He did not mail, or email, or post on Facebook, threats to send the Victims IEDs.  He mailed them IEDs.  His mailings did not include a note indicating that subsequent packages would contain better-constructed bombs.  Rather, he succeeded in assembling crude destructive devices; his mailings included explosives, toxic chemicals, and shards of glass packed into PVC pipe.  Consistent with these factual problems, the Court specifically inquired of the defendant at his guilty plea, and he confirmed under oath that he was "aware of the risk that [his IEDs] would explode."  (*Id.* at 20).

Next, when the Government pointed out that Counts 17 through 32 require intent to injure persons or property, defense counsel suggested that the defendant's plea was based on the latter.  (*Id.* at 21).  The defendant, however, stated under oath that he understood there were risks of injury to property and people.  (*Id.* at 22).

Nevertheless, after the defendant's guilty plea, he sought to recant some of his sworn admissions in two letters submitted to the Court.  At a conference on April 15, 2019, defense counsel once again argued that intent to damage property was sufficient.  (04/15/2019 Tr. at 5).  The Court reiterated its doubt that someone could, "under the facts of this case," intend to damage property but not harm people.  (*Id.* at 5-6).  In response to questioning from the Court, the defendant

36

indicated at first that he intended to damage "[j]ust the property." (*Id.* at 7). But he ultimately agreed that he understood that "if those exploded or caught fire or in any other way detonated, that it could injure either property or person." (*Id.* at 8). And of course that is true. Any suggestion to the contrary is frivolous.

At the April 15 conference, the Court noted that it had received a third letter from the defendant, which was docketed on April 23, 2019. (Dkt. No. 26). The letter contained a lengthy proffer of unpersuasive excuses for the defendant's terrorist attack, couched in the terminology of armed conflict that provides additional evidence of his own violent intent. For example, he argued that politics are "very dangerous," referred to "political war," and blamed "leftist encouragement" for "promoting violence"—a thinly veiled attempt to blame his Victims for his crimes. (*Id.* at 19, 26). Thus, the defendant's post-plea behavior reflects a lack of acceptance of responsibility and remorse, and demonstrates the importance of specific deterrence at this sentencing.

### C.   The Defendant's Expert Report Does Not Mitigate His Conduct

The defendant retained Dale Mann, a consultant and scientist, to examine the FBI Explosives Report and the notes underlying the FBI's examination of the IEDs, among other things. Notwithstanding the defendant's guilty plea to 16 counts of using weapons of mass destruction, he asked Mann to evaluate based on the FBI Explosives Report whether the IEDs constituted "weapons of mass destruction" under the "destructive device" prong of the statutory definition. (*See* Dkt. No. 36 at 3). Moreover, notwithstanding the defendant's guilty plea to 16 counts of interstate transportation of explosives, and one count of using explosives in connection with 64 other felonies, Mann also evaluated whether the defendant packed actual explosives into his IEDs. (*See id.* at 6).  p

37

Mann's conclusion that the IEDs would not function as assembled is consistent with the FBI's analysis. (*See id.* at 9-10). His conclusion, however, is not dispositive of whether the IEDs constituted "destructive devices" under Section 921. Rather, the pertinent questions are whether the IEDs were capable of exploding, even if not as designed, and were intended to be used as weapons. *See Sheehan*, 838 F.3d at 119-20; *see also* 18 U.S.C. § 921(a)(4). In *Sheehan*, the Second Circuit held:

> In light of the objective features of the device—which was built to look like an IED, contained an explosive, and was capable of detonating—the jury could rationally find that the device was objectively designed as a weapon even if it was missing a component required to enable it to explode in a specific way.

838 F.3d at 120; *see also United States v. Langan*, 263 F.3d 613, 625 (6th Cir. 2001) ("To qualify under [Section 921], we do not require that the destructive device operate as intended."); *United States v. Johnson*, 152 F.3d 618, 628 (7th Cir. 1998) ("The objective characteristics of these devices indicated that they were useful only as weapons. Shoddy workmanship cannot make a device that contains all the ingredients necessary to inflict harm, and to do nothing more, into something more benign.").[2]

The defendant's IEDs were capable of exploding if heat or friction ignited his chosen explosives. (*See* Dkt. No. 37 at 24). Contrary to Mann's suggestions, there is no mystery about the operative ingredient in the explosives and no additional testing was required. The defendant admitted that he used fireworks, and there were fireworks seized from his van. It is also clear that

---

[2] The Second Circuit in *Sheehan* also noted that the defendant's subjective intent was "irrelevant." 838 F.3d at 120. Here, in contrast, the defendant has admitted that he harbored violent intent as confirmed by years of evidence.

38

the defendant intended to use the IEDs as weapons based on his admissions regarding his intent and his inclusion of glass shards and toxic "pool shock" in the PVC pipes. *See United States v. Hammond*, 371 F.3d 776, 780 (11th Cir. 2004) (noting that definition of "destructive device" included a pipe containing explosive powder since "when the pipe ruptured, fragments of it would be propelled like shrapnel against the bodies of those in the vicinity"). Therefore, Mann's report is not mitigating and does not militate for leniency.

## III.   A Life Sentence Will Avoid Creating Unwarranted Sentencing Disparities

In light of the defendant's criminal history, the scope of his attack, the harm that it caused, and the intent with which he acted, a life sentence will not result in unwarranted sentencing disparities.

### A.   *United States v. Tomkins*, No. 07 Cr. 227 (N.D. Ill)

The defendant in *United States v. Tomkins*, 782 F.3d 338 (7th Cir. 2015), was sentenced to 37 years' imprisonment after sending threatening letters and two packages containing what appeared to be pipe bombs to investment firms and managers in efforts to drive up the price of certain stocks he owned. *Id.* at 341. Tomkins's homemade devices consisted of a plastic pipe containing gunpowder, lead pellets, and an igniter connected to live batteries. *Id.* Letters in each package warned that the recipients were alive only because Tomkins had left one wire on each device unattached. *Id.* Tomkins was convicted of Mailing Threatening Communications, in violation of 18 U.S.C. § 876(b), Illegally Possessing Firearms, in violation of 26 U.S.C. § 5861(d), and Using a Firearm in Connection with a Crime of Violence, in violation of 18 U.S.C. § 924(c)(1)(A) & (B)(ii), which carried a 30-year mandatory minimum term of imprisonment. *Id.*

Like Sayoc, Tomkins argued that his devices were "hoaxes," and that he "did not ever intend to hurt anybody or damage their property." *United States v. Tomkins*, No. 07 Cr. 227, Dkt. No. 441 (N.D. Ill. 2013). Unlike Sayoc, however, Tomkins did not at sentencing appear to call into question elements of the crimes of which he was convicted. At sentencing, the Honorable Robert M. Dow, Jr., United States District Judge for the Northern District of Illinois, properly concluded that the mailing of just two IEDs (in contrast to the 16 in this case) was "horrific" and "terrifying":

> The nature and circumstances of the offense. "Horrific" is the single best word that I have seen to describe the Defendant's crimes. "Terrifying" is another good one. . . . As the Government stated, it was a campaign of terror with more than a dozen victims taking place over almost [] two years. . . . The goal was some bizarre combination of making money on his investments and lashing out at the victims as proxies for greed on Wall Street and issues the Defendant had with the Government and the financial industry.

> As I said before, had he wished only to make a threatening statement or call attention to his cause, he might have placed sawdust in the cylinder. It would have been the same effect on the recipient without placing at risk everyone who ever came into proximity with the package.

> . . .

> Even if the Defendant is correct that by not hooking up the last wire . . . it wasn't likely that the device would explode, the risk was there. And when the consequences are so severe—death or serious injury—nobody in their right mind would ever want to play those odds with the mail clerk or the delivery guy or any other innocent victim, much less the recipient, the intended targets here.

*Tomkins*, No. 07 Cr. 227, Dkt. No. 450 at 28-29 (N.D. Ill. 2013). The Court also discussed "[w]hat would happen if and when the Defendant is released from prison," questioning whether the defendant's "time in prison [would] simply harbor more resentment that he would act out by

making new pipe bombs or would he work to improve himself, come to terms with what he did." *Id.* at 32.  The Court found that there were "legitimate questions" about the continued danger the defendant posed to the public.  *Id.* at 33.

      **B.**     **The Anthrax Cases**

      In the early 2000s, the country experienced an "anthrax scare," as aspiring terrorists mailed white powder resembling the biological agent anthrax to government officials and government facilities.  Most of these cases involved the mailing of one envelope containing white powder that was later deemed harmless but that resembled anthrax.  The defendant's attack was far more serious in significant ways:  Whereas the defendant mailed destructive devices containing actual explosives and shards of glass, the anthrax mailings were true hoaxes.  And each anthrax case typically involved one mailing, not 16.

      For example, the defendant in *United States v. Guevara*, 408 F.3d 252 (5th Cir. 2005), wrote and mailed a letter to a United States District Judge containing a white, powdery substance and a death threat.  *Id.* at 255.  The federal building, including the District Court, was closed for the rest of the day, and local and federal law enforcement responded to the scene.  *Id.*  The powder turned out to be harmless.  *Id.*  For this single mailing, Guevara was convicted of threatening to use a weapon of mass destruction, in violation of Section 2332a, and mailing a threatening communication by way of the USPS, in violation of Section 876.  *Id.*  The defendant was sentenced to life imprisonment.  *Id.*; *see also id.* at 263 (discussing the defendant's criminal history and offense level).

      The defendant in *United States v. Davila*, 461 F.3d 298 (2nd Cir. 2006), sent an envelope from prison to the State's Attorney's Office in Bridgeport, Connecticut.  *Id.* at 298-99.  Davila was

41

charged with threatening the use of a weapon of mass destruction, in violation of Section 2332a, and delivering a threat to injure through the USPS, in violation of Section 876(c). *Id.* at 299. For his one envelope, the defendant was sentenced to 360 months' imprisonment. *Id.* at 300.

Here, the defendant's conduct was far more egregious than that of Guevara or Davila. The defendant used and sent 16 weapons of mass destruction—not just one—through the U.S. mail to victims across the country over the course of weeks. The defendant has admitted that each of the 16 IEDs he constructed and mailed contained explosive material, and each had the capacity to explode and harm individuals and property. The defendant, moreover, targeted victims based on their public service and political activities. He intended to scare the Victims, as well as other Americans, to force them from the public sphere and end their participation in the civic discourse that is the lifeblood of our democracy and a bedrock of good governance. For these reasons, the anthrax cases counsel in favor of a life sentence in this case to avoid unwarranted sentencing disparities.

## IV.   A Life Sentence Is Necessary to Afford Adequate Deterrence and to Promote Respect for the Law

A life sentence is also necessary to adequately deter acts of domestic terrorism aimed at silencing and intimidating government officials and members of the public based on their political views and activities. The act of mailing an IED to another human being, much less a current or former public official, is completely incompatible with the functioning of an orderly society governed by the rule of law. It is vital for our country's security that people contemplating violence—especially on the scale perpetrated by the defendant—be deterred by the knowledge that such conduct will be met with a certain and severe prison sentence. It is equally vital to the nation's

public discourse that officials and citizens alike are permitted to participate in civic discourse without fear of violent retribution and terrorism.  Thus, a life sentence is necessary and warranted in this case to serve the pressing need for general deterrence of domestic terrorism offenses such as the defendant's.

## **<u>CONCLUSION</u>**

For the foregoing reasons, the Government respectfully submits that the Court should sentence Sayoc to life in prison—the sentence called for by the Guidelines and recommended by the Probation Office—as such a sentence is sufficient but not greater than necessary to comply with the purposes of sentencing pursuant to Section 3553(a).

Dated: New York, New York
      July 22, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

By:     _____/s/_____
Sam Adelsberg
Emil J. Bove III
Jane Kim
Jason A. Richman
Assistant United States Attorneys
212-637-2038

Cc:    Defense Counsel
       (Via ECF)

43

# Exhibit A















# Exhibit B

A Sample of the Defendant's Internet Searches Found on the Defendant's Laptop.

| Approximate Date of Internet Search by Sayoc | Internet Search Terms |
|---|---|
| January 12, 2018 | tom steyer political |
| January 18, 2018 | cory booker |
| January 18, 2018 | MAXIM [sic] WATERS |
| January 19, 2018 | eric holder |
| February 9, 2018 | kamala harris |
| March 20, 2018 | john brennan |
| April 10, 2018 | robert de niro |
| April 16, 2018 | George soros |
| May 1, 2018 | list of house democrats |
| May 21, 2018 | james clapper |
| June 29, 2018 | kill maxim waters |
| September 18, 2018 | cnn building |
| September 18, 2018 | msnbc building |
| September 18, 2018 | george soros and family[1] |
| September 18, 2018 | hilary Clinton and family |
| September 18, 2018 | james clapper wife and kids |
| October 17, 2018 | BARACK OBAMA FAMILY |
| October 23, 2018 | DEBBIE WASSERMAN SCHULTZ FAMILY |
| October 23, 2018 | tom steyers mailing address |
| October 23, 2018 | CORY BOOKER family |
| October 23, 2018 | KAMALIA [sic] HARRIS family |

---

[1] At the time of the defendant's arrest, the first result for this search on Google images was the photograph that Sayoc affixed to the IED he mailed to Soros.

1

A Sample of the Defendant's Text Messages Found on the Defendant's Cellphone.

| Approximate Date of Text Message | Text of Message or Series of Messages[2] |
|---|---|
| September 17- 18 , 2016 (one recipient) | Defendant: Hopefully she'll die<br>Defendant: Lol |
| November 13, 2016 | Yep Soros at work like he did in Charlotte.  Puttin Russia put wanted dead or alive bounty on Soros head |
| November 30, 2017 | Tom Steyer |
| March 23, 2018 | John o Brennan |
| April 12, 2018 | Death to all liberals<br>https://www.researchgate.net/publication/313314127_Bloodied_Democracy_Duterte_and_the_Death_of_Liberal_Reformism_in_the_Philippines |
| May 10, 2018 | Camila [sic] Harris kill her |
| June 20, 2018 | Chris Coons Senator Delaware kill him |
| July 16, 2018 | Anderson Cooper kill him now |
| July 17, 2018 | That was Scalise shooting baseball game . It time to start executing democrats period. |
| July 20, 2018 | Jerrold Nadler democrat NY kill him |
| July 27, 2018 | Joe Crowley democrat kill him |
| August 27, 2018 | Viola Davis kill her congress |
| October 5, 2018 | Bob Mendez kill him |
| October 23, 2018 (18 recipients) | https://www.nytimes.com/2018/10/22/nyregion/george-soros-explosive-device.amp.html |

---

[2] Unless otherwise indicated, the text messages were sent by the defendant to himself as notes.

A Sample of the Defendant's Social Media Posts Found on His Social Media Accounts.

| Approximate Date of Post / Social Media Platform | Text of Post |
|---|---|
| April 1, 2016 (Facebook) | "GEORGE SLIME DAYS ARE NUMBERED SORROS" |
| April 5, 2016 (Facebook) | "Obama head need to be chopped off with both dead man walking Obama Muslim terrorist and George Slime Soros death to Obama , George Slime Soros . . ." |
| April 8, 2016 (Facebook) | "George dead man walking Soros" |
| April 15, 2016 (Facebook) | "Eric scum Holder death to him" |
| June 8, 2016 (Facebook) | "Hilary will tear apart the US terrorist will flow through America daily bombs . She has to die period not option" |
| June 9, 2016 (Facebook) | "The slime Hilary Clinton must be killed abolished crimes against humanity . Death to Hilary." |
| August 14, 2016 (Facebook) | "The media needs beat down and major reality check enough enough it time to seek destroy CNN insight violence and lying BS" |
| April 13, 2017 (Facebook) | "Death Death Death to all Clintons" |
| November 29, 2017 (Facebook) | "Your days are number Steyer…" |
| March 9, 2018 (Facebook) | On a photograph of George Soros with a backdrop of a cemetery, Sayoc posted the caption "He must die" |
| April 28, 2018 (Facebook) | On a photograph of Sayoc holding up a poster that says, among other things, "CNN Sucks," Sayoc posted the caption "We want their funded George Soros dead man walking . He will vanish and will see it happen" |
| June 13, 2018 (Facebook) | "Die and leave our land never come back . Your movies and stars suck . Di Niro will vanish soon." |
| June 27, 2018 (Twitter) | Sayoc posted a map of Maxine Waters' congressional district and two pictures of what appear to be Waters' home with the text "@maximewaters see you soon Maxim." |
| September 5, 2018 (Facebook) | "Death to Obama criminal Soros socialist paid puppet" |

A Sample of the Defendant's Google Searches.

| Approximate Date | Search Terms |
|---|---|
| December 23, 2017 | Address of nancy pelosi |
| December 23, 2017 | Address chuck schumer |
| December 23, 2017 | Address Maxine waters california |
| March 9, 2018 | George soros killed |
| March 9, 2018 | Kill George soros |
| March 9, 2018 | photo soros dead |
| March 18, 2018 | How do they make letter bomb |
| March 18, 2018 | What a letter bomb |
| April 9, 2018 | How to kill all democrats |
| April 12, 2018 | Killing George soros |
| April 12, 2018 | How to kill George soros |
| April 19, 2018 | Maxim waters ties funds George soros |
| April 20, 2018 | Anderson cooper cnn address |
| April 24, 2018 | judge in cohen case tied to soros |
| April 24, 2018 | Kill all socialist |
| May 17, 2018 | Maximwater [sic] home address 549 south Lucerne Blvd |
| June 15, 2018 | Address peter strzok fbi agent |
| June 27, 2018 | Cory booker home address in new jersey |
| June 29, 2018 | Kill Maxine waters |
| July 15, 2018 | Hilary Clinton home address |
| July 15, 2018 | George soros address home 136 cantitoe st katonah, ny |
| September 19, 2018 | george soros and family |

4

| September 26, 2018 | Kill George soros head off |
|---|---|
| September 26, 2018 | Address for senator chuck schumer |
| September 26, 2018 | Address for barack obama |
| September 26, 2018 | Michelle Obama mailing address |
| October 1, 2018 | Jeff flake home address in arizona |
| October 20, 2018 | Beto o'rourke address |
| October 20, 2018 | Alec Baldwin address |
| October 23, 2018 | Address morning joe msnbc new york |
| October 25, 2018 | tom steyers mailing address |