UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



UNITED STATES OF AMERICA

-against-

CESAR ALTIERI SAYOC,

                    Defendant.

18-cr-820 (JSR)

OPINION

JED S. RAKOFF, U.S.D.J.

Since the instant sentence presents some difficult and somewhat recurring issues in sentencing, I am setting forth my thoughts in a written opinion,[1] to be read in open court at the time of sentencing after taking full account, not only of the

---

[1] In a recent column, Brian Jacobs, my former law clerk and the former chief of criminal appeals at the U.S. Attorney's Office for the Southern District of New York, who is now a partner at the prominent litigation firm of Morvillo Abramowitz, bewailed what he called the vanishing of written federal sentencing decisions. See Brian Jacobs, The Vanishing of Federal Sentencing Decisions, The Insider (July 19, 2019, 5:38 PM), https://www.forbes.com/sites/insider/2019/07/19/the-vanishing-of-federal-sentencing-decisions/#3c4e937d4c44. As he noted, since judges are required by law to "state in open court the reasons for imposition of the particular sentence" they are about to impose, 18 U.S.C. § 3553(c), busy judges with heavy dockets see little need to duplicate what they have already said by issuing a written opinion. But since the transcripts of sentencing hearings are not readily searchable for particular terms, the result is that the law of sentencing does not develop as fully as it might if the reasons for particular sentences were also set forth in written opinions.

voluminous papers submitted by counsel for the respective parties, but also the very helpful presentations made at the sentencing hearing itself (which I took a recess to consider before finalizing the Opinion).

In a nation like the United States that rightly places such a high value on individual autonomy, it is no small thing to deprive a person of his or her freedom. Prison, moreover, is a harsh environment, in which fear and misery are never far from the surface, boredom is endemic, and privacy is nil. Accordingly, the federal criminal code, in the section governing the imposition of sentence, requires a sentencing judge to "impose a sentence sufficient, but not greater than necessary," to fulfill the purposes of sentencing. 18 U.S.C. § 3553(a).

To achieve this result is no easy task, and, in my view, cannot be meaningfully achieved by simply rubber-stamping whatever the Sentencing Guidelines prescribe for a given case. The Guidelines deal of necessity with gross generalities, while imposition of a just and fair sentence requires immersion in all the individual facts and circumstances of a particular case. It really comes down to a simple application of the Golden Rule. If any of us had the misfortune to face sentencing, who would we want to be sentenced by? – a judge who primarily focused on the abstract numbers prescribed by a distant Commission, or a judge

who looked carefully at all the particular facts and circumstances of our case?

But here again the federal criminal code provides helpful guidance. The very first factors it directs a sentencing judge to consider are "the nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Let's consider each in turn:

The nature and circumstances of the instant offenses are, by any measure, horrendous. In late October 2018, the defendant mailed 16 improvised explosive devices - commonly called "pipe bombs" - to 13 victims around the country. While none of the devices exploded - a matter I will return to later - at the very least they were intended to strike fear and terror into the minds of their victims and to intimidate those victims (mostly prominent political figures) from exercising their freedom. To this end, each pipe bomb was accompanied by a photo of the intended victim, with a red "X" marked across the victim's face, an obvious symbol of extermination. Moreover, the defendant included in the pipe bombs not only explosive powder but also chlorine and shards of glass potentially capable of burning and maiming any victim not killed by the putative explosion.

In at least three instances - involving Joseph Biden, Hillary Clinton, and George Soros - the bombs were mailed to the

3

victims' homes, thus conveying the further message that no place was safe from the predator's attacks. Others were mailed to public locations, thus occasioning the shutdown of postal facilities, train stations, and even schools. And, predictably, the mailing of these pipe bombs day after day engendered widespread fear among the public generally.

So, just who is the human being who perpetrated these horrific acts of domestic terrorism? Cesar Sayoc was himself, it seems, a victim of physical and psychological violence. As a child, born with severe learning disabilities but by all accounts eager to please, he was abandoned by his father, sexually abused by a teacher, and bullied by his fellow students. It was to avoid such attacks that he eventually turned to steroids as a body-building measure, but his excessive use of steroids only made him more prone to obsessive thoughts and compulsive acts.[2] He

---

[2] The defendant's sentencing submission includes a report from Dr. Harrison G. Pope, Jr., a prominent psychiatrist who has long studied the effects of anabolic steroids. See Def. Sent. Exh. A, ECF No. 38-1. Dr. Pope reports that steroid use can cause individuals to exhibit significant personality changes, in particular exaggerated self-confidence, aggression, and obsessiveness. Id. at 5-7. Steroid use may be linked to violent or criminal behavior, including in persons who did not display violent tendencies prior to use. Id. at 5-6. Dr. Pope concludes that Mr. Sayoc's mental state around the time that he fashioned the pipe bombs was "characteristic of the stereotypic psychological effects" observed "in other individuals under the influence of large doses of steroids," id. at 9 - in particular, Mr. Sayoc's reported feeling that he was "invincible," his

nonetheless was able to finish high school and even managed a bit of college before dropping out; but thereafter he failed to maintain steady employment, and in his impecunious situation, he frequently engaged in petty theft. This in turn resulted in various criminal charges, mostly for theft but also including, in 2002, a conviction for making a verbal bomb threat against his electric company, which might be viewed in hindsight as a portent of worse to come. In any event, Mr. Sayoc, increasingly isolated from meaningful human interaction, began living alone in a decrepit van and made ever greater use of steroids. Deprived of any meaningful mental health treatment, his sad existence bore all too great witness to how dysfunctional life, even in our great society, can sometimes be.

It is perhaps, then, not surprising that someone of Mr. Sayoc's emotionally fragile nature not only became infatuated with a public figure, in this case Donald Trump, but also came to view Mr. Trump's political opponents as demons who were out to destroy not just Mr. Trump but Mr. Sayoc as well. While Mr. Sayoc was never insane in the technical legal sense of that word – and his lawyers do not contend otherwise – he clearly became

---

pathological obsession with power figures, and his disregard for the grotesquely immoral and disproportionate nature of his response to those such figures with whom he disagreed.

obsessive and paranoiac, and it was in this state, made still worse by his steroid abuse, that he decided to commit the crimes for which he is now to be sentenced.

Does any of this matter? Should an understanding of the combination of unfortunate circumstances that might cause a troubled person like Mr. Sayoc to commit the horrendous deeds here in issue make any difference to his sentencing? Within modest limits, the law of the United States says yes, that the personal characteristics, circumstances and background of the defendant are relevant to sentencing, at least insofar as they help "explain" in some sense why he did what he did, and with what degree of culpability.

One aspect of this is that our criminal law, from time immemorial, has measured the degree to which even the most heinous offenses should be punished by taking account of the defendant's mental state, his "intent," at the time he committed the crime. Thus, even in the case of murder, we make critical distinctions between someone who commits a premeditated murder, someone who commits a murder in the heat of passion, someone who unintentionally causes a victim's death through reckless behavior, and someone whose actions result in a victim's death purely by accident - and the degree of punishment we mete out in these different circumstances varies accordingly. What this shows

is that we as a society have concluded that a defendant's intent - what he meant to do - is as important as his actions, and that we should reserve our most severe punishments for those whose intentions are without any justification or excuse.

This does not mean that we can ignore for one moment a defendant's actions or their consequences. Nor does it mean that we can ignore the other important factors that federal law requires a judge to consider in imposing sentence, including the need to protect the public from further crimes of the defendant, the need for more general deterrence of others tempted to commit such crimes, and, most broadly, the need for the sentence, in the words of the statute, "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). In this case, all these factors support imposition of a lengthy sentence.

But the issue that is most in dispute in this case - and one that, for the reasons already mentioned, ought to and does make a difference - is the issue of Mr. Sayoc's intent. It is common ground between the parties that his pipe bombs were constructed in such a way that, though there was an outside risk they might explode, they were quite unlikely to do so. For example, the pipe bombs were controlled by timers that were never set to go off. More generally, in the Government's own words, "the fuzing system

7

(i.e. the wiring) on the devices was inoperable." Govt Reply to Def. Sentencing Memo, at 4.

Was this, as the Government argues, simply because Mr. Sayoc was a careless or unskilled pipe bomber, whose intent, nevertheless, was to maim or kill his victims? Or was it, as the defense argues, because he never intended to cause physical harm to his victims but rather simply to scare them, express his hatred for them, and intimidate them from acting by exposing their vulnerability?

Given Mr. Sayoc's psychological frailties, this is not an easy question to answer. But I conclude in the end that Mr. Sayoc, though no firearms expert, was fully capable of concocting pipe bombs capable of exploding. Indeed, as the Government itself points out, he spent weeks studying YouTube instructions on how to make an effective pipe bomb. His decision to instead design the pipe bombs so that they would not likely explode was, in the Court's view, a conscious choice. He hated his victims, he wished them no good, but he was not so lost as to wish them dead, at least not by his own hand.

But please do not misunderstand. This mitigating factor is just one of the many factors that, as already noted, the Court is required by federal law to consider. In this Court's view, it means that it would be inappropriate for the Court to impose the

very highest sentence available to it - life imprisonment without parole - despite the Government's ardent arguments for such a sentence. But it by no means follows that, as the defense would have it, the Court should impose the most modest sentence available to it in this case, namely, ten years and one month. Even though, thank God, no one was injured, the crimes were far too horrible to warrant such a relatively lenient punishment.

Accordingly, it is the sentence of this Court that the defendant be sentenced to 240 months, i.e., 20 years in prison, to be followed by five years of supervised release on the terms and conditions to be specified orally after I conclude with my written remarks. Since Mr. Sayoc is 57 years old, and since federal law does not permit parole, the likelihood is that Mr. Sayoc, even if he proves to be a model prisoner and qualifies for so-called "good time," will be about 75 years old before he can be released. No one can pretend this is not, in real terms, substantial punishment; but, in the Court's view, it is no more, and no less, than he deserves.

Dated:   New York, NY                              _____
         August 5, 2019                            JED S. RAKOFF, U.S.D.J.