J855sayS1                          sentence

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          18 Cr. 820 (JSR)

5   CESAR ALTIERI SAYOC,

6              Defendant.

7   ------------------------------x

8                                         August 5, 2019
                                          2:00 p.m.
9

10  Before:

11                    HON. JED S. RAKOFF,

12                                        District Judge

13

14                    APPEARANCES

15  GEOFFREY S. BERMAN
         United States Attorney for the
16       Southern District of New York
    BY:  JANE KIM
17       EMIL J. BOVE, III
         JASON A. RICHMAN
18       SAMUEL S. ADELSBERG
         Assistant United States Attorneys
19
    FEDERAL DEFENDERS OF NEW YORK
20       Attorneys for Defendant
    BY:  IAN H. MARCUS AMELKIN
21       SARAH J. BAUMGARTEL
         AMY GALLICCHIO
22

23

24

25
```

J855sayS1                          sentence

```
 1          (Case called)

 2          THE DEPUTY CLERK:  Will everyone please be seated and

 3  will the parties please identify themselves for the record.

 4          MS. KIM:  Good afternoon, your Honor.  Jane Kim, Emil

 5  Bove, Jason Richman, and Samuel Adelsberg for the government,

 6  and with us at counsel table are Special Agents Keely McCarthy

 7  and Joseph Capaccio.  Also in the courtroom are FBI explosive

 8  expert Kevin Finnerty and chemistry expert Christine March, who

 9  are available for the Court's questions.

10          THE COURT:  Thank you very much.  Good afternoon.

11          MR. MARCUS-AMELKIN:  Good afternoon, your Honor.  Ian

12  Marcus-Amelkin of Federal Defenders of New York.  With me at

13  counsel's table is Sarah Baumgartel, an attorney in our office,

14  our client Mr. Cesar Sayoc, Amy Gallicchio, another attorney in

15  our office, Rheem Brooks, who is our paralegal supervisor, and

16  Duncan Hosie, who is a summer intern in our office.

17          Also present in the courtroom are Dr. Harrison Pope

18  who is from Harvard University, an expert on steroids and

19  psychiatry; Dr. Michael First, who is a psychiatry expert as

20  well from Columbia University, and Mr. Dale Mann from ESI who

21  wrote our chemical report, and they're available if the Court

22  has questions.

23          THE COURT:  Very good.

24          So, the first thing we need to do is deal with the

25  calculation of the sentencing guidelines and also any
```

J855sayS1                        sentence

1   objections to the presentence report.  The probation office has

2   calculated the total offense level as 43 and the Criminal

3   History Category as VI, which leads to a guideline range which

4   is not binding on the Court but which the Court will consider,

5   of lifetime imprisonment plus 10 years.  I am always intrigued

6   by -- I understand that is a function of how the statutes act

7   but while I knew that the government's power and the Sentencing

8   Commission's power was great, I did not realize until now that

9   it goes after life.  So, I hope the angels are listening to the

10  guidelines.

11          So, in any event, any objection to that from the

12  government?

13          MS. KIM:  No, your Honor.

14          THE COURT:  Any objection from the defense?

15          MR. MARCUS-AMELKIN:  No, your Honor.

16          THE COURT:  Now, there were two objections to the

17  report that were raised by the defense.  First, with respect to

18  paragraph 77 of the report, the presentence report.  It states,

19  among other things, that Mr. Sayoc planned his attacks several

20  months in advance.  The specific sentence is, *"In subsequent*

21  *searches of Sayoc's computer and telephone, agents learned that*

22  *Sayoc planned his attack several months prior to his arrest."*

23          That's my understanding of the evidence as well but

24  let me hear from defense if you disagree.

25          MR. MARCUS-AMELKIN:  We will withdraw the objection,

J855sayS1                          sentence

1    your Honor.  I think that the word "planning" is a generous for

2    Mr. Sayoc's actions, but there is certainly evidence that he

3    was thinking about something in advance of doing it.

4              THE COURT:  All right.

5              And then the second objection was to a statement that

6    was originally in paragraph 79 that dealt with the potential

7    for injury and that was reworded, at the government's

8    suggestion, to read:  *Because of the explosive materials used,*

9    *there was a potential for an injury to the intended targets,*

10   *mail carriers, and any other persons who handled, opened, or*

11   *were in the vicinity of those packages.*

12             Is there still objection to that?

13             MR. MARCUS-AMELKIN:  We are comfortable with the

14   rewording, your Honor.

15             THE COURT:  All right.  Very good.

16             Any other objections, from either side, to the

17   presentence report?

18             MS. KIM:  No, your Honor.

19             MR. MARCUS-AMELKIN:  No, your Honor.

20             THE COURT:  Then I will adopt the presentence report.

21             The next thing I think would be to turn to are the

22   various expert reports and I guess the first one I wanted to

23   clarify or at least get, ask some questions about, is the very

24   full and interesting report from Agent Finnerty.  So, if he is

25   here, maybe he will come on up here.

J855sayS1                       sentence

1    KEVIN D. FINNERTY,

2            THE DEPUTY CLERK:  State your name and spell it slowly

3    for the record.

4            THE WITNESS:  Kevin D. Finnerty.  And the last name is

5    spelled F, as in frank, I-N-N-E-R-T-Y.

6            THE COURT:  So, Agent Finnerty, thank you for being

7    here.

8            In your report, at page 24, out of the modest 107

9    pages you state that, *"The devices would not have functioned as*

10   *a result of their design.  The fusing system for each device*

11   *lacked the proper components and assembly to enable it to*

12   *function as a method of initiation for these devices.  It*

13   *cannot be determined if the non-functional fusing system is a*

14   *result of poor design or the intent of the builder."*

15           So, do I understand from that and from the rest of

16   your report that it was highly unlikely that these bombs would

17   explode?

18           THE WITNESS:  It would not have worked with the design

19   that the individual put into those bombs.

20           THE COURT:  Okay.  So, the government seems to suggest

21   in some of its submissions that there was still a remote risk

22   that the bombs might explode.  Maybe I am misunderstanding

23   that.  But, if that were their position, you would not agree

24   with that?

25           THE WITNESS:  No.  There is a remote chance but not

J855sayS1                        sentence

1   from the fusing system.

2            THE COURT:  What would be the remote chance from?

3            THE WITNESS:  The remote chance is handling.  And also

4   when you do disassemble it, because of the explosives you have

5   a heat shock friction, there is a risk to removing and

6   disassembly.

7            THE COURT:  I see.  Okay.

8            Any other questions for Agent Finnerty?

9            MS. KIM:  Yes, your Honor.  If I could just ask a

10  couple?

11           Agent Finnerty, during the course of your career, have

12  you worked with other IEDs containing low order explosives?

13           THE WITNESS:  Low explosives?  Yes, I have.

14           MS. KIM:  And, do you know of instances where those

15  explosives have in fact detonated?

16           THE WITNESS:  In the field?  Yes, I do.

17           MS. KIM:  If you recall, could you please provide us

18  with some details as to some of those circumstances?

19           MR. MARCUS-AMELKIN:  Objection, your Honor.

20           THE COURT:  Sustained.

21           MS. KIM:  Just to clarify for the record, the 16 IEDs

22  that you analyzed in connection with this case, were they

23  capable of exploding?

24           THE WITNESS:  Yes, they were.

25           MS. KIM:  And why were they capable of exploding?

J855sayS1                    sentence

1          THE WITNESS:  Because you have a low explosive or

2     energetic material that has been placed into a sealed container

3     and through the handling of those, the risk that I just spoke

4     about, the heat shock friction; any of those could occur during

5     disassembly or mishandling.

6          MS. KIM:  And if even one of these IEDs had exploded,

7     could people have been injured?

8          THE WITNESS:  Yes.

9          MS. KIM:  And how do you know this?

10         THE COURT:  Sustained.

11         MR. MARCUS-AMELKIN:  Thank you, your Honor.

12         THE COURT:  Counsel --

13         MS. KIM:  Could I just ask one more question, your

14    Honor?

15         THE COURT:  One.

16         MS. KIM:  Could you please explain what, if any,

17    render safe procedures Quantico used for these IEDs?

18         THE WITNESS:  Yes.

19         All of our render safe procedures follow the remote --

20    basically, we don't touch and we have a disassembly facility.

21    And these devices were transported to Quantico, eight of them,

22    fully in tact.  They were removed by a robot, placed into our

23    disassembly facility, and a robot takes them apart for us.

24         MS. KIM:  Nothing further, your Honor.

25         THE COURT:  Anything from the defense?

J855sayS1                          sentence

1              MR. MARCUS-AMELKIN:  No, your Honor.

2              THE COURT:  Thank you so much.  You may step down.

3              Now, we also had a report from the defense, I think if

4     I understand it Mr. Mann was the primary author of this report.

5              MR. MARCUS-AMELKIN:  That's correct, your Honor.  He

6     is present in the courtroom.

7              THE COURT:  So, yes, if he would come forward?

8      DALE MANN,

9              THE DEPUTY CLERK:  State your name and spell it slowly

10    for the record.

11             THE WITNESS:  My name is Dale Mann.  Last name is

12    spelled M-A-N-N.

13             THE COURT:  So, Mr. Mann, thank you for coming here.

14             Agent Finnerty, as I understand it from his report and

15    from his testimony a minute ago, indicated that on the one

16    hand, as designed, these bombs were not designed to explode or

17    at least they would not -- the fusing system would make them

18    inoperable but that there was still, for other reasons

19    independent of the design, at least a possibility that they

20    might explode.

21             Do you agree or disagree with that?

22             THE WITNESS:  Only in the broadest sense would I agree

23    with that.

24             THE COURT:  Okay.  Well, give me a narrow sense then.

25             THE WITNESS:  These devices were charged with both

J855sayS1                    sentence

1    inert materials and what we term energetic materials, and there

2    was no way of knowing from the analysis what the percentage of

3    the two components -- class of components would be.  And any

4    mixture that contains a low level of reactive materials, that

5    reaction is obviously mitigated by the presence of large

6    amounts of inert materials so we don't know how reactive that

7    total mixture might be, even though we do all agree that there

8    are some energetic particles present.  Let me give you a couple

9    of examples.

10        Fireworks are shipped all over the country, all over

11   the world, millions upon millions of devices shipped.  The same

12   type of materials that are found in these devices, they're not

13   particularly reactive to shock, temperature, or other types of

14   disturbance from shipping them.  In fact, part of the analysis

15   at the FBI was the grinding up of these particles for further

16   analysis, which is an extreme example of friction, and there

17   was no reaction.

18        So, in those types of initiation events, the material

19   that's in these devices are negligibly reactive.  So, I can

20   never say never that they wouldn't react, but under almost

21   every conceivable circumstance I would not expect them to.

22        THE COURT:  Any questions for Mr. Mann?

23        MR. MARCUS-AMELKIN:  No, your Honor.

24        MS. KIM:  No, your Honor.

25        THE COURT:  Very good.  Thank you so much.  You may

J855sayS1                              sentence

1    step down.

2              THE WITNESS:  Thank you.

3              THE COURT:  Now, we also received two psychiatric

4    reports from the defense, one is from Dr. Pope.  Is he here?

5              MR. MARCUS-AMELKIN:  Yes, he is, your Honor.

6              THE COURT:  If we could bring him up to the stand?

7              MR. MARCUS-AMELKIN:  Absolutely.

8     HARRISON G. POPE, JR.,

9              THE DEPUTY CLERK:  State your name and spell it slowly

10   for the record.

11             THE WITNESS:  Dr. Harrison G. Pope, P-O-P-E, Jr.

12             THE COURT:  So, Dr. Pope, thank you for being here.  I

13   understand you have spent a great deal of your career at

14   Harvard but I will disregard that unfortunate consequence.

15             You talk, in your very interesting report, about how a

16   excess of steroid use such as allegedly was the case in

17   Mr. Sayoc's situation, can lead to feelings of invincibility

18   and obsessiveness and things like that.  Exactly, if can you

19   explain it to a simple-minded Judge, how did the steroids cause

20   that effect?

21             THE WITNESS:  Science still does not know the exact

22   biological mechanism in the brain that causes it.  We do know

23   that it is some type of biological mechanism and cannot be

24   explained purely by social factors or personality factors or

25   expectational factors.  The reason that we know that it is

J855sayS1                    sentence

1    biological is that steroids have been tested in so-called

2    double-blind studies where neither the recipient nor the

3    investigator knew whether he was getting the genuine steroid or

4    inert placebo, and even under those conditions these effects

5    have been demonstrated.

6           THE COURT:  And from what you were shown about this

7    particular defendant, do you think that that was plausibly what

8    was operating in his case?

9           THE WITNESS:  Yes.

10          THE COURT:  Why do you think that?

11          THE WITNESS:  Because there is -- first, because we

12   know that he was getting substantial doses of steroids because

13   we actually have an interview performed of the drug dealer who

14   sold the steroids to him somewhat earlier, and because the

15   nature of the effects that he described has a characteristic of

16   stereotypical quality that I have witnessed numerous times when

17   people get these types of reactions to anabolic steroids.  In

18   addition, we have the fact that prior to the time that he was

19   using this very large dose of steroids, he had no comparable

20   instances of behavior even approaching the magnitude of what

21   happened at this time.  And, in the interval since that time,

22   again, he has reverted back to his pre-morbid personality.

23          So, to a reasonable medical certainty, this --

24          THE COURT:  I always worry when I hear that, "a

25   reasonable medical certainty."  What my high school biology

J855sayS1                        sentence

1   teacher taught me was that nothing is certain, even in science.

2            THE WITNESS:  No, you are quite correct.  But, barring

3   a definitive scientific demonstration of the biological

4   mechanism, we still do not know.

5            THE COURT:  All right.

6            Any questions for Dr. Pope?

7            MR. MARCUS-AMELKIN:  No, your Honor.

8            MS. KIM:  No, your Honor.

9            THE COURT:  Thank you very much.

10           Finally, there was a report from Dr. First.  Is he

11   here?

12           MR. MARCUS-AMELKIN:  Yes, he is, your Honor.

13           THE COURT:  Have him come up, please.

14    MICHAEL B. FIRST,

15           THE DEPUTY CLERK:  State your name and spell it slowly

16   for the record.

17           THE WITNESS:  Michael B. First.  F-I-R-S-T.

18           THE COURT:  So, Dr. First, thank you for being here.

19           I notice in your report you also use the term "a

20   reasonable degree of medical certainty."  I won't give you a

21   hard time on that, I will just disregard it.  But, it is your

22   opinion, as I understand it, that Mr. Sayoc suffered from a

23   severe personality disorder that likely contributed to the

24   behavior we are dealing with here; is that right?

25           THE WITNESS:  That's correct.

J855sayS1                        sentence

1              THE COURT:  Could you elaborate on this a little bit?

2              THE WITNESS:  Well, as Dr. Pope was talking about, one

3     of the main factors that led up to this was this overuse of

4     steroids and, as with every case, that's a strong biological

5     component but there is a strong psychological component as

6     well -- his predisposition to be paranoid, that's an example of

7     a personality disorder; his sense of disconnection; his

8     impulsivity.  Lots of aspects of his personality interacted

9     with life events and the underlying biology of the steroids, to

10    lead to this act.  And if any piece were missing, if he weren't

11    taking steroids this probably wouldn't have happened.  If he

12    didn't have this life trajectory it probably wouldn't have

13    happened.  So, it is the combination of the two that helps

14    explain what happened.

15             THE COURT:  Do you have an opinion -- I don't know

16    whether you said anything about this in your report but do you

17    have an opinion whether he intended these devices to go off and

18    just poorly designed them, or whether he did not intend them to

19    go off?  Or, something else?

20             THE WITNESS:  My understanding is that he -- his

21    intention was to make a statement and to scare people to try to

22    say, *you have to watch out what you are doing,* but there was

23    never, at least from what he told me and it seemed very

24    credible, there was absolutely no intention of this going off.

25             THE COURT:  You base that primarily on what he said to

J855sayS1                          sentence

1    you?

2              THE WITNESS:  Yes.

3              THE COURT:  Any questions for Dr. First?

4              MS. KIM:  No, your Honor.

5              MR. MARCUS-AMELKIN:  May I ask one, your Honor?

6              THE COURT:  Yes.

7              MR. MARCUS-AMELKIN:  Dr. First, if the Judge accepts

8    our recommendation and sentences Mr. Sayoc to about 10 years in

9    prison, do you think when he is released he can be safely

10   managed in the community and, if so, what recommendations would

11   you have to ensure that?

12             THE WITNESS:  I do feel that he could be safely

13   managed.  First of all, obviously a very important component is

14   not to be on the steroids because that was one of the critical

15   elements.  So, you can do random drug testing.  Plus, his life

16   circumstances have changed now.  One the factors that caused

17   him to take steroids in the first place was his profession; he

18   needed that to be a bouncer.  In fact, he escalated his steroid

19   use because the jobs he had in the last couple of years

20   required him to be bulked up.  And, the self-esteem that he

21   derived from the steroids and his need for that, that has also,

22   as he gets older, less so.  But, a very important factor is he

23   has never gotten any treatment whatsoever.

24             When he came into MCC and I met him the first time, he

25   knew I was a psychiatrist because it was explained to him I was

J855sayS1                    sentence

1   a psychiatric expert but he was begging me to help treat him.

2   I had to explain to him that's not why I am here.  But, he

3   actually saw -- he said to me in the very beginning, this is my

4   first chance to really deal with a lot of the bad things that

5   have happened to me.  He is very, very open and eager to try to

6   understand what happened and be able to control his impulses.

7   That's one of the most important prerequisites for people

8   responding to psychotherapy, is the motivation to change, and I

9   think that everything that he has gone through, including the

10  time is he going to spend incarcerated, is a very strong

11  motivation for him to change.

12          So, I think when he is released, he would need to

13  be -- I am hopeful he will be lucky enough to be in a facility

14  where there will be some kind of psychology support to at least

15  begin to work through some of these issues.  But, outpatient

16  psychotherapy would be my absolute recommendation.

17          And plus, just to be sure, I suspected after all of

18  this, his inclination to go back on the steroids -- because he

19  is completely aware now of the negative effect -- is probably

20  low but, with all drug cases, random testing would be

21  recommended as well.

22          THE COURT:  Thank you very much.  You may step down.

23          All right, I think with that background, which was

24  very helpful and I appreciate all the experts being here, I am

25  now ready to hear from counsel.

J855sayS1                    sentence

1          The range in which the Court may sentence Mr. Sayoc is

2     very broad; there is a mandatory minimum of 10 years, there is

3     a maximum of life imprisonment plus 10 years, and so that's a

4     wide range and the Court will, of course, be guided by all the

5     factors under Section 3553(a) of Title 18.

6          So, let me hear first from defense counsel and then

7     from government counsel and then from the defendant, if he

8     wishes to be heard.

9          MR. MARCUS-AMELKIN:  Thank you very much, your Honor,

10    and thank you for asking our experts those questions.

11         First I would like to note, and thank Mr. Sayoc's

12    family who is present in the courtroom.  His mother and sister

13    are here and they are thankful to the Court for making

14    arrangements to have them be present.

15         I think the Court has two questions to answer.  The

16    first is does this mentally ill man, who did not physically

17    injury anyone, deserve to die in prison.  We believe that the

18    answer to that is no.

19         THE COURT:  Well, he created, did he not, a climate of

20    fear and terror going on, day after day, for several weeks?

21         MR. MARCUS-AMELKIN:  We both recognize that and also

22    believe that it was not his intention to create a mass

23    hysteria.  He was honestly shocked that any news covered it and

24    I think that it is important, as I lay out his life, to

25    recognize that at the time he committed this offense he was not

J855sayS1                          sentence

 1    thinking rationally and he was quite mentally ill.  And, given

 2    those two things, when we look at the 3553(a) factors --

 3            THE COURT:  He wasn't insane.  There hasn't been any

 4    claim here of an insanity defense, correct?

 5            MR. MARCUS-AMELKIN:  That is correct, he was not

 6    insane, but his history and characteristics and his diminished

 7    mental health and cognitive challenges, I think, are all

 8    relevant and important to understand his way of thinking at the

 9    time that he put these things into the mail.

10            So, if the Court agrees that life is not appropriate,

11    the second question is given his age, given the mitigating

12    factors that we presented in our submission, given the 3553(a)

13    factors, is any additional time over our recommended sentence

14    to the Court necessary to meet the goals of sentencing?

15            THE COURT:  I'm not sure I understand the argument

16    about age.  Sometimes the argument is made that because people

17    beyond the age of 35 or so are less likely to commit new crimes

18    that they've committed when they were 16 or whatever --

19            MR. MARCUS-AMELKIN:  Right.

20            THE COURT:   -- that it is inappropriate to imprison

21    them beyond that age.  This is not that kind of situation; he

22    committed these crimes when he was in his 50s.

23            MR. MARCUS-AMELKIN:  That's correct, your Honor.

24            THE COURT:  So, if I were to -- if, theoretically, the

25    right sentence for him under all the relevant factors was X,

J855sayS1                        sentence

1   why shouldn't that be the sentence whether he is 40, 50, 60 or

2   whatever?

3                MR. MARCUS-AMELKIN:  I think there is a couple answers

4   to that.  The first is that social science says it continues to

5   drop as you get older and older so some people who are on VOSRs

6   in their 50s, there was small percentage but there were none

7   once you got up into the 70s.

8                So, I think the fact that no matter what he is going

9   to be in prison into his late 60s is relevant to the fact that

10  his age is an important consideration and it is one that the

11  Sentencing Commission now thinks about, it is one that Congress

12  asks the Courts to think about.  It is one of the components of

13  the First Step Act that now, after a certain age, the Court can

14  grant compassionate release to somebody who they sentenced to a

15  long period of time.  And I think it is because we recognize

16  that as a person becomes older, they become far less likely to

17  commit crime.  But I think that the other --

18                THE COURT:  Forgive me, but that doesn't seem to fit

19  his profile.  He committed petty thefts when he was younger.

20  He had one situation where he made a verbal bomb threat over

21  the phone to the electric company but he got much worse in

22  terms of what he did as he, perhaps because of steroid use or

23  whatever, gets into his 50s and then he commits these much more

24  egregious acts.  So, one would think that on that theory the

25  line is going up and we should lock him up forever.

J855sayS1                    sentence

1          MR. MARCUS-AMELKIN:  I think not for a number of

2    reasons but I think it is important to note that leading up

3    into this event his life had deteriorated significantly as

4    compared to even how it was just a decade before.  I mean, the

5    Court saw pictures of how he was living.  It was a very cramped

6    van, this old mattress, very dirty; his clothes warding him off

7    from the sun.  He, after his grandparents passed away, his

8    relationship with his family also somewhat fractured.  And

9    then, during the time period leading up to the offense, as

10   Dr. Pope explains, he was experiencing what's called a slow

11   boil.  And I will get into that as I go through his history,

12   but I think that we don't view this as, oh, his behavior became

13   more serious as he got older and he was graduating through

14   crime.  This is not one of those instances.  I am sure the

15   Court, over the years, has seen the hand-to-hand drug dealer

16   move up to the middle man, move up to the kingpin, and then the

17   government says he has escalated his criminal behavior.

18   Everything in this gentleman's life prior to this offense

19   resulted in no jail time.  In fact, of all the offenses that he

20   was charged with, I believe only two of them actually resulted

21   in a conviction, a misdemeanor conviction.  All the others were

22   adjudication withheld, which under Florida law is not a

23   conviction.  Certainly, it counts under the guidelines.  But,

24   he never had to admit to his guilt in these offenses.

25          I mean, spending a couple days in a county jail

J855sayS1                          sentence

1   because you pick up some food or you make your age younger on

2   your license so you seem more attractive to employers is so

3   different from what happened here and it was just so out of

4   character for his life and the reason why you have to go all

5   the way back to the beginning, to some extent, because his

6   mental illness was kind of catalyzed by his early struggles in

7   life.

8          We have three major problems in his early life, the

9   first is his learning disabilities.  He was born with cognitive

10  limitations, dyslexia.  We have records --

11         THE COURT:  However, if I am not mistaken he,

12  notwithstanding that, completed high school and even -- what --

13  a year or so of college?

14         MR. MARCUS-AMELKIN:  No question.  And I think that's

15  both a testament to the close-knit nature of his family and his

16  grandparents' guidance, the fact that he moved in with his

17  grandmother to help tutor him through high school.  But, then

18  you will note he went to a junior college to play soccer.  He

19  was good at soccer.  They were a good team.  But, he couldn't

20  make it through school for longer than a year.  And then he

21  gets an opportunity to play in an even more prestigious

22  institution, to play at UCF, and on the week before classes

23  start he is so fractured and emotionally vulnerable and scared

24  that he had to go home and couldn't continue to play.  And

25  then, his friends from Brevard gets bumped up to UNC Charlotte,

J855sayS1                    sentence

1    they invite him to join the team there.  Another opportunity to

2    get through school.  But, without the structure of his

3    grandparents and his mom staying on top of him, he couldn't

4    make it there either.  And although they were blurry, we

5    included for you the transcripts to see that.  He really did

6    poorly.  School was always a challenge and I think his sister's

7    letter, which says he was a low IQ person who was a dreamer,

8    had trouble making friends, the fact that newspaper reports --

9    look.  I mean, the press did a lot of interviews down south and

10   so many people were like, *he is simple-minded, he is naive, I*

11   *can't believe he would have done this crime.*  And I think that

12   it is no offense to Mr. Sayoc, he just has mental challenges

13   that he has struggled with his entire life and they made him

14   vulnerable.

15        He was more vulnerable after his father left the

16   family when he was young and it made him a target at the school

17   for this priest because he is this little kid, he stutters, he

18   has dyslexia, he has trouble making friends, and he was

19   sexually abused over the course of a year.  Look.  This is not

20   a situation where we say the abuse is so mitigating that it's

21   our main piece to the puzzle, but I do think that without the

22   abuse -- we do think without the abuse and Dr. Pope thinks,

23   that the steroids wouldn't have happened.  Because he returns

24   to Florida, still a small kid, now a victim of these attacks,

25   he is little, he is still being bullied, and he starts taking

steroids when he is like 15 years old which is off-the-charts

young in terms of when people start using anabolic steroids.  I

mean, he most likely wasn't even through puberty yet.  And

these steroids had a profound effect on his psyche.  A profound

effect.

THE COURT:  I always thought people didn't start using

steroids until they got a big contract to play in professional

sports.

MR. MARCUS-AMELKIN:  Well, yes.  Right?  I mean --

And you see, just with those folks and Mr. Sayoc, that

there is a percentage of people where these things really mess

with your brain.  And, studies show that men who use high doses

of steroids, it can cause a profound effect on your personality

and your mood and it will cause you to display aggressiveness

that is entirely different from your normal personality.  Now,

that's important in this instance because we know from

interviews, from his family, that Mr. Sayoc, in general, was a

kind and caring guy.  Even the people who worked at Ultra, who

he met in the height of his kind of steroid-induced delusion,

thought he was a good worker and pleasant to be around.  They

weren't his friends, mind you; they thought he was odd and they

kept their distance from him, but they thought he was

professional and did a good job.  And I think when you look

back at his youth and how he cared for his grandparents, his

mother's letter, *he fed them, gave them things to drink and he*

J855sayS1                    sentence

*washed them*, and his cousin Kimberly Sayoc is really a far

family acquaintance who didn't know Mr. Sayoc very well says

that after 20 years of not seeing him, he doted on her parents.

That when he spent time with them in Buffalo he did everything

he could to help them.  And that's the kind of guy he was and

is.  But this was juxtaposed with these mental health

challenges, these anxieties and other problems that made living

particularly hard.

         And, as he got older -- and, Judge, he lost the

structure of his grandparents' home, he lost the structure of

school after basically flunking out, he becomes more withdrawn

and more mentally ill.

         You know, he has a long work history.  He is capable

of holding down a job.  He worked in the service industry, he

worked in catering.  You know about the exotic dancing.  You

snow about the failed dry cleaning business.  And then, as an

adult, to be in his 50s and work full, like 12-hour days half

the day either bouncing or DJ-ing at a strip club and he is

delivering pizzas all night, this is a guy who wanted to work,

he was capable of work, but it was challenging for him.  And in

the last 10 years --

         THE COURT:  He doesn't seem to have been able to keep

a job for very long.

         MR. MARCUS-AMELKIN:  Well, I think that there were

years when he kept them a year or two.  He, with some of the

J855sayS1                    sentence

pizza delivery folks he had been in and out with them for

years; two, three years.  There was a lot of interviews of

employers.  For the most part, they were all very positive that

we saw both in the FBI reports and in the news.

          But, yes, I think that he did struggle and he, any

time he was required to take a leadership role or there was

extra thought involved, he struggled, especially the dry

cleaning business, the male revues.  And, in the last 10 years,

he really hit rock bottom.  He lost his home during the great

recession.  He went bankrupt.  He was financially desperate

which led to an uptick in these petty offenses, and in that

desperation he turned to a spiritual advisor where he is

lighting dozens of candles every week, spending like hundreds

of dollars on these candles where he works and works to get

money for candles to burn the candles in the hopes that his

luck will change.  And, he was reading self-help books and, in

particular, the books by Donald Trump really resonated with

him.

          Now, at the time of this offense this was a man who,

for the last 10 years, was lacking in friendships, strong

relationships with his family, any version of success.  He

never had the real opportunity to be in a long, committed,

loving relationship, ever be married in a real way other than a

fling when he was young; have children.  He is living there

alone in that van and it makes sense because as Dr. First

explained, his psychological issues caused such significant

impairments in his occupational abilities, his social

abilities, and other important areas of functioning.

So, the steroid use and the mental health problems led

him to start more obsessional beliefs.  He is using these

self-help books to cope, he loves the books, and he kind of

becomes obsessed with Donald Trump and he buys Trump-branded

suits, ties.  He loves WWF wrestling which the President was

involved in before he became President.  And you saw in the

settlement letter dated 2013 about his love of Trump.  And then

the letter from Don Jones, his former attorney, who said he

looked up to the President as a father figure.  And he starts

getting involved in politics because of that.

He was watching Fox News and joins, basically, what is

this pro-Trump movement and in that he ramps up his social

media involvement.  He is posting about politics, he is reading

these conspiracy theories.  We only gave the Court a small

sampling of some of the stuff he was reading but he was exposed

to a lot of hateful ideas, conspiracy theories, misinformation.

And, because of his cognitive limitations and his mental

health, he didn't really have the capacity to critically

evaluate the information and he slowly became deranged by it.

You have seen this in his social media postings which I think

he will tell you, when he reads now, he can't believe that was

what he was writing and his beliefs that democrats were hurting

J855sayS1                          sentence

1    this country and trying to attack him personally.

2           Now, this is what Dr. Pope refers to as the slow boil.

3    Some men who abuse steroids develop a chronic, obsessional

4    pre-occupation that they cannot get out of their heads and in

5    2018, leading up to this event, he was taking an extremely

6    large dose of steroids.  He could not perceive his actions as

7    growing more grossly abnormal.  He became pathologically

8    obsessed with the perceived actions of certain democratic

9    leaders.  You saw in the submission he is writing long lists of

10   all their names, he is going to Lisa Massa, burning all of

11   these candles, he is custom printing all of these decals and

12   putting them on the van.  But, he also felt victimized because,

13   as he became more engaged, the stickers on his van made him a

14   target for harassment and his van was vandalized and these

15   incidents validated his paranoia and caused him to become more

16   withdrawn.

17          (Continued on next page)

18

19

20

21

22

23

24

25

J856SAYS2                        Sentence

1            MR. MARCUS-AMELKIN:  Now, we believe that the

2    President's rhetoric contributed to Mr. Sayoc's actions in this

3    offense.  The government doesn't mention the President in their

4    opening brief, and we understand their hesitancy.  They are

5    part of the Executive Branch.  They answer to the President.

6    The President appoints the United States Attorney.  He serves

7    at the President's leisure.  But for the government to say that

8    millions of people have strong views and that only Mr. Sayoc

9    acted criminally is simply false.  They say that in their reply

10   brief.

11           Studies have shown that after a Trump rally comes into

12   a county, there is over 226 percent increase in reported hate

13   crimes.  Right-wing extremists were linked to at least 50

14   extremist-relate murders in the U.S. in 2018.  The most in any

15   year since 1995 in Oklahoma City.  At his rallies, the

16   President has encouraged or at least condoned chance of

17   threatened violence.

18           THE COURT:  Well, you haven't presented me that I

19   recall in any of those studies.

20           MR. MARCUS-AMELKIN:  I am happy to pass that up, your

21   Honor.

22           THE COURT:  As I have learned from long experience,

23   studies of that nature are very difficult to construct in a

24   rigorous fashion because there are so many other factors

25   involved that it is very difficult for any responsible social

J856SAYS2                    Sentence

1  scientist to isolate meaningfully any particular figure.

2  Correlation and causation are two very different things as the

3  cliché would have it and correctly so.

4          So I am wondering whether this is bit of a side issue.

5          MR. MARCUS-AMELKIN:  I understand.  I will just note

6  that first study was cited from the Washington Post on

7  March 22nd, 2018.  I can pass up the materials if the Court is

8  interested.

9          I would note just taking a step back and why this is

10 important is because of Mr. Sayoc's mental illness this type of

11 rhetoric deeply affected him because he so greatly admired the

12 President.  It is impossible, I believe, to separate the

13 political climate and his mental illness when we're talking

14 about the slow boil and his obsessional beliefs.

15         THE COURT:  Let's take everything you have just said

16 as undisputed, but I think it will be in part disputed in a

17 minute.  So just accepting it for the moment.

18         MR. MARCUS-AMELKIN:  Right.

19         THE COURT:  I have to look at a whole bunch of factors

20 under Section 3553(a).  I have to look at the nature of the

21 offense, which was by any measure terrible.  I have to look at

22 the deterrent effect.  Yes, I understand that the argument or

23 the opinion of Dr. First that he is unlikely if he goes onto --

24 I think steroids was a big part of this.  Both doctors agreed

25 to that.  And if he is on steroids, Mr. Hyde becomes

J856SAYS2                        Sentence

 1   Dr. Jekyll.

 2          Again, I also have to look at general deterrence.  I

 3   have to look at just punishment, etc.  So what about all that?

 4   Assuming everything you have just said, how far does it cut?

 5          MR. MARCUS-AMELKIN:  I think I have plenty to say

 6   about all of that, but the main thing I want to say is this:

 7   10 years is not a slap on the wrist.  We combed the country for

 8   similar cases.  It is in line I think with similarly situated

 9   defendants.  It is long enough to punish him.  It's long enough

10   to deter him.

11          First off, you will hear from him.  He is individually

12   deterred.  He is very, very sorry and very, very ashamed.

13   Studies say as to general deterrence it is the fact that you

14   will be caught and prosecuted and punished that is far more

15   deterring than it is how long you are going to give a person in

16   jail.  Mr. Sayoc was caught so quickly and so effectively I

17   think it shows to people that if you are going to try a stunt

18   like this, you are going to pay severely.

19          I don't think anybody in this room wouldn't think

20   about 10 years -- all of your time in college, all of your time

21   in law school, you clerked for judges -- as a very long period

22   of time and not being a significant portion of your life.

23          THE COURT:  Well, law school admittedly is cruel and

24   unusual, but he wasn't subjected to that.

25          MR. MARCUS-AMELKIN:  Right.  You and I were, your

J856SAYS2                        Sentence

1    Honor.

2            I think that you have to put these devices in the

3    framework of our sentencing structure.  If you give life in a

4    case like this, it does not allow for greater punishment for

5    far worse conduct.  Not a single person was injured here.  It

6    scary and this was serious.  We all agree.  Mr. Sayoc agrees.

7    But a bomb sent in the mail goes off or designed to go off,

8    which this was not, where people are injured or somebody dies

9    or a lot of people die, that's an appropriate time to consider

10   a life sentence under our sentencing structure; but these

11   devices were not functioning and the chances of them injuring

12   anyone was remote.

13           The parties agree that they had energetic material.

14   We are not arguing about that.  It seems that there is

15   disagreement about how likely they were to hurt anyone, but you

16   heard from Mr. Finnerty.  This all comes down really to a

17   question of chemistry, but we have a lot of information.  None

18   detonated.  None sparked or caught fire in the mail stream.

19   These things were in the mail -- several of them -- for a

20   significant period of time.

21           THE COURT:  The question is whether that was because

22   he just poorly designed them or because he did not intend, even

23   in the angry state he was in, to actually have them explode.  I

24   think the government points out that he was studying how to

25   build these things for some time.

J856SAYS2                    Sentence

1              MR. MARCUS-AMELKIN:  Well, we take issue with this.

2    He watched one YouTube video.

3              If you have a zero out of a hundred on a test, you are

4    trying to get all the questions wrong; right?  Like, if you are

5    just guessing, you are going to get 50 percent.

6              Everything was wrong with these devices.  Everything.

7    The fact of the matter is you are using solder wire, which

8    cannot heat the mixture.  You are not attaching that solder

9    wire to any igniter.  The clock, which is purchased at a swap

10   shop, still has the plastic numbers written on it and most if

11   not half of the batteries are dead and the wires are not

12   connected to the batteries.  And you are putting a sticker of

13   the ISIS flag and the person who is being attacked with a big X

14   over their face.  These things were designed to be opened and

15   scare the crap out of you.  Because if you put them in the mail

16   in south Florida and they are going up here and you expect that

17   they are going to blow up at a certain time, you have no idea

18   when that is going to happen.

19              More to the point, beyond all that --

20              THE COURT:  But why should I, assuming again for the

21   sake of argument everything you just said in the last minute or

22   two, credit your argument that he had no idea that this would

23   cause such fear and terror?  More broadly you send an operative

24   pipe bomb to various high-level political figures intending --

25   if I understand your argument -- that they will react with

J856SAYS2                    Sentence

1    great fear and that it will be punishment for their wrongful

2    political views or deter them from future wrongful political

3    views or whatever it is the view was, how could he not realize

4    when you are dealing in that way with such high-visibility

5    figures it would send a current of fear throughout the country?

6             MR. MARCUS-AMELKIN:  I think that he simply was not

7    thinking rationally and I think that he is a man living alone

8    in a van whose life is online to some extent and he is focused

9    on this these people as if almost he has a relationship with

10   them.  He is angry at them for things that affected him

11   personally.  Obviously they have no idea that his van was

12   vandalism or someone threw something at him or gave him the

13   finger.  And he wanted to respond to these people who he felt

14   were the leaders of this resistance against him personally.

15   Now, that is not rational to me and I can't imagine that it is

16   rational to you, but I think he slowly realized with the source

17   device arriving and it being in the newspaper and seeing it on

18   TV, wow, this is a big deal.

19             Now, the government is right he did send a couple more

20   after that.  I think that goes to his state of mind, that he

21   was in this slow boil of obsession.  He was so focused and

22   ramped up that he just simply was not thinking clearly about

23   the ramifications of his actions.  Because, you know, he is not

24   somebody standing here on principle today and saying, I did it

25   for the love of country and it was the right thing to do.  He

J856SAYS2                          Sentence

1   is really, really sorry and really afraid.  I think that he is

2   afraid because he didn't realize just how serious this was

3   until the moment he was arrested or the moment he found out

4   that he is facing life in prison.

5          I think it was a slow progression, but it was also a

6   deescalation over the past months where the steroids left his

7   system, the tears of regret flowed freely and he is a different

8   person here today.  Still mentally ill.  Still with a lot of

9   things that need to be figured out, but no longer dangerous and

10  no longer boiling under the effects of steroids.

11         I think that his record at the MCC should give you

12  some comfort if you take our recommendation.  Number one, he

13  pleaded guilty and did not go to trial.  We knew that these

14  devices were bad.  There were arguments to be made if he was to

15  proceed, but he took responsibility for his actions.  He pled

16  guilty to 65 counts before this Court with the understanding

17  that he would be spending most of the rest of his life in

18  prison.  Assuming that if he lived the life expectancy, he

19  might have less than 10 years left if he gets the sentence that

20  we're asking for.

21         He has dedicated himself to the MCC.  His transcript

22  is incredible.  Every single class he could possibly take he

23  has taken.  Every activity he could do, he has done.  He has

24  had no disciplinary records.  There is also the added factor

25  that his family is now stronger and there for him in a way that

J856SAYS2                    Sentence

1    they were not before.  That is not an insult to his family.  He

2    will admit to you freely that he was a difficult guy at the

3    times when he was on steroids and his mom wanted him to get

4    help and he didn't feel he needed it.  Now he and his mom are

5    talking almost every day.  He is talking to his sisters.  He is

6    talking to old friends that he hasn't seen for a long time.  I

7    think the fact that so many people showed up and put in letters

8    for him is indicative of these rebuilding of relationships.

9           Finally and the most important thing about the MCC and

10   his time since he has been arrested, is that this is a man who

11   was willing to get help.  He wants it.  He knows he needs it

12   and he is willing to take it.  I think that wherever he gets

13   sent, he will continue to seek help.  He will seek

14   psychological counseling.  He will stay on the psychological

15   medication he has been prescribed.  And when he gets home, he

16   will do the gold standard of supervised release, whatever the

17   Court wants, to stay safe and to stay in the community.

18          So altogether we're asking for 121 months.  The

19   guidelines are not appropriate here.  His history and

20   characteristics, he was mentally ill.  He suffered terribly in

21   his life and he was not thinking clearly.  We know from every

22   study that the elderly pose less of a risk to society.  At 67

23   as gets older and older, he becomes less of a risk.

24          I look to the ultimate conclusions by both of our

25   experts.  Dr. Pope opined that if Mr. Sayoc had not been using

J856SAYS2                    Sentence

1   steroids in 2018 the alleged offenses would -- the crimes --
2   strike alleged -- the crimes would not have happened.  If he
3   stopped using, which he most certainly will, it is very remote
4   that he would ever commit a crime of comparable magnitude.
5   Dr. First, found that Mr. Sayoc was suffering from a
6   personality disorder with the effects of a steroid-introduced
7   mental disorder with manic like features.  At the time he
8   committed these offenses and as the psychiatric changes caused
9   by his steroid use worked in concert with his maladapted
10  personality traits, like emotional ability and suspiciousness
11  caused him to act in a self-destructive way.  You heard from
12  Dr. Pope and Dr. First that it is likely he will never -- I
13  know he will never use steroids again and he will be less of a
14  risk.
15          To the stature and circumstances of this crime, we
16  discussed it at length but I will just say again that a life
17  sentence does not give space for far less conduct.  Functioning
18  bombs, injuries, death -- none of which were here.  We have
19  provided dozen of similar cases.  The government tries to parse
20  them, but there are a lot of pages of cases and I think the
21  Court gets the point on that.
22          Finally, he is truly sorry.  He has accepted
23  responsibility and he can be safely managed in the community.
24          So for all of those reasons, your Honor, we ask that
25  you sentence him to a total of 121 months.

J856SAYS2                          Sentence

1              THE COURT:  Thank you very much.

2              Let me hear from the government.

3              MS. KIM:  Thank you, your Honor.

4              Your Honor, as the Court has said the defendant

5    created a climate of fear and terror across the country with

6    his conduct and he admitted as much on two occasions.  He

7    admitted before the Court that he wanted to scare and

8    intimidate people.

9              I would like to start off by walking through very

10   briefly the timeline of the defendant's conduct in October.  On

11   or about Wednesday, October 17th the defendant mailed his first

12   pipe bomb.  The next day, October 18th, he mailed two more pipe

13   bombs.  The next day, October 19th, he mailed three pipe bombs.

14   The next day, Saturday, October 20th, he mails three more pipe

15   bombs.

16             The following Monday, October 22nd, the defendant's

17   first pipe bomb is discovered at the residence of George Soros.

18   It makes national headlines and the defendant forwards the New

19   York Times article to 18 people.  The next day, October 23rd,

20   the defendant mails two additional pipe bombs and the

21   defendant's second pipe bomb is discovered at the residence of

22   Hillary Clinton.  Also on October 23rd, the defendant watches

23   television news from a store in Florida reveling in his conduct

24   and the national headlines that have been made from his

25   conduct.  He searches for the addresses of two additional

victims in efforts to prolong his attack.

          The next day, Wednesday, October 24th, five additional
IEDs are recovered and the following day, Thursday,
October 25th, the defendant mails two more pipe bombs and three
more pipe bombs are recovered.  On October 26th, the defendant
mails yet another pipe bomb and four bombs are recovered and he
is arrested.  Following his arrest, two additional pipe bombs
are recovered on October 29th and November 1st.

          This was how the defendant's terrorist attack
unfolded -- 16 pipe bombs recovered across the country over the
course of 10 days.

          In response to the defendant's terrorist attacks,
hundred of law enforcement officers were mobilized around the
country, thousands of postal employees were on alert for
suspicious packages, buildings and mail facilities were
evacuated, schools were ordered to shelter in place, and a
subway station in New York was temporarily closed.

          The defendant's campaign of terror was national in
reach and extremely serious.  The defendant is asking now for a
sentence of 121 months' imprisonment and that is wholly
insufficient.  Essentially what that would mean would be that
the defendant would get less than one year for each of his pipe
bombs.

          In terms of the capabilities of the defendant's IEDs,
the defendant has already admitted to the Court on two

J856SAYS2                      Sentence

1   occasions that first he packed the bombs with glass shrapnel

2   explosives and chemicals.  These were materials that he

3   selected that could cause an explosion and/or injury.  If he

4   had intended for these bombs to just be hoaxes, he could have

5   left them empty or he could have packed them with sand, but he

6   chose to put glass fragments into the bombs.

7            THE COURT:  What do you make of the fact that, first

8   of all, your own expert, Agent Finnerty, in a very long and

9   detailed report concludes that it was unlikely to say the least

10  that these bombs would go off because of the various way they

11  were designed -- the clocks were not set, the wires were not

12  attached and things like that?  So the fact that he put

13  menacing stuff in there made them a better hoax if you will,

14  but what reason is there to believe that he intended they would

15  actually go off?

16           MS. KIM:  Your Honor, first the defendant has stated

17  on two occasions before this Court that he knew that the IEDs

18  were capable of exploding and he knew there was a risk of harm

19  to people and property.  I don't think anyone doubts that the

20  fusing system here was not operable for any of the IEDs, but

21  the actual mixture within each pipe -- the mixture of pool

22  chemicals, the mixture of explosive material and mixture of

23  glass, that mixture was still capable of exploding.  And even

24  if the likelihood of explosion was remote, these IEDs were

25  still dangerous.  They were rendered safe either in the field

J856SAYS2                    Sentence

1   or they were transported down to Quantico in total containment

2   vessels because the FBI believed that they posed a danger.

3        We're not saying, your Honor, that these were the most

4   sophisticated bombs constructed, but certainly they did pose a

5   danger and they were handled.

6        THE COURT:  So the explosives, as I understand it,

7   were made up of the same materials used in firecrackers and

8   alike.  And as you heard from one of the defense experts, those

9   are routinely shipped all over the country without exploding.

10  It doesn't mean they don't have no potential of exploding.  It

11  does happen, but it is a very rare circumstance.

12       Pieces of broken glass, certainly one doesn't put that

13  into a package of this sort with loving intentions, but those

14  are not the kind of thing that are likely by themselves without

15  an explosion to cause serious injury.  And the chlorine, yes,

16  chlorine can cause burns; but chlorine is a product that is

17  routinely shipped all over the place without problems.

18       So I don't quite see why you think that he intended

19  the kinds of harm you are talking about.  You recognize that as

20  he indicated in court that there was at least a possibility of

21  this happening, but what I am focused on is what was his most

22  likely intent.  I am trying to find out whether you are saying

23  his intent was that these would go off, or his intent was not

24  or what.

25       MS. KIM:  Your Honor, I think first there is a

J856SAYS2                     Sentence

1   distinction between mailing fireworks commercially and mixing

2   up the explosive material with pool shock.  I am told that pool

3   shock can often result in what is called a hypergolic reaction,

4   which is a spontaneous reaction when mixed with other

5   chemicals.  And I think the combination of all these components

6   within a contained pipe that allows for the gases and the

7   pressure to build up, I am told is very different than mailing

8   commercial grade fireworks.

9           THE COURT:  That might be, but do you have any reason

10  to believe that he knew that?  This is something you only know

11  because of how you got into it through the FBI expert in this

12  case.  This is not a matter of common knowledge.

13          MS. KIM:  Certainly, your Honor.  I can point to two

14  things, your Honor.  The first is that in 2016 he did start

15  searching how to create mail bombs and how to create pipe

16  bombs.

17          THE COURT:  Forgive me for interrupting, but that's my

18  job.

19          The very fact that he started researching in advance,

20  which I accept and I think you have some good evidence of, does

21  that not show if he wanted to build a working pipe bomb, he

22  knew how to find out how to do it?

23          MS. KIM:  I would point to two things, your Honor.

24  The first is that the defendant has already admitted that he

25  believed that the IEDs were capable of exploding.

J856SAYS2                    Sentence

1          THE COURT:  Well, no.  We have been through that.

2     Those were limited admissions in my court, and I don't think

3     that that means that he was ever saying that he thought that it

4     was likely that these were going to explode.

5          MS. KIM:  I think, your Honor, the second indication

6     is that he as I mentioned earlier packaged these with

7     components that had the capacity to explode -- the shrapnel and

8     the explosive material.  In terms of his research and whether

9     or not he had the ability to create a more sophisticated bomb,

10     the government would submit that the defendant's deficiencies

11     as a bomb maker aren't at this stage something that he should

12     benefit from at the time of sentencing.

13          We'd also note that at the plea proceeding and in a

14     subsequent proceeding, the defendant admitted that he believed

15     or he knew that there was a risk that the bombs could hurt

16     people and property.  As I said earlier, your Honor, these may

17     not have been the most sophisticated bombs but they did pose a

18     danger and they posed a danger to all of the individuals -- the

19     U.S. Postal Service employees, the law enforcement officers,

20     the victims and their families and their colleagues who were in

21     the pathway of each IED.

22          Your Honor, with respect to the risk of recidivism

23     here and the danger that the defendant poses to the public, the

24     government would highlight again that this was not a whim or

25     reaction in one moment in time.  It was years and years of

J856SAYS2                    Sentence

1    hate, of threats and a desire to commit violence.  Those are

2    evidenced from messages and social media posts that the

3    defendant posted as far back as 2011.  He began to plan for his

4    attack in 2016.  His messages included assertions of wanting to

5    kill, to decapitate, to eliminate, and to exterminate.

6             Is it also worth noting, your Honor, once he started

7    mailing these bombs, he didn't stop until he was arrested.

8    After the first IED was recovered, he mailed approximately five

9    to seven additional bombs.

10            Your Honor, we'd also like to point to the defendant's

11   failure to fully accept responsibility.  He has tried to walk

12   away from his guilty plea with respect to the WMD counts.  He

13   has also tried to argue that he intended to injure property and

14   not people here.  The government would submit that this is

15   implausible.  There was no way that he would have been able to

16   detonate these bombs just to target property and not people.

17            The defendant has also offered a whole slew of excuses

18   blaming politicians, politics, victims, and the news media.

19            THE COURT:  I think on the one hand you're right that

20   like 99.9 percent of the defendants who appear before me, he

21   has excuses or justification aspects for this conduct.  On the

22   other hand, I am not particularly impressed neither by the

23   defense arguments that he is now incredibly remorseful.

24   Because there again in 99 percent of the cases I hear at

25   sentencing, Oh, I am so sorry, Judge, and sometimes all it

J856SAYS2                     Sentence

1    means is I am sorry that I was caught.  I don't know that this

2    aspect -- the remorse or lack of remorse -- whether he has

3    fully accepted responsibility or is just partially accepting

4    responsibility should mean much to me.  I don't see why that is

5    a rationally significant factor in my sentencing of him.  What

6    counts is what he did and what he intended at the time he did

7    it and not what he subsequently said either to me, you, his

8    lawyers or the world.

9            MS. KIM:  Your Honor, I think the point there is that

10   the defendant's failure to fully accept responsibility in the

11   government's mind shows that he doesn't appreciate the

12   seriousness of the conduct.  His comments that these were hoax

13   devices, decoys, it was just a joke minimizes the national

14   effect of his conduct, which we view to be extremely serious.

15           With respect to some of the excuses that the defendant

16   has advanced about politics and politicians, the government

17   would submit that politics cannot justify a terrorist attack.

18   Politics here cannot justify 16 bombs being mailed.

19           THE COURT:  Well, I've already indicated that I think

20   that argument by the defense is something of a sideshow in any

21   event.

22           MS. KIM:  Yes, your Honor.  One final note on

23   deterrence.  As the Court has recognized, the defendant

24   committed these crimes at the age of 57 and it appears that his

25   criminal history has in part in some ways escalated over time.

1          THE COURT:  What about the argument that his age is

2     really a mitigating factor?  At an absolute minimum, he will be

3     67 when he gets out presuming my acceptance of the defense

4     point of view.  Unless you totally dispute the steroid aspect

5     of the case, and I didn't see that you did but maybe I missed

6     that, the likelihood would seem low that he is going to commit

7     new crimes at that point.

8          MS. KIM:  Your Honor, I think that there is a point

9     here about general deterrence which the Court raised earlier,

10    and that is that the fundamental nature of the defendant's

11    crime is something that is extremely harmful to the public and

12    to the country.  So it is important for this Court to send a

13    message to the public that this type of conduct is

14    unacceptable.

15         THE COURT:  That is the general deterrence argument.

16         MS. KIM:  Yes, your Honor.

17         THE COURT:  That is not where you were going.

18         MS. KIM:  Your Honor, I don't know that there is any

19    guarantee if the defendant is released in 10 years that he will

20    not commit another crime or commit other acts of violence.

21         The defendant has self-reported about his steroid use

22    and there is certain things that the experts have testified to

23    and written up in their reports; but I think that a lot of

24    questions still remain unanswered.  We don't know what the

25    long-term effects are.  We don't know if he would comply with

J856SAYS2                    Sentence

1    treatment.

2          THE COURT:  Well, you chose, as certainly is your

3    right, not to put in any rebutting expert on this issue.  So at

4    this point that doesn't mean I am bound by what the two defense

5    experts say.  I have to make my own individual evaluation, but

6    here you have two very well credentialed doctors.  One of whom

7    has spent a good deal of his professional career studying

8    steroid use.  And I took the liberty of reading some of his

9    earlier studies just because I wanted to see what they were

10   like and I wanted to make sure I could get a good night's

11   sleep, but they do all come out the same way -- that excessive

12   steroid use leads to kinds of psychological impairments that

13   could lead one to violent action.

14         MS. KIM:  I think we would have two responses to that.

15   First is that there are many, many people in this country who

16   use steroids and this is, I believe, one of or perhaps the only

17   instance that I am aware of where someone who has self-reported

18   steroid use has then committed a terrorist attack involving 16

19   IEDs.  I did not see from the expert's past papers or from his

20   report any sort of indication of what the long-term effects are

21   of steroids.  I think that is still my understanding.  I think

22   that research is still somewhat unknown.  So I think because of

23   those components, there is no guarantee that the defendant

24   wouldn't commit additional acts of violence.

25         I would also note that when he was 40 years old that

J856SAYS2                     Sentence

1   is when he threatened to blow up the Florida Power and Light

2   Company.

3             THE COURT:  That was over the phone; right?

4             MS. KIM:  Yes, your Honor.

5             THE COURT:  In a fit of anger over some bill dispute.

6   I don't mean to minimize it in any way, shape or form.  I just

7   want to make sure I understand the context.

8             MS. KIM:  Yes, your Honor.  I don't believe he was

9   using steroids at that time and so I think the point here is

10  that we can't guarantee that he wouldn't continue to commit

11  crimes of this nature or to commit violent crimes.

12            Back to the point of general deterrence, your Honor.

13  We think that it's important for the Court to recognize that

14  the defendant here set out to terrorize people and he set out

15  to silence people who had beliefs that he did not agree with

16  who were government officials or former government officials

17  and he wanted to deter and chill political activity.  We

18  believe that that is extremely harmful to the public and to the

19  country and warrants substantial punishment.

20            For all these reasons, your Honor, the government

21  submits that a life sentence is warranted.

22            THE COURT:  Thank you very much.

23            I will hear briefly from defense in rebuttal and then

24  I will hear from the defendant if he wishes to be heard.

25            MR. MARCUS-AMELKIN:  Your Honor, I don't have a

J856SAYS2                          Sentence

1  rebuttal; but if the Court would like, I am certain that if the

2  Court asks Dr. Pope about the long-term effects, he would happy

3  to answer those questions if it will be useful in the Court's

4  sentencing determination.

5          THE COURT:  Let's put Dr. Pope back on the stand.

6          The Court reminds you that you are still under oath.

7          THE WITNESS:  Yes.

8          THE COURT:  So here is what I took from that point the

9  government counsel is making.  Some excessive use of certain

10  drugs can alter your brain more less permanently as I

11  understand it.  For example, that is one of the reasons that

12  heroin addiction is difficult to cure because it makes

13  permanent changes in your long-term memory and in other aspects

14  of your mental makeup whereas other drugs do not have that

15  effect.  They may temporarily derange you, but not permanently.

16          So do you have an opinion and have their been studies

17  as to whether the effects that you've been talking about that

18  steroids cause are permanent or go away or somewhere in

19  between?

20          THE WITNESS:  The short answer is the effects go away

21  within a matter of weeks.  There is no evidence that I am aware

22  of anywhere in the literature that aggression, irritability,

23  violence -- the types of effects that we have been discussing

24  today -- would persist for any period more than a few weeks

25  after stopping steroids.

J856SAYS2                      Sentence

1          THE COURT:  Did you want to put any questions to the

2   doctor?

3          MS. KIM:  No, your Honor.

4          THE COURT:  Thank you very much.

5          (Witness excused)

6          THE COURT:  I will hear from the defendant if he

7   wishes to be heard.

8          You don't have to stand up.  It is easier if you speak

9   into the microphone.

10         JUROR:  Your Honor, Jed S. Rakoff, the government, the

11  court, probation, FBI, the marshals, BOP, my attorneys, and

12  most of all the victims, I am beyond so very sorry for what I

13  did.  I am forever thankful to my superwoman mother, my

14  wonderful beautiful sisters, Mr. Ron Louis, my priest Father

15  McGuire, Lisa my God send spiritual advisor for traveling South

16  Florida to be here today, I am so very sorry for what I did and

17  have put you through.  I want to thank also my stepfather John,

18  family and friends who have supported me and my superheros in

19  heaven, my grandparents.  I am so sorry I am here today.

20         I prepared my speech in writing because I have --

21  because I knew that I would be emotional and forget some of the

22  things that I wanted to say to this Court, the victims, and

23  you, your Honor.  I have had a very hard time in life after my

24  dad left my mother, my two sisters and myself and stranded

25  and -- and strand -- and being sexual assaulted at a Catholic

J856SAYS2                         Sentence

1    boarding school.

2              I have always had a hard time struggling dyslexia,

3    opiates, PTSD, and my mental health disorders.  I have tried to

4    work hard and have a job all my entire life.  I have -- I have

5    had so many personal major tragedies that played a severe role

6    in my life and had a very devastating serious effect on my

7    future.  This placed me in a deep depression and I began using

8    mass amounts of steroids and drugs.

9              When I read -- when I read what I had wrote online and

10   now being sober and what I had did, I can't believe it what I

11   said.  Now that I am a sober man, I know I was a very sick man.

12   I should have listened to my mother, the love of my life.  She

13   told me to get help.  As she tried to help me, she seen me

14   struggle so very hard but I was in deep denial.

15             Your Honor, I understand now that I have committed a

16   serious crime.  I fully accept responsibility.  I am so very

17   sorry to all the victims whom I have caused pain and fear.  I

18   wish more than anything I could turn back time and take back

19   what I did.  But I want you to know, your Honor, with all my

20   heart and soul I feel the pain and suffering of these victims

21   and I will be apologizing to them for the rest of my life.

22             Thank you, your Honor.

23             THE COURT:  Thank you very much.

24             The Court will take a no-more-than-10-minute recess to

25   reflect on all that I have heard right now and we will resume

J856SAYS2                    Sentence

1    in 10 minutes for sentencing.

2             (Recess)

3             (Continued on next page)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  Since the instant sentence presents

2     difficult and somewhat recurring issues in sentencing, I am

3     setting forth my thoughts in a written opinion, to be read in

4     open court at the time of sentencing after taking account, not

5     only of the voluminous papers submitted by counsel for the

6     respective parties, but also the very helpful presentations

7     made at the sentencing hearing itself which I took a recess to

8     consider before finalizing the opinion.

9          In a nation like the United States, that rightly

10    places such a high value on individual autonomy, it is no small

11    thing to deprive a person of his or her freedom.  Prison,

12    moreover, is a harsh environment in which fear and misery are

13    never far from the surface, boredom is endemic, and privacy is

14    nil.  Accordingly, the Federal Criminal Code, in the

15    section governing the imposition of sentence requires a

16    sentencing Judge to, "impose a sentence sufficient but not

17    greater than necessary," to fulfill the purposes of sentencing.

18         To achieve this result is no easy task and, in my

19    view, cannot be meaningfully achieved by simply rubber-stamping

20    whatever the Sentencing Guidelines prescribe for a given case.

21    The guidelines deal of necessity with gross generalities, while

22    imposition of a just and fair sentence requires immersion in

23    all the individual fact and circumstances of a particular case.

24    It really comes down to a simple application of the Golden

25    Rule.  If any of us had had the misfortune to face sentencing,

J855sayS3                              sentence

who would we want to be sentenced by?  A Judge who primarily

focused on the abstract numbers prescribed by a distant

Commission, or a Judge who would look carefully at all the

particular facts and circumstances of our case?

        But, here again, the federal criminal code provides

helpful guidance.  The very first factors it directs a

sentencing judge to consider are "the nature and circumstances

of the offense, and the history and characteristics of the

defendant."  Let's consider each in turn.

        The nature and the circumstances of the instant

offenses are, by any measure, horrendous.  In late October

2018, the defendant mailed 16 improvised explosive devices --

commonly called pipe bombs -- to 13 victims around the country.

While none of the devices exploded -- a matter I will return to

later -- at the very least they were intended to strike fear

and terror into the minds of their victims and to intimidate

those victims -- mostly prominent political figures -- from

exercising their freedom.  To this end, reach pipe bomb was

accompanied by a photo of the intended victim, with a red "X"

through the victim's face, an obvious symbol of extermination.

Moreover, the defendant included in the pipe bombs not only

explosive powder but also chlorine and shards of glass

potentially capable of burning and maiming any victim not

killed by the putative explosion.

        In at least three instances involving Joseph Biden,

J855sayS3                    sentence

Hillary Clinton, and George Soros, the bombs were mailed to the
victims' homes, thus conveying the further message that no
place was safe from the predator's attacks.  Others were mailed
to public locations, thus occasioning the shutdown of postal
facilities, train stations, and even schools.  And,
predictably, the mailing of these mail bombs day after day
engendered widespread fear among the public generally.

          So, just who is the human being who perpetrated these
horrific acts of domestic terrorism?  Cesar Sayoc was himself,
it seems, a victim of physical and psychological violence as a
child, born with severe learning disabilities but by all
accounts eager to please.  He was abandoned by his father,
sexually abused by a teacher, and bullied by his fellow
students.  It was to avoid such attacks that he eventually
turned to steroids as a body building measure, but his
excessive use of steroids only made him more prone to obsessive
thoughts and compulsive acts.  He, nevertheless, was able to
finish high school and even managed a bit of college before
dropping out; but thereafter he failed to maintain steady
employment and in his impecunious situation, he frequently
engaged in petty theft.  This, in turn, resulted in various
criminal charges, mostly for theft but also including, in 2002,
a conviction for making a verbal bomb threat against his
electric company which might be viewed, in hindsight, as a
portent of worse to come.  In any event, Mr. Sayoc,

J855sayS3                       sentence

increasingly isolated from meaningful human interaction, began

living alone in a decrepit van, and made ever greater use of

steroids.  Deprived of any meaningful mental health treatment,

his sad existence bore all too great witness to how

dysfunctional life, even in our great society, can sometimes

be.

          It is perhaps then not surprising that someone of

Mr. Sayoc's emotionally fragile nature not only became

infatuated with a public figure -- in this case Donald Trump --

but also came to view Mr. Trump's political opponents as demons

who were out to destroy not just Mr. Trump but Mr. Sayoc as

well.  While Mr. Sayoc was never insane in the technical legal

sense of that word -- and his lawyers do not contend

otherwise -- he clearly became obsessive and paranoiac, and it

was in this state, made still worse by his steroid abuse, that

he decided to commit the crimes for which he is now to be

sentenced.

          Does any of this matter?  Should an understanding of

the combination of unfortunate circumstances that might cause a

troubled person like Mr. Sayoc to commit the horrendous deeds

here in issue make any difference to his sentencing?  Within

modest limits, the law of the United States says, yes, that the

personal characteristics, circumstances, and background of the

defendant are relevant to sentencing, at least insofar as they

help explain in some sense why he did what he did and with what

J855sayS3                      sentence

degree of culpability.

One aspect of this is that our criminal law, from time immemorial, has measured the degree to which even the most heinous offenses should be punished by taking account of the defendant's mental state, his "intent," at the time he committed the crime.  Thus, even in the case of murder, we make critical distinctions between someone who commits a premeditated murder, someone who commits a murder in the heat of passion, someone who unintentionally causes a victim's death through reckless behavior, and someone whose actions result in a victim's death purely by accident -- and the degree of punishment we mete out in these different circumstances varies accordingly.  What this shows is that we, as a society, have concluded that a defendant's intent -- what he meant to do -- is as important as his actions, and that we should reserve our most severe punishments for those whose intentions are without any justification or excuse.

This does not mean that we can ignore for one moment a defendant's actions or their consequences.  Nor does it mean that we can ignore the other important factors that federal law requires a judge to consider in imposing sentence, including the need to protect the public from further crimes of the defendant, the need for more general deterrence of others tempted to commit such crimes, and most broadly the need for the sentence, in the words of the statute, "to reflect the

J855sayS3                      sentence

1    seriousness of the offense, to promote respect for the law, and

2    to provide just punishment for the offense."  In this case, all

3    those factors support imposition of a lengthy sentence.

4           But, the issue that is most in dispute in this case,

5    and one that, for the reasons already mentioned, ought to and

6    does make a difference, is the issue of Mr. Sayoc's intent.  It

7    is common ground between the parties that his pipe bombs were

8    constructed in such a way that though there was an outside risk

9    they might explode, they were quite unlikely to do so.  For

10   example, the pipe bombs were controlled by timers that were

11   never set to go off.  More generally, in the government's own

12   words, "the fusing, i.e. the wiring on the devices, was

13   inoperable."

14          Was this, as the government argues, simply because

15   Mr. Sayoc was a careless or unskilled pipe bomber whose intent,

16   nevertheless, was to maim or kill his victims?  Or, was it as

17   the defense argues, because he never intended to cause physical

18   harm to his victims but rather simply to scare them, express

19   his hatred for them, and intimidate them from acting by

20   exposing their vulnerability?

21          Given Mr. Sayoc's psychological frailties, this is not

22   an easy question to answer.  But, I conclude in the end that

23   Mr. Sayoc, though no firearms expert, was fully capable of

24   concocting pipe bombs capable of exploding.  Indeed, as the

25   government itself points out, he spent weeks studying YouTube

J855sayS3                    sentence

1    instructions on how to make an effective pipe bomb.  His

2    decision to instead design the pipe bombs so they would not

3    likely explode was, in the Court's view, a conscious choice.

4    He hated his victims, he wished them no good, but he was not so

5    lost as to wish them dead, at least not by his own hand.  But,

6    please do not misunderstand.  This mitigating factor is just

7    one of many factors that, as already noted, the Court is

8    required by federal law to consider.  In this Court's view, it

9    means it would be inappropriate for the Court to impose the

10   very highest sentence available to it -- life imprisonment

11   without parole -- despite the government's ardent arguments for

12   such a sentence.  But it by no means follows that, as the

13   defense would have it, the Court should impose the most modest

14   sentence available to it in this case, namely 10 years and one

15   month.  Even though, thank God, no one was injured, the crimes

16   were far too horrible to warrant such a relatively lenient

17   punishment.

18        Accordingly, it is the sentence of this Court that the

19   defendant is sentenced to 240 months, that is, 20 years in

20   prison, to be followed by five years of supervised release on

21   the terms and conditions to be specified orally after I

22   conclude my written remarks.  Since Mr. Sayoc is 57 years old

23   and since federal law did does not permit parole, the

24   likelihood is that Mr. Sayoc, even if he proves to be a model

25   prisoner and qualifies for so-called good time, will be about

J855sayS3                          sentence

75 years old before he can be released.  No one can pretend

that this is not, in real terms, substantial punishment but, in

the Court's view, it is no more, and no less, than he deserves.

          Now I will turn now to supervised release.  A

five-year term of supervised release will be imposed.  This

will include the mandatory conditions that he not commit any

other federal, state or local crime, that he not unlawfully

possess a controlled substance, that he cooperate in the

collection of DNA, and that with within 15 days of his release

from imprisonment he will be subject to a drug test, to be

followed by at least two periodic drug tests thereafter as

determined by the probation office.

          There will also be imposed the standard conditions 1

through 12, they appear on the face of the judgment and will be

gone over with the defendant by the probation officer after the

defendant begins his period of supervised release.

          There will also be imposed the following special

conditions:

          First, that the defendant will participate in an

outpatient drug treatment program under standard terms and

conditions; second, that the defendant will participate in an

outpatient mental health treatment program under standard

conditions; and third, that the defendant, within 72 hours of

his release from prison, will report to the nearest probation

office to begin his period of supervised release.  And, he will

J855sayS3                         sentence

1   be supervised by the district of his residence.

2            The only other aspects of sentence are the fine and

3   special assessment.  No fine will be imposed because the Court

4   makes the finding that the defendant is not in position to pay

5   any meaningful fine either now or in the foreseeable future.

6   There is, however, a special assessment of $6,500 that must be

7   paid and it must be paid no later than at the conclusion of his

8   supervised release period.

9            Now, before I advise the defendant of his right of

10  appeal, is there anything else that either counsel wishes to

11  raise with the Court?

12           Anything from the government?

13           MS. KIM:  Your Honor, there is an underlying

14  indictment which the government moves to dismiss.

15           THE COURT:  Yes.  That motion is granted.

16           MR. MARCUS-AMELKIN:  Your Honor, we have two matters.

17  The first is that we request he be designated as close to the

18  south Florida area as possible where he can receive both mental

19  health and drug treatment, and if he is able to participate in

20  the Residential Drug Treatment Program.  We understand probably

21  he would not receive, necessarily, a benefit to his sentence

22  time but at least he would benefit from that program.

23           THE COURT:  Well, I will recommend south Florida,

24  although as you know I can't order that, that's up to the

25  Bureau of Prisons.  But, I will recommend it.

J855sayS3                     sentence

1           I don't think I will recommend the residential drug

2    treatment program first because, in practical terms, that

3    detracts from the sentence and I think I have already given the

4    lowest sentence I could reasonably give him; and secondly,

5    because according to the two defense experts, at least for now

6    while he may need mental health treatment, he doesn't need drug

7    treatment.

8           MR. MARCUS-AMELKIN:  Understood, your Honor.

9           THE COURT:  All right?

10          MR. MARCUS-AMELKIN:  The second matter I was going to

11   ask is if it is possible for Mr. Sayoc to receive a visitor in

12   the non-contact visiting booth from his mother and sister at

13   the conclusion of the case?  Because he has not had a visitor

14   the entire time he has been incarcerated.

15          THE COURT:  Well, that can be arranged with the

16   marshals, that's fine with me, but I leave it to their

17   discretion as to whether that is something that can be

18   meaningfully done under these circumstances.

19          MR. MARCUS-AMELKIN:  Thank you, your Honor.

20          THE COURT:  Mr. Sayoc, you have a right to appeal this

21   sentence.  Do you understand?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  And if you can't afford counsel for the

24   appeal, the Court will appoint one for you free of charge.

25          Do you understand that?

J855sayS3                          sentence

1               THE DEFENDANT:  Yes, sir.

2               THE COURT:  Very good.  Thanks a lot.

3                               o0o

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25